UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DIARIO EL PAIS, S.L. and PRISACOM, S.A.,

Plaintiffs,

v.

THE NIELSEN COMPANY (US), INC.,

Defendant.

07-CV-11295 (HB)

## DECLARATION OF WILLIAM J. TAYLOR, JR.

WILLIAM J. TAYLOR, JR. declares pursuant to 28 U.S.C. § 1746:

1.    I am an attorney associated with the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019-6064, counsel for defendant The Nielsen Company (US), Inc. in the above-captioned action.

2.    Attached hereto as Exhibit A is a true and correct copy of the Complaint filed in this action by plaintiffs Diario El Pais, S.L. and Prisacom, S.A., dated December 17, 2007.

3.    Attached hereto as Exhibit B is a true and correct copy of a certified English translation of the Service Contract entered into between Netratings Spain, S.L. and Prisacom, S.A., dated July 26, 2005.

4.    Attached hereto as Exhibit C is a true and correct copy of the original Service Contract entered into between Netratings Spain, S.L. and Prisacom, S.A., dated July 26, 2005.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York, New York
February 8, 2008

_____
WILLIAM J. TAYLOR, JR.

# Exhibit A

Judge McMahon

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**07 CV 11295**

DIARIO EL PAIS, S.L. and PRISACOM, S.A.,    )
                                            )    Case No. _____
            Plaintiffs,                     )
                                            )
        v.                                  )
                                            )    **COMPLAINT**
THE NIELSEN COMPANY (US), INC.,             )
                                            )
            Defendant.                      )
                                            )

RECEIVED
DEC 17 2007
U.S.D.C. S.D. N.Y.
CASHIERS

  Plaintiffs Diario El Pais, S.L. ("El Pais") and Prisacom, S.A. ("Prisacom" and,
collectively with El Pais, "Plaintiffs") seek monetary relief from defendant The Nielsen
Company (US), Inc., ("Nielsen") for publishing false statements regarding Nielsen's estimation
of the audience of Plaintiffs' website elpais.com. Nielsen's audience estimations are the
"currency" used by advertisers and advertising agencies to determine whether and if so how
much to allocate to purchasing advertising space among competing websites. As more fully
alleged herein, Nielsen has violated New York law in connection with its publication of false and
misleading estimations of the audience of elpais.com. In support of their claims, Plaintiffs, upon
information and belief, allege as follows:

## NATURE OF THE ACTION

  1.  Plaintiff El Pais is the owner of *El Pais*, Spain's most widely read daily
newspaper. Plaintiff Prisacom, through its agreement with El Pais, owns and operates
elpais.com, the online version of *El Pais*. El Pais and Prisacom are each part of the Promotora de
Informaciones, S.A. media conglomerate ("Grupo Prisa"). Prisacom generates revenue by
selling space on its webpages to advertisers.

- 2 -

2.      Defendant is the leading provider of online audience estimates in Spain. Defendant's estimates, and rankings produced from those estimates, are one of the most important criteria relied upon by advertisers and advertising agencies in determining how to allocate an advertising budget among competing websites.

3.      At all times, Defendant understood that its estimates of elpais.com's audience and elpais.com's ranking in large measure determined how much advertising revenue elpais.com could earn.

4.      Defendant collects data from a panel of users, and uses that data to produce estimates of any given website's total audience.  Prior to March 2007, the panel from which Defendant collected data was composed of 4,000 users who connected to the internet from their homes.  Under this pre-March 2007 system, Defendant estimated that elpais.com grew its audience from 1.76 million unique users in August 2006 to 2.37 million unique users in February 2007.  These estimates, which were consistent with the trend in data collected and measured by Plaintiffs internally, determined that elpais.com was, save for December 2006, the #2 media website in Spain over this period.

5.      In March 2007, Defendant unilaterally changed both the size and composition of its panel of users as well as the methodology by which Defendant collected and analyzed the data collected from the panel.  Despite these changes, which produced unexplained market-wide increases in nearly all of Defendant's estimates, elpais.com remained the #2 ranked media website in March 2007 and remained so until July 23, 2007 when Defendant announced that elpais.com had become the #1 ranked media website in Spain as of June 2007.  Defendant's estimates, which showed the continued erosion of the gap between elpais.com and the market leader over this period, were consistent with the trend in data collected and measured by Plaintiffs internally.

6.      On September 21, 2007, elpais.com's competitors published news articles that Defendant intended to reduce its estimate of elpais.com's audience by as much as 20% for August 2007 due to an alleged over-inclusion of certain data (the "Competitor Reports").  These

- 3 -

media reports cited persons within Defendant's Nielsen Online service as the source of the information reported therein.

7.    Plaintiffs first learned of the alleged error in Defendant's estimates of its audience by reading the Competitor Reports.

8.    Immediately upon learning of the substance of the Competitor Reports, Prisacom called Defendant and demanded an explanation. Defendant had no explanation to offer Prisacom at that time, but assured Prisacom that no action would be taken without a complete and thorough review of the data. Over the next three days, Prisacom and Defendant participated in a series of telephone calls and meetings during which Prisacom repeatedly notified Defendant that, absent a complete and unimpeachable explanation as to the reasons why its estimates of elpais.com's audience were overstated, any immediate reduction in Defendant's estimate of elpais.com's audience was both premature and, potentially, inappropriate. In addition, Prisacom expressly put Defendant on notice of the material and significant negative effect that a downward revision of Defendant's estimate of elpais.com's audience would have on Plaintiffs' businesses. Responding to Prisacom's concerns, Defendant agreed not to publish any revised data for August 2007 for elpais.com until Prisacom had been given an opportunity to both review the data and receive a full explanation for any material downward revisions to its estimate of elpais.com's audience.

9.    Despite Defendant's assurances, however, Defendant published data for August 2007 on September 25, 2007 (the "August Data") without first consulting with Prisacom or providing any explanations for the results published therein. The August Data showed a decrease in Defendant's estimate of elpais.com's audience (when compared with Defendant's estimates of July 2007) of more than 1.8 million unique viewers (representing a reduction of more than 37% of elpais.com's total audience from its July 2007 totals), resulting in a downgrading of elpais.com's ranking from #1 to #3 among Spanish media websites.

10.    Defendant's publication of the August Data on September 25, 2007 was widely and immediately reported by elpais.com's competitors.

- 4 -

11.    On September 26, 2007, the International President of Nielsen Online, Jonathan Carson, wrote to Plaintiffs from his office in New York apologizing for violating the agreement not to publish the August Data without giving Plaintiffs an opportunity to review the data and without an explanation justifying the downward revision reported therein.

12.    On November 1, 2007, Defendant published data for September 2007 (the "September Data"). Defendant's September Data was consistent with the August Data in that Defendant stated that elpais.com's audience ranked only third among media websites in Spain.

13.    On November 28, 2007, Defendant published revised monthly data for March through July 2007 (the "Revised Nielsen Data"). The Revised Nielsen Data showed a reduction in Defendant's estimates of elpais.com's audience for each month from data originally published by Defendant in the following amounts: March (24%); April (31%); May (26%); June (33%); and, July (34%).

14.    Defendant's data for the March to September 2007 period is materially and significantly inconsistent with the trends noted in the data collected and measured internally by Plaintiffs.

15.    In relation to the publication of the August Data, Defendant delivered a report, entitled "Elpais.com – Correction of Reported Standard Metrics: March – July 2007" (the "Nielsen Report"), to Prisacom that purportedly explained the reasons justifying Defendant's actions. Notably, the Nielsen Report did not provide any details regarding how Defendant calculated the data for elpais.com as reported in the August Data.

16.    Prisacom conducted a thorough review of its systems and data to verify the accuracy and veracity of the general justifications given in the Nielsen Report for the downward revision of Defendant's estimate of elpais.com's audience for August 2007. Prisacom determined Defendant's explanations, as stated in the Nielsen Report, were either materially incomplete and/or entirely without merit.

17.    To date, Defendant has refused to either (i) provide an accurate and complete explanation as to why elpais.com's audience, as estimated by Defendant for the period March to

- 5 -

July 2007, were overstated or (ii) retract the downward revisions to its estimates of elpais.com's audience as reported in the August Data, the September Data and the Revised Nielsen Data.

18.    As a result of Defendant's unwarranted downward revision of Defendant's estimate of elpais.com's audience, Plaintiff estimates that, in this calendar year alone, it will lose more than €1 million in advertising revenue.  Plaintiff further expects that its losses will increase arithmetically, if not exponentially, in the coming months and years unless Defendant takes sufficient steps to correct the serious and systemic errors in Defendant's methodology and, once corrected, restate all of the data published by Defendant since March 2007.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction of this matter based on 28 U.S.C. § 1332.  Plaintiffs are corporations incorporated under the laws of Spain and have their principal places of business in Madrid, Spain.  Defendant is a subsidiary of the Nielsen Company B.V., a Netherlands corporation, and has its principal place of business in New York.  The amount in controversy exceeds, exclusive of interest and costs, the sum specified in 28 U.S.C. § 1332.

20.    This Court has personal jurisdiction over Defendant because it resides in this judicial district.

21.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a).

## PARTIES

22.    Plaintiff El Pais owns and publishes *El Pais*, one of several media entities owned by Grupo Prisa.  *El Pais* is Spain's most widely read newspaper with a circulation of approximately 430,000 copies a day.  El Pais relies heavily on revenue generated by the sale of advertising to meet its production budget.

23.    Plaintiff Prisacom controls the rights to and operates the various websites owned by the various Grupo Prisa companies, including the digital version of *El Pais*, elpais.com.  Prisacom, through its various online media, targets users and advertisers both in Spain and elsewhere.  In particular, Prisacom targets users and advertisers among the Spanish-speaking

- 6 -

population of the United States, including New York State. Prisacom's main source of income derives from sale of space on its various media websites to advertisers and advertising firms.

24.     Defendant Nielsen is the world's leading provider of marketing information, audience measurement, and business media products and services. Nielsen services clients in more than 100 countries with a global team that is headquartered in New York, New York and Haarlem, The Netherlands. Nielsen Online (also known as "Nielsen Net Ratings" or "NNR"), a service of Defendant, measures and analyzes online audiences, advertising, video, consumer-generated media, word of mouth, commerce, and consumer behavior, and includes products previously marketed under the Nielsen//Netratings and Nielsen BuzzMetrics brands.

## THE NIELSEN RATING SYSTEM

25.     As it does for traditional media such as television, Defendant calculates ratings based on a statistical analysis of data collected from a panel of randomly selected internet users.

26.     Nielsen, through its NNR service, is the leading provider of online media audience measurements in Spain, which it calculates from a sample of online users (the "NNR Panel"). Defendant supplies each member of the NNR Panel with a "box" that, through proprietary software, tracks each member's internet activity.

27.     Defendant uses the raw data collected from the NNR Panelists and, using a proprietary methodology, produces a report that purports to rank the most popular websites in each particular geographic location by audience size. In the online world, audience size is measured by the number of "unique users" that view a website each month. According to Defendant, "unique users" are measured by the number of distinct users that view any page belonging to a website during any given month.

28.     Defendant uses the data collected from the NNR Panel to determine the percentage of NNR Panelists that have viewed any particular website during the previous month. From that data, Defendant calculates and publishes an estimate of the total audience for that website. Defendant also publishes a ranking of all measured websites based on their respective

estimated number of their unique users.  Defendant publishes its audience estimates to its clients, which include media companies such as Prisacom and many of the advertisers and advertising firms that are Prisacom's actual and potential customers.

29.    Defendant's estimates of audience and the rankings resulting from the NNR unique user statistics, are the "currency" by which advertisers and their agencies allocate advertising spending among online media outlets in Spain.

30.    Prisacom relies on Defendant to produce accurate and reliable ratings for its various media sites, including elpais.com.

31.    Defendant has publicly held out its methodology as producing accurate and reliable data upon which companies can base their strategic decisions.  For example, Defendant has publicly stated that:

> o    "Thanks to their reliability and accuracy, the market research and audience analysis solutions offered by Nielsen//NetRatings allow you to base your strategic decisions on these results, and thus become more competitive."

> o    "NetView provides the most reliable and actual information on online users, both for advertisers as well as agencies, businessmen and publicists."

> o    "Nielsen NetRatings -- The global standard for measuring and analyzing Internet audience."

> o    "Nielsen//NetRatings…is the world leader in audience measurement and Internet market investigation."

32.    Plaintiffs' understanding of the details of Defendant's methodology is limited. For each user in the panel, Defendant installs proprietary software in the user's computer (either directly on the computer or by way of some external hardware) which tracks the various uniform resource locators ("URLs", which are a website's address) that are "called" by the user's computer.

33.    By means of this software, Defendant can track the number of "page views" each measured website receives from members of the NNR Panel each month.  Likewise, Defendant also tracks how many "unique users", that is how many individual NNR Panelists, visited each

- 8 -

measured website over the prior month.  As each unique user can generate multiple page views, advertisers place a greater value on unique user statistics.  Indeed, the rankings, which are based primarily on NNR's unique user statistics, are the primary measurement of audience in the online world as advertisers are primarily focused on the number of individuals who will view their advertisement.

34.    By means of its proprietary methodology, Defendant estimates each measured website's audience from the data collected from the NNR Panel.

## ELPAIS.COM ATTAINS THE #1 NNR RATING

35.    As the following table shows, according to Defendant, with the exception of December 2006, elpais.com had been consistently rated as the #2 media website in Spain prior to March 2007.

Table 1:  Unique Users (000)

| Company | July 06 | Aug 06 | Sept 06 | Oct 06 | Nov 06 | Dec 06 | Jan 07 | Feb 07 |
|---|---|---|---|---|---|---|---|---|
| Elmundo.es | 2246 | 2226 | 2517 | 2510 | 2766 | 3168 | 2919 | 2672 |
| *Elpais.com* | *1699* | *1764* | *1993* | *2256* | *2355* | *2392* | *2602* | *2373* |
| Vocento Noticias | 1493 | 1728 | 1742 | 1852 | 1924 | 2823 | 2337 | 2266 |
| 20 Minutos | 619 | 574 | 937 | 928 | 1162 | 1011 | 1117 | 1117 |

Source:  Nielsen

36.    Moreover, over the course of 2006 through February 2007, the gap between elpais.com and the media category leader elmundo.es was closing: over this period, the estimated audience of elmundo.es grew by only 426,000 unique users (16%), while the estimated audience of elpais.com grew by 674,000 unique users (28%).  By February 2007, Defendants had reported that elpais.com trailed elmundo.es by only 299,000 unique users.

37.    The consistent and steady growth of elpais.com's audience between July 2006 and February 2007 as estimated by Defendant is consistent with the trends observed in data collected and measured internally by Plaintiffs.

38.    Prior to March 2007, the NNR Panel consisted of 4,000 users who connected to the internet from their homes ("Home Users") but did not capture any data from users who connected to the internet at work ("Work Users").

- 9 -

39.    Despite the fact that the NNR Panel did not include any Work Users prior to March 2007, Defendant maintained at the time, and continues to maintain through the present day, that the various statistics published by Defendant regarding the Spanish online market prior to March 2007, including the monthly ranking based on those statistics, were accurate.

40.    For this reason, Defendant cannot contest that elpais.com was the #2 media website in Spain in February 2007 and had been so for much of the prior year.

41.    In March 2007, Defendant unilaterally changed both the composition of the NNR Panel for Spain, as well as the methodology by which Defendant estimated each website's audience.  Specifically, Defendant increased the size of its panel of Home Users from 4,000 to 16,000 users and added 1,000 Work Users to the NNR Panel.

42.    Defendant has not made public a full explanation of the changes that were made as of March 2007 to the methodology by which the NNR unique user statistics are determined.

43.    Defendant continued to publicly tout the reliability and accuracy of its statistics, including the rankings based on those statistics.

44.    At no time did Defendant ever suggest that its pre-March 2007 statistics and the resulting rankings were inaccurate.

45.    At no time did Defendant ever suggest that its pre-March 2007 statistics were less accurate than the statistics published following the March 2007 changes to the NNR Panel and Defendant's methodology.

46.    As a result of these changes to the NNR Panel and Defendant's methodology, the March 2007 data for the Spanish market showed a market-wide increase of more than 23% in unique users over the prior month.  Elpais.com, and its closest competitors, all experienced growth as well.

47.    However, despite the increase in total unique users of elpais.com reported by Defendant in March 2007, elpais.com's relative ranking remained consistent with prior months: Defendant reported that elpais.com was still the #2 media website in Spain for March 2007.

48.    From March through May of 2007, elpais.com continued to narrow the gap between itself and the market leader elmundo.es in the rankings resulting from the NNR unique user statistics.  Finally, in July 2007, Defendant reported that elpais.com had become the market leader in June 2007.

49.    The consistent and steady growth of elpais.com's audience between March 2007 and June 2007 as estimated by Defendant is consistent with the trends observed in data collected and measured internally by Plaintiffs.

50.    At no time prior to September 21, 2007 did Defendant suggest that the data and estimates it had collected, analyzed, and published for June and July 2007 were in any way inaccurate or otherwise overstated the audience of elpais.com.

### DEFENDANT'S PUBLICATION OF THE AUGUST 2007 DATA

51.    On September 21, 2007, three of elpais.com's competitors (elmundo.es, adn.es, and 20minutos.es) published news articles, *i.e.*, the Competitor Reports, citing internal sources at Defendant who claimed that Defendant had erroneously inflated traffic to elpais.com by 20% by improperly including automatic calls to elpais.com's RSS page.  The Competitor Reports cited persons within Defendant's NNR business unit as the source of the information reported therein.

52.    RSS (really simple syndication) is a format used to publish frequently updated content.  RSS is commonly used by online media to syndicate news headlines to other websites.  By subscribing to a RSS feed, the receiving website can publish automatically updating headlines generated by a third party source.  In most instances, the website receiving the RSS feed will "call" the originating website automatically to receive the updated headlines.  Thus, this "call" to the originating website is an automated call.  Defendant's policy apparently is, in general, not to credit automated calls to the unique user count that forms the basis of the rankings, but rather to credit only user calls towards a website's audience.

53.    The elpais.com RSS page has been in existence since 2004.  There have been no material changes to the structure of the elpais.com RSS page, or to the means by which it may be

accessed, since 2004 until the end of September 2007. In September 2007, Prisacom made a minor change to the header of the elpais.com RSS page to respond to some of Defendant's expressed concerns.

54.    Immediately upon learning of the substance of the Competitor Reports, Prisacom contacted Defendant's local general manager, Gustavo Nunez, to inquire about the unnamed sources that were cited in, and the substance of, the Competitor Reports. Nunez confirmed that the elpais.com data was being audited due to a high percentage of traffic that had been observed on elpais.com's RSS page. During this September 21, 2007 phone call, Nunez commented that Defendant's preliminary review of the data indicated that as many as one million unique users had been improperly included in elpais.com's audience and that the matter was being reviewed in the United States. Nunez also stated that Defendant's review of the elpais.com data was undertaken in response to "pressure" from an internet measurement user association to which elpais.com's competitors belong, and admitted to being pressured by elpais.com's competitors to make a statement as to the results of Defendant's review. In response, Prisacom demanded that Nunez explain: (a) why it had not been informed of the review of elpais.com data when three other news outlets had already been informed, (b) the details of how the review of elpais.com data was being performed, and (c) why Defendant had not detected this alleged error in its methodology previously. Defendant refused to answer any of Prisacom's questions during this call.

55.    Subsequently on September 21, 2007, Nunez and David Sanchez, also of Nielsen, met in person with the Prisacom's executive team for elpais.com but refused to provide any guidance beyond what had been stated on the phone call earlier in the day. Despite his continued refusal to provide any further details or explanations, Nunez promised that Defendant would, prior to any publication of any revised data, provide Prisacom with an opportunity to review the data and provide Prisacom with a full explanation for any downward revisions to Defendant's estimate of elpais.com's audience. During this meeting, Nunez stated that the data for August

- 12 -

2007 would be published within the next two days and that this data would not reflect any downward revision to Defendant's estimate of elpais.com's audience.

56.    On September 22-23, 2007, Prisacom reviewed the matter internally and determined that the RSS page could not have generated a large number of invalid unique users.

57.    On September 22 and 23, 2007, Nunez notified Prisacom that the August Data would not be published on schedule, but rather during the course of the following week. For the first time, Nunez confirmed to Prisacom that Defendant intended to publish the August Data reflecting an "adjustment" to Defendant's estimate of elpais.com's audience. Nunez continued to assure Prisacom that it would be given both an opportunity to review the August Data and receive a full explanation justifying the downward revision to elpais.com's audience prior to publication of the August Data.

58.    On September 24, 2007, Prisacom conveyed to Defendant its belief that the elpais.com RSS page could not have caused a material overstatement of unique users for elpais.com generally.

59.    On September 24, 2007, Defendant and Prisacom participated in a conference call with Louise Ainsworth, Defendant's European Manager, and members of Defendant's international technical team, which was in charge of processing, analyzing, and publishing the August Data. During this call, Prisacom notified Ainsworth that (i) Defendant had not adequately explained to Prisacom the reasons justifying a reduction in elpais.com's audience, (ii) Prisacom did not believe that elpais.com's audience figures were overstated as Defendant's data was consistent with the trends in the data collected and measured by Plaintiffs internally, and (iii) any reduction in elpais.com's audience would have a material and significant effect on Plaintiffs' businesses. Ainsworth did not respond to any of these points. Ainsworth only represented to Prisacom that it would not publish the August Data until (i) Defendant had completed a full analysis of elpais.com's data, (ii) Prisacom had been given an opportunity to review and comment on the August Data, and (iii) Defendant had provided Plaintiffs with a full explanation justifying any downward revision in elpais.com's audience.

- 13 -

60.    On September 25, 2007, Defendant published the August Data.

61.    Defendant did not give Prisacom an opportunity to review the August Data in advance of publication.

62.    The August Data showed a reduction of 1.8 million unique viewers from Defendant's estimate of elpais.com's audience as reported for July 2007.  In the August 2007 ranking of Spanish media websites, elpais.com had fallen from #1 to #3.

63.    Defendant did not provide any explanation to Plaintiffs prior to its publication of the August Data that justified the significant and material reduction in elpais.com's audience.

64.    The reduction of elpais.com's audience, as estimated by Defendant, for August 2007 did not reflect the trend in data collected and measured internally by Plaintiffs.

65.    Immediately following Defendant's publication of the August Data, several media outlets published news articles that reported the reduction in elpais.com's audience and ranking.

66.    Defendant attempted to recall its publication of the August Data within hours after publication.

67.    Immediately following the publication of the August Data, Prisacom spoke with Ainsworth, who apologized for Defendant's premature publication of the August Data and stated that it was a result of an error by Defendant's technical team in the United States.

68.    Following the publication of the August Data on September 25, 2007, Prisacom informed Defendant during a conference call of several inconsistencies in Defendant's estimates of elpais.com's audience.  Defendant acknowledged these inconsistencies, but stated that its various estimates, as published, were accurate.  Defendants at that time notified Prisacom that they intended to again publish the August Data without any modifications.

69.    On September 26, 2007, Jonathan Carson, the International President of Nielsen Online in New York, wrote a letter to Manuel Mirat, the Chief Executive Officer of Prisacom. Carson confirmed in his letter that Defendant intended to republish the August Data.  Although Carson apologized for Defendant's breach of its promises to Plaintiffs not to publish the data before (i) providing Plaintiffs with an opportunity to review and comment on the August Data,

- 14 -

and (ii) providing Plaintiffs with a full explanation justifying any downward revision to Defendant's estimate of elpais.com's audience, Carson stated that Defendant did not intend to revise its estimates of elpais.com's audience prior to publication.

## DEFENDANTS' FLAWED METHODOLOGY

70. On September 26, 2007, in relation to its publication of the August Data, Defendant provided Prisacom with the Nielsen Report, which purported to provide a complete explanation for Defendants' decision to reduce its estimate of elpais.com's audience by more than 37% from the prior month.

71. The Nielsen Report concludes that, beginning in March 2007, Defendant had improperly counted automated calls to the elpais.com RSS page as unique viewers of elpais.com.

72. The Nielsen Report fails to establish, and Defendant has failed to verify, that each and every unique viewer that was excluded from elpais.com's audience was, in fact, an automated call rather than a user call.

73. Although Prisacom made numerous and consistent efforts to obtain a detailed explanation justifying Defendant's decision to exclude more than one million unique visitors from its estimates of elpais.com's audience, Defendant has, to date, given only perfunctory explanations, none of which withstands scrutiny.

74. There is no basis for Defendant to exclude more than one million unique visitors from its estimates of elpais.com's audience or for Defendant to have downgraded elpais.com from the #1 to #3 position in the rankings resulting from its statistics.

## INJURY

75. Defendant's unjustified exclusion of more than one million unique visitors to elpais.com has continued each and every month since the August Data was published on September 25, 2007.

76. Elpais.com's audience, as measured by Defendants, has been materially and significantly understated since the August Data was published on September 25, 2007.

- 15 -

77. Elpais.com has been improperly relegated to the #3 ranking among Spanish media sites since the August Data was published on September 25, 2007.

78. The direct and proximate result of Defendant's conduct as herein described has been a significant reduction in Prisacom's advertising revenue, which is expected to amount to in excess of €1 million for this calendar year alone and is expected to increase arithmetically, if not exponentially, over the coming months and years. Such lost revenue is due to both the loss of existing advertising as well as the loss of future advertisers who would have done business with Plaintiffs based on their #1 ranking.

79. Defendant's conduct as described herein has also directly and proximately caused significant damage to Plaintiffs' reputation. Plaintiffs have not only lost their #1 ranking in the ─ market, they have also lost credibility in the market by reason of Defendant's actions which may take years to restore.

## CLAIMS FOR RELIEF

### COUNT ONE
### Trade Libel

80. Plaintiffs repeat and reallege paragraphs 1 through 79 set forth above.

81. On information and belief, Defendant is aware that its estimates of elpais.com's audience are inaccurate and rest on a faulty methodology, and that their inaccurate estimates harm Plaintiffs. Defendant's publication of these inaccurate estimates of elpais.com's audience libels Plaintiffs by providing false data about elpais.com's audience to advertisers, thus causing Plaintiffs harm.

82. Defendant, which is a sophisticated and long-time participant in the provision of audience measurement, is conscious and aware that its flawed methodology causes harm to Plaintiffs.

- 16 -

83.    The provision of inaccurate estimates of elpais.com's audience has caused advertisers to reduce or cease altogether doing business with Plaintiffs, or to refrain from doing so in the future.

84.    As a result of Defendant's libel, Plaintiffs have sustained substantial special damages in the form of lost advertising revenue, the details of which will be given at the appropriate time in discovery.

85.    Plaintiffs are entitled to actual damages it may prove at trial.

## COUNT TWO
### Tortious And Negligent Interference With Prospective Economic Advantage

86.    Plaintiffs repeat and reallege paragraphs 1 through 85 set forth above.

87.    Plaintiffs' current and future advertising revenues are dependent on the accurate measurement of internet audience.

88.    These estimates of audience size are disseminated, both directly and indirectly, by Defendant to those advertisers and advertising firms with whom Plaintiffs have existing or prospective contractual relations.

89.    A special relationship of trust existed between Plaintiffs and Defendant.  Plaintiffs trusted Defendant to accurately collect, analyze, and distribute internet audience measurements. The fact that Defendant is the leading company that analyzes and publishes internet audience measurements for online media in Spain highlights the level of Plaintiffs' dependency on Defendant to perform their measurements accurately.

90.    At all material times, Defendant possessed and possesses knowledge of Plaintiffs' relationships with its current advertisers, and possesses knowledge that Plaintiffs may enter into contracts with other advertisers in the future.

91.    Plaintiffs are informed, and believe, and based thereon allege, that Defendant has committed and is committing the acts alleged in this Complaint, with reckless and willful disregard regarding the accuracy of its statistics, data and ratings.  This reckless and negligent conduct has reduced Defendant's estimates of elpais.com's audience and resulting ranking, and,

- 17 -

as a result, the advertising dollars earned by Plaintiffs.  Defendant's conduct has made Plaintiffs less attractive to potential advertisers, and directly results in diversion of advertising spending to other online media, as well as diminishing the value of existing contracts by artificially undervaluing the rates at which Plaintiffs can sell their advertising.  This has had and will have the tendency and effect of disrupting Plaintiffs' business relationships and prospective business relationships with their advertisers.

92.     Plaintiffs have already sustained substantial damages in the form of lost advertising revenue, and will continue to sustain such losses in the months and years to come.

## COUNT THREE
### Negligent Misrepresentation

93.     Plaintiffs repeat and reallege paragraphs 1 through 92 set forth above.

94.     A special relationship of trust existed between Plaintiffs and Defendant.  Plaintiffs trusted Defendant to accurately collect, analyze, and distribute internet audience ratings.  The fact that Defendant is the leading company that analyzes and publishes internet audience measurements for online media in Spain highlights the level of Plaintiffs' dependency on Defendant to perform their measurements accurately.  Additionally, Plaintiffs reasonably believed in, and relied upon, Defendant's self-represented expertise in audience measurement when conducting its online media business.

95.     Although Defendant knew that its estimates of elpais.com's audience and its resulting ranking were false and had no reasonable basis in fact, it nonetheless represented to Plaintiffs and the public that these statistics were accurate.

96.     Defendant knew that Plaintiffs used Defendant's audience measurements, including the resulting Rankings, for the purpose of soliciting advertisers, and that Plaintiffs intended to rely and act upon Defendant's audience measurements and the resulting Rankings for the purpose of soliciting advertisers.

97.     In reasonable reliance on Defendant's false representations, Plaintiffs did, in fact rely on Defendant's data to solicit advertisers.

- 18 -

98.    As a result of this reliance, Plaintiffs have sustained substantial damages, including a significant reduction in Prisacom's advertising revenue and damage to their business reputation.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    That the Court award Plaintiffs monetary damages in an amount to be finally determined at trial.

B.    That the Court award Plaintiffs such other relief as it may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Respectfully submitted,

William O. Purcell
Ethan E. Litwin
HOWREY LLP
Citigroup Center
153 East 53rd Street, 54th Floor
New York, NY 10022
(212) 896-6500

*Attorneys for Plaintiffs*

Dated:    December 17, 2007

Exhibit B

The LanguageWorks, Inc.
1123 Broadway
New York, NY 10010
Tel. 212 447 6060
Fax 212 447 6257

**Language** *Works*

STATE OF NEW YORK    )
                     )    ss
COUNTY OF NEW YORK   )

## <u>CERTIFICATION</u>

This is to certify that the attached, to the best of my knowledge and belief, is a true and

accurate translation into English of "Netratings Spain, S.L Unipersonal and Prisacom, S.A

," completed on 12/20/2007, originally written in Spanish.

*Karen D'Urso*

Karen D'Urso
Director of Production
The LanguageWorks, Inc.

Sworn to and subscribed before me,
This Fifth day of February, 2008.

Notary Public

GINA ST LAURENT
Notary Public, State of New York
No. 01ST6146442
Qualified in New York County
Commission Expires May 15, 2010

# SERVICE CONTRACT

CONTRACT NUMBER: 200507/280

Madrid, July 26, 2005

PARTY OF THE FIRST PART, Mr. Diego Semprún de Castellane, being of full legal age, a Spanish national, with head business office in Madrid, calle Velázquez, 86, gate B, Center Bottom, and having National Identification Document No. 5282205W,

acting for and on behalf of NETRATINGS Spain, S.L. Unipersonal, with head office at calle Velázquez, 86, gate B, Center Bottom, 28006 Madrid, with taxpayer ID B83841445. He is doing so in his capacity as Director (hereinafter NETRATINGS).

PARTY OF THE SECOND PART, Mr. Manuel Mirat Santiago, being of full legal age, a Spanish national, acting for and on behalf of PRISACOM, S.A., with head office in Madrid, calle Ribera del Sena, no number, 4ᵗʰ floor, and with taxpayer ID A 82649690. He is doing so in his capacity as Managing Director (hereinafter CLIENT).

Hereinafter, NETRATINGS and CLIENT shall be referred to jointly as the "Parties" and each one of them individually as the "Party."

Both parties exhibit and recognize each other's legal capacity to enter into and undertake obligations through this Contract, expressly stating that their powers have not been revoked, modified or suspended, and to that end,

## THEY STATE

1.      NETRATINGS is a company specialized in the measurement, analysis and study of Internet audiences, advertising and markets, and has broad knowledge and experience in providing this type of service in the Internet environment.

2.      CLIENT is interested in adopting one or more SOLUTIONS developed by NETRATINGS, for the purposes of measuring its web sites.

3.      In light of the above, both Parties have agreed to enter into this Contract, by which NETRATINGS shall provide Internet measurement services to CLIENT, by granting a usage license; both Parties agree that the relationship shall be governed by the following.

## STIPULATIONS

## 1.      DEFINITIONS

1.1.      "PASSWORDS": User name and passport that NETRATINGS provides to CLIENT's employees and that enable access to the information through the NETRATINGS portal.

1.2.      "INFORMATION": This is the demographic information and any other information that NETRATINGS provides pursuant to this Contract through its various SOLUTIONS referring to the use and/or behavior of users of the Internet, computers and advertising over the Internet.

1.3.    "NETRATINGS PORTAL" shall mean the websites owned by NETRATINGS from which clients are provided access to the various regular reports generated by the NETRATINGS SOLUTIONS.

1.4.    "MEASUREMENT SYSTEM" shall mean any mechanism used for compiling data, used in generating INFORMATION.

1.5.    "SOLUTIONS" refers to any system developed by NETRATINGS composed of software, methodology, services and means of delivery of INFORMATION and CLIENT DATA.

## 2.    PURPOSE

2.1.    This Contract (hereinafter the "CONTRACT") establishes for CLIENT the terms and conditions for using the NETRATINGS SOLUTIONS (the "SERVICES").

2.2.    Specifically, pursuant to the terms of this contract, CLIENT is retaining the following SERVICES:

*NetView.*

System based on the NETRATINGS RDD panel, which shows information about the entire Internet market for the contracted countries. It also enables access to information about the websites that publish data using the Country Market Intelligence solution.

## 3.    <u>INTELLECTUAL AND INDUSTRIAL PROPERTY</u>

3.1.    This contract does not presuppose any type of transfer to CLIENT of the ownership of the intellectual and industrial property, or any of the products and services that are covered under this contract, be they reports, data, analysis or any other format of information, all of which shall continue to be the exclusive property of NETRATINGS.

3.2.    Without prejudice to the provisions of the preceding paragraph, CLIENT preserves all inherent rights, titles and interests with respect to any data provided by CLIENT to NETRATINGS that is not obtained through the MEASUREMENT SYSTEMS used in the SOLUTIONS covered under this contract, and the results of any survey that has been specifically requested and prepared for the CLIENT.

3.2.1    Without CLIENT's advance consent, NETRATINGS shall not sell or otherwise share that data with any other client.

## 4.    PASSWORDS

4.1    The PASSWORDS:

4.1.1.    Prove the identity of CLIENT's employees, and are personal.
4.1.2.    Shall be assigned to CLIENT after the signing of this Contract.

4.1.3.  Shall permit access to the information and the SOLUTIONS contracted through the NETRATINGS PORTAL.

4.2.  With respect to the PASSWORDS, CLIENT:

4.2.1.  Must have custody and use its codes diligently and not disclose them to any third party.

4.2.2.  Must notify NETRATINGS of any incident that occurs with the codes or the usage thereof, such as loss, destruction or theft, so that they may be replaced by NETRATINGS.

4.2.3.  CLIENT shall be liable for any damage that might be caused to NETRATING by the improper use of the PASSWORDS, except in the cases indicated in point 4.2.2. and in any case that might be similar, provided CLIENT acts with haste in advising NETRATINGS as of the time of their detection to facilitate corrective actions.

4.3.  NETRATINGS may:

4.3.1.  Change or cancel the PASSWORDS with no advance notice for reasons of security, if it detects their use by unauthorized personnel of CLIENT or third parties.

4.3.2.  With advance notice, suspend them temporarily in the event that CLIENT fails to perform any of the obligations that it assumes under this CONTRACT (especially those pertaining to the calendar of payments of the consideration or those referring to the publication of the information) until CLIENT rectifies that nonperformance.

4.4.  CLIENT designates here one or more persons responsible for receiving and distributing the codes within its organization, who shall act as regular contact individuals with NETRATINGS.

| Representative(s):<br>Designated person (s):<br>Initial(s): | Sonia Ruiz Morán<br>Elena Callejo |
| --- | --- |

## 5.  LICENSE

5.1.  NETRATINGS grants CLIENT a usage license for the information that is non-exclusive, non-transferable and has a term determined by the effectiveness of this contract, to use the PASSWORDS and the INFORMATION, internally as guides for the management of CLIENT in the marketing and promotion of client's products and services, and externally in CLIENT's organization with respect to its business as indicated in this document.

5.2.  CLIENT shall have this usage license for the territory of Spain.

## 6.  USE OF INFORMATION

6.1.  Access to the INFORMATION shall be through the corresponding NETRATINGS PORTAL, except in the cases in which CLIENT receives delivery of a customized report with the INFORMATION.

6.2.  CLIENT shall have the right to publish the information in the following form:

6.2.1.  Internally, provided the persons specified as PASSWORD holders access the INFORMATION directly through the corresponding NETRATING PORTAL.

6.2.2.  Disclosing, in summarized form, limited excerpts of information to its advertising agencies and clients insofar as it may be necessary for the marketing of its own products and/or services.

6.2.3.  For Clients who are advertising agencies, limited extracts of information to its clients for the sole purpose of media planning; and

6.2.4.  Publishing, in summarized form, limited excerpts of the information in its own commercial advertising version and for the consumer; annual reports; reports addressed to the financial community (financial intermediaries, banks, etc.); and to the news media (newspapers, television, radio, publishers of Internet publications, etc.), for the purpose of promoting its own corporate image or its products.

6.3.  In general, CLIENT shall not use this information, directly or indirectly, for providing services to third parties or in favor of any person or entity other than CLIENT. Therefore, CLIENT may not:

6.3.1.  Transfer the information: CLIENT is expressly prohibited from transferring, conveying, renting, selling, communicating or otherwise releasing the information, be it totally or partially, free of charge or for valuable consideration, and CLIENT shall be the sole party liable for any consequences that might derive from its actions.

6.3.2.  Modify the information: CLIENT is expressly prohibited from altering, transforming or otherwise modifying the information, totally or partially.

6.3.3.  Create any file or compilation containing, totally or partially, the information supplied by NETRATINGS, for the purpose of being distributed, communicated publicly or made available to third parties.

6.4.  CLIENT shall not be provided with, nor shall CLIENT be authorized to access or use, INFORMATION other than the information supplied to CLIENT through the NETRATINGS PORTAL, or the unprocessed data compiled by NETRATINGS.

## 7.  DISCLOSURE OF DATA.

7.1.  In general, CLIENT must obtain the written consent of an authorized representative of NETRATINGS before publishing the following information:

7.1.1.  It must always request this authorization before publishing any INFORMATION pertaining to a third party.

7.1.2.  It may not use the NETRATINGS name in relation to any public announcement (including advertisements) without this consent.

7.2.  The information disclosed must be identified with the utmost accuracy, leaving no margin of error, and shall necessarily exhibit the following label: "Source: Nielsen/NETRATINGS. With copyright. All rights reserved."

7.3.  CLIENT may not use the information in any may that might disparage the brand or the good trade name of NETRATINGS.

7.4.  CLIENT may not use or disclose the INFORMATION or the PASSWORDS: in any lawsuit or administrative proceedings without the advance written consent of NETRATINGS, unless so required by law.

7.5.  NETRATINGS may automatically terminate the information-usage license early, with no need for advance notice, in the event that CLIENT uses the information in a manner not authorized or is contrary to the provisions of

this Contract, without prejudice to the right to take any appropriate legal actions for compensation of damage caused, as the case may be.

## 8.   CONFIDENTIALITY

8.1.   The parties agree that, as to confidential information (according to the definition included below) that may be revealed by one party to the other party in connection with this Contract, the party receiving the information shall not disclose said confidential information to any third party, and shall not use it for any purpose, except in connection with the rights and obligations that it bears pursuant to this Contract.

8.2.   "Confidential Information" shall mean any information, referring to a party or any of its subsidiaries or affiliated companies, that is not in the public domain, that is marked as confidential or protected, or that, given the circumstances, reasonably must be treated as confidential or protected information, including the prices and conditions of this CONTRACT.

8.3.   Independently of the foregoing, the Confidential Information shall not include information that:

   8.3.1.   at the time of its disclosure, is subsequently or comes to be in the public domain, through a source other than the receiving party;
   8.3.2.   is legitimately in the possession of the receiving party at the time of its disclosure.
   8.3.3.   has been developed independently by the receiving party without making reference to the Confidential Information; or
   8.3.4.   has been obtained subsequently through a third party that is not subject to a confidentiality obligation with respect to the information that is the subject of the disclosure.

8.4.   In the event that the receiving party is required, by law, or in connection with legal proceedings, to disclose Confidential Information, it must communicate this immediately to the issuing party for the purpose of requesting the corresponding legal coverage of the Confidential Information. The receiving party shall be released from performance of the stipulations referring to non-disclosure included herein with the scope necessary for compliance with the law or legal proceedings in question.

6.5.   At the time of termination of this Contract, the parties shall immediately return or destroy all the tangible Confidential Information, except the Confidential Information about CLIENT's clientele or the visitors to the CLIENT's website or portal that CLIENT is required to keep in accordance with the applicable laws.

## 9.   LIABILITY FOR WARRANTIES. LIMITATION OF LIABILITY.

9.1.   NETRATINGS warrants CLIENT the proper functioning of the contracted services, within the normal parameters of Internet activity, and also warrants that the information compiled and delivered in the reports is generated in accordance with the methodologies used in each service, and that its reliability corresponds to the limitations of each one of the sources.

9.2.   NETRATINGS expressly denies any other express or implicit warranty, including but not limited to warranties of salability or those adapted to a specific purpose.

9.3.   NETRATINGS shall not be liable in any event for indirect, special, incidental, consequential, punitive or confidence damages, including, *inter alia*, loss of profits, savings or income, be they of a contractual, extracontractual or other nature (including negligence, product liability and objective liability) resulting from agreements between CLIENT and a third party, or for claims from a third party, independently of whether NETRATINGS knew of, or had reasons to know of, the possibility of said damages, engendered by the use of the SOLUTIONS and the information that they generate.

9.4.   Except as to NETRATINGS' compensation obligations that are provided in stipulation 10 below, the total maximum liability of NETRATINGS, under any circumstance, shall not exceed the amount actually paid by CLIENT to NETRATINGS under this contract for twelve months prior to the date on which the case arises.

9.5.   NETRATINGS shall not be liable for any delay or nonperformance due to force majeure.

9.6.   In the event that the applicable laws do not permit the aforementioned limitation or exclusion of liability, the limitation or exclusion of the object of the liability shall be considered modified so that it will be effective with the maximum scope permitted.

## 10.   INDEMNITY

10.1.   CLIENT shall indemnify, compensate and, at NETRATINGS' request defend NETRATINGS, its affiliated companies, officers, directors, representatives and employees, from all claims, obligations, damages, losses and expenses, including reasonable fees of attorneys, derived from or related to (i) any claim made by a third party against NETRATINGS as a consequence of CLIENT's nonperformance of any of the obligations that are indicated in this Contract or (ii) the use by CLIENT of the services under circumstances that do not conform to this Contract; provided however that:

10.1.1.   NETRATINGS notify CLIENT immediately in writing of the existence of the claim from a third party;
10.1.2.   At CLIENT's request, and at its expense, NETRATINGS cooperate in the investigation and defense of said claim; and
10.1.3.   CLIENT is the sole party required to defend or settle the claim from a third party (provided it not enter into any mediation that negatively affects the rights and obligations of NETRATINGS without the advance written consent of NETRATINGS).

10.2.   NETRATINGS shall indemnify, compensate and, at CLIENT's request defend CLIENT, its affiliated companies, officers, directors, agents and employees, from all claims, obligations, damages, losses and expenses, including reasonable fees of attorneys, derived from the claim of a third party against CLIENT in which it maintains that the services infringe the patent rights, copyright, trademark or industrial secrets of a third party, provided however that

10.2.1.   CLIENT notifies NETRATINGS in writing of the existence of the claim from a third party;
10.2.2.   At NETRATINGS' request, and at its expense, CLIENT cooperate in the investigation and defense of said claim; and
10.2.3.   NETRATINGS is the sole party required to defend or settle the claim from a third party (provided it not enter into any mediation that negatively affects the rights and obligations of CLIENT without the advance written consent of CLIENT).

10.2.4. If, in NETRATINGS' opinion, it is probable that any service may be the object of an action for violation, or if it is subject to said action, NETRATINGS, at its discretion, and at its expense,

10.2.4.1.1.    may obtain for CLIENT the right to continue using said service,

10.2.4.1.2.    may replace the service in question either by another one that does not involve any violation or that adequately modifies the appropriate elements so that no violation occurs, provided that it not vary the essential nature of the Service; or

10.2.4.1.3.    may terminate this Contract and refund to CLIENT the amounts already paid for services that have not yet been provided.

10.2.5. Independently of the foregoing, NETRATINGS does not assume any liability for claims for violations derived from

10.2.5.1.    combining any service with software or other products that have not been supplied by NETRATINGS, if that claim would not have been made if the combination in question had not occurred; or

10.2.5.2.    the change in any service, if that claim would not have been made if the change had not occurred.

10.3.    In the event that, in performance of the contract, NETRATINGS comes to have access to personal information owned by or under the responsibility of CLIENT, NETRATINGS agrees to respect the provisions of the Organic Law of Protection of Personal Information and its implementing regulations, and is liable to Client for the claims of any nature that might be filed by any individual or legal entity as a consequence of improper or illegitimate use of personal information, done directly by NETRATINGS, or its personnel or persons whom it employs or uses in providing the service.

## 11.    TERM AND TERMINATION

11.1.    The term of this Contract shall be one year (12 months) as of  September 2, 2005, the date on which the services will start being provided.

11.2.    At the end of the term, this Contract shall be extended automatically for successive periods of 12 months in accordance with the provisions of stipulation 11.8, unless one of the parties terminates it through written advance notice 30 days prior to the expiration of the period effective at that time.

11.3.    This Contract may be terminated by either of the parties in the event of significant performance by the other party, and if said nonperformance is not rectified within thirty (30) days after the written communication thereof, or if the other party is declared insolvent or is subject to a bankruptcy proceeding, reorganization or a petition or resolution of a similar nature.

11.4.    In the event of termination due to significant nonperformance on the part of NETRATINGS, and involving no fault on CLIENT's part, CLIENT shall have the right to receive a proportional refund corresponding to the amounts paid for services that have not yet been provided as of the date of the termination.

11.5.    In the event of early termination due to nonperformance attributable to CLIENT, NETRATINGS may, in addition to filing any other legal action to which it may be entitled, declare all amounts owed to it immediately due and payable.

11.6.   After the early termination of this Contract, in accordance with the provisions of this clause, CLIENT may not use any Password or access the information through the NETRATINGS PORTAL.

11.7.   The termination of this Contract shall not, under any circumstances, exempt the Parties from their liability for prior nonperformance thereof. Stipulations 6 to 13 shall subsist at the termination of this Contract.

11.8.   If an automatic extension of this Contract occurs, the price to be paid to NETRATINGS corresponding to each Extension Period shall be increased by 2.5% or the interannual CPI if it is higher than said amount with respect to the period immediately preceding, unless specified otherwise for any specific period in section 15.

## 12.    APPLICABLE LAW AND VENUE

12.1.   This Contract shall be governed and interpreted in accordance with Spanish law, and each party consents irrevocably, waiving any venue of its own, to the exclusive jurisdiction and territorial authority of the Courts and Tribunals of Madrid (Spain).

12.2.   The **Parties** must, in good faith, endeavor to reach an agreement on any disputes that might arise between them with respect to the interpretation, performance, validity or termination of this Contract or any dispute that might be based on it, for a period not greater than 30 calendar days after the existence of said discrepancy has been reliably reported by either of them.

12.3.   In the event that it is not possible to reach an agreement over the disputes in question, all the **Parties**, with express waiver of any venue of their own that might correspond to them, agree to submit said disputes to *de jure* arbitration within the Madrid Chamber of Commerce and in accordance with its Regulations and Bylaws, to which the administration of the arbitration is entrusted.

12.4.   The **Parties** agree to submit the dispute to the corresponding entity, as the case may be, and to abide by all terms of any decision or award that is issued.

## 13.    MISCELLANEOUS STIPULATIONS

13.1.   In the event of inconsistency between this Contract and any Exhibit or other attached document, appendix, invoice or purchase order, this Contract shall prevail, unless in the other document the parties expressly state to the contrary.

13.2.   Any notice or communication that may or must be made pursuant to this Contract shall be done in writing through hand delivery, certified fax, notarial channel or by any other legally valid means that makes it possible to document its date of receipt, its content and the identity of the sender.  Notices must be addressed to the addresses of the parties indicated above.

13.3.   CLIENT may not assign this Contract, by legal imperative or for any other reason, without the advance written consent of NETRATINGS; any assignment, or intent to assign, without the written consent of NETRATINGS shall be void and shall be considered a significant breach.

13.4.   In the event that any stipulation of this Contract is void or voidable, the validity of the Contract overall shall not be affected by that circumstance, provided that it is not a substantial part of the Contract that might undermine the original sense sought by the Parties.

13.5.   The legally ineffective stipulation shall be replaced by a new stipulation, or interpreted in a legally acceptable manner, that has a substance as close as possible to the stipulation that the Parties would have formalized had they been cognizant of the ineffectiveness of the stipulation in question.

13.6.   This Contract may not be amended except by written instrument, signed by the party against whom any breach is claimed, and no breach, by action or omission, may be waived.

13.7.   As to services, this Contract constitutes the full agreement between the parties and cancels any other prior or contemporaneous agreement and understanding between them, be it written or oral.

## 14.   SUPPORT AND TRAINING.

14.1.   At CLIENT's request, and considering the availability of NETRATINGS' resources and time, NETRATINGS shall provide services of training as specified in the Exhibit.

14.2.   Ordinary support. NETRATINGS shall provide, free of charge, ordinary support to CLIENT, including support by telephone and by email, and everything connected with the processes of configuration of the various SOLUTIONS.

14.3.   Technical support for CLIENT's staff. NETRATINGS agrees to offer CLIENT technical support.

14.3.1.   That support shall be on-site in the cases in which it is necessary.

14.4.   Training

14.4.1.   In any case, CLIENT may request a training session free of charge every year.
14.4.2.   In the cases in which the training has to be done outside of Madrid, CLIENT shall assume the corresponding costs of travel and lodging.
14.4.3.   If CLIENT requires more on-site trainings, the cost shall be € 500 per day.

14.5.   No substitution. CLIENT agrees not to use the support services as a substitution for the training services, and agrees to train its users properly.

## 15.   PRICE AND TERMS OF PAYMENT

15.1.   The fees corresponding to the contracted SOLUTIONS are (prices in EUROS without VAT).

The financial and billing terms shall be as follows.

| Solution | Characteristics | Amount | Billing |
|---|---|---|---|
| NetView | Access for 5 users to the following countries:<br><br>Spain | € 31,518.75 annual | Quarterly billing<br>1st invoice will be issued ~~at the time of signing~~. [handwritten: on September 2, 2005. Change Valid. (illegible initials)] |

15.2.   The form of payment of all invoices shall be by check or transfer at 30 days, as of the date of issuance of the invoice, hereinafter the due date.

15.3.   In the event that more than 30 days elapse from the due date of an invoice without payment from CLIENT, NETRATINGS, at its absolute discretion, may suspend all or part of the Service (including but not limited to access to the NETRATINGS PORTAL) until CLIENT rectifies the delinquency.

15.4.   In the event of a dispute, CLIENT must immediately inform NETRATINGS; otherwise, after 30 days, NETRATINGS may claim payment whether or not there is any dispute.

15.5.   The amounts in dispute shall not affect the payment of amounts that do not involve any dispute. If, within the same invoice, only one part of the amount is disputed, CLIENT shall not delay the partial payment of the part that is not in question.

15.6.   In the event that CLIENT delays the payment due to lack of documentation, or requires a form of any type from NETRATINGS, it must communicate this within 30 days after receiving the invoice; otherwise, it shall be assumed that CLIENT accepts the invoice and will make payment without delay.

15.7.   CLIENT shall pay any applicable similar amounts or charges, independently of their name, that are assessed by any authority in connection with the products or services acquired by CLIENT under this contract (unless it concerns taxes or similar charges based on NETRATINGS' income).


And, to make it effective, they sign in Madrid, on July 26, 2005


For NETRATINGS Spain S.L. Unipersonal

Diego Semprún                                      For CLIENT
Director                                           [signature]
[signature]                                        Manuel Mirat Santiago
                                                   Managing Director

# Exhibit C

# CONTRATO DE PRESTACIÓN DE SERVICIOS

## CONTRATO NÚMERO: 200507/280

En Madrid, a 26 julio de 2005

DE UNA PARTE, D. Diego Semprún de Castellane, mayor de edad, de nacionalidad española, con domicilio profesional en Madrid, calle Velázquez, 86, portal B, Bajo Centro y provisto de DNI núm. 5282205W.

Interviene en nombre y representación de NETRATINGS Spain, S.L. Unipersonal, con domicilio social en c/ Velazquez, nº 86, portal B, Bajo, Centro, 28006 Madrid, con CIF B83841445. Lo hace en su calidad de Administrador, (en adelante NETRATINGS).

Y DE OTRA, D. Manuel Mirat Santiago, mayor edad, de nacionalidad española, que interviene en nombre y representación de PRISACOM, S.A., con domicilio social en Madrid, C/ Ribera del Sena, s/n, planta 4ª y con CIF A 82649690. Lo hace en su calidad de Consejero Delegado, (en adelante el CLIENTE).

En adelante, NETRATINGS y el CLIENTE, se denominarán conjuntamente como las "Partes", y cada una de ellas individualmente, la "Parte".

Ambas partes ostentan y se reconocen recíprocamente capacidad legal para otorgar y obligarse por el presente Contrato, manifestando expresamente que sus facultades no han sido revocadas, modificadas ni suspendidas, y a tal efecto,

## EXPONEN

1. Que, NETRATINGS es una compañía especializada en la medición, el análisis y el estudio de audiencias, publicidad y mercados de Internet, contando con amplios conocimientos y experiencia en la prestación de este tipo de servicios en el entorno de Internet.

2. Que, el CLIENTE esta interesado en adoptar una o varias SOLUCIONES desarrolladas por NETRATINGS, a efectos de medición de sus sitios Web.

3. Que, en atención a lo expuesto, ambas Partes han acordado celebrar el presente Contrato, por el cual NETRATINGS prestará servicios de medición de Internet al CLIENTE, mediante el otorgamiento de una licencia de uso, pactando ambas Partes que la relación se regirá por las siguientes.

## ESTIPULACIONES

1. DEFINICIONES

1.1. "CONTRASEÑAS": Nombre de usuario y password que NETRATINGS facilita a los empleados del CLIENTE y que permiten el acceso a la Información a través del portal de NETRATINGS.

1.2. "INFORMACION": Es la información demográfica y cualquier otra información que NETRATINGS proporcione según este Contrato a través de sus diferentes

SOLUCIONES referente al uso y/o comportamiento de los usuarios de Internet, los ordenadores y la publicidad en Internet.

1.3. "PORTAL DE NETRATINGS" significa los sitios web de propiedad NETRATINGS desde los que se facilita a los clientes el acceso a los distintos informes regulares generados por las SOLUCIONES de NETRATINGS.

1.4. "SISTEMA DE MEDICION" significa cualquier mecanismo utilizado para recopilar datos, utilizados en la generación de INFORMACION.

1.5. "SOLUCIONES" se refiere a cualquier sistema desarrollado por NETRATINGS, compuesto de software, metodología, servicios y medios de entrega de INFORMACION y DATOS DEL CLIENTE.

## 2.  OBJETO

2.1. El presente Contrato (en adelante, el "CONTRATO"), establece los términos y condiciones para el uso de las SOLUCIONES de NETRATINGS (los "SERVICIOS") para el CLIENTE.

2.2. De forma explícita, el CLIENTE está contratando según los términos de este contrato los siguientes SERVICIOS:

> **NetView.**
>
> Sistema basado en el panel RDD de NETRATINGS, que muestra información sobre el conjunto del mercado Internet para los países contratados. También permite acceder a la información relacionada con los sitios web que publican datos utilizando la solución Country Market Intelligence.



## 3.  PROPIEDAD INTELECTUAL E INDUSTRIAL

3.1. El presente contrato no supone transferencia de ningún tipo al CLIENTE de la titularidad de la propiedad intelectual e industrial, ni de ninguno de los productos y servicios que se recogen en el presente contrato, ya se trate de informes, datos, análisis o cualquier otro formato de información, todos los cuales seguirán siendo de titularidad exclusiva de NETRATINGS.

3.2. Sin perjuicio de lo establecido en el párrafo anterior, el CLIENTE conserva todos los derechos, títulos e intereses inherentes respecto de cualquier dato proporcionado por el CLIENTE a NETRATINGS, que no se obtenga a través de los SISTEMAS DE MEDICION utilizados en las SOLUCIONES objeto de este contrato, y los resultados de cualquier sondeo que haya sido específicamente solicitado y elaborado para el CLIENTE.

3.2.1. Sin el previo consentimiento del CLIENTE, NETRATINGS no venderá ni de ningún otro modo compartirá dichos datos, con ningún otro cliente.

## 4.  CONTRASEÑAS

4.1. Las CONTRASEÑAS:

4.1.1. Acreditan la identidad de los empleados del CLIENTE, son personales.

4.1.2. Se asignarán al CLIENTE tras la firma de este Contrato.

4.1.3. Permiten acceder a la información y a las SOLUCIONES contratadas a través del PORTAL DE NETRATINGS.

4.2. Respecto a las CONTRASEÑAS el CLIENTE:

4.2.1. Deberá custodiar y utilizar sus claves diligentemente y a no ponerlas en conocimiento de ningún tercero.

4.2.2. Deberá notificar a NETRATINGS cualquier incidencia que se produzca en las claves o en su utilización, tales como perdida, destrucción o robo, con la finalidad de que estas sean sustituidas por NETRATINGS.

4.2.3. El CLIENTE será responsable de los daños y perjuicios que pudieran derivarse para NETRATING por el uso indebido de las CONTRASEÑAS, excepto en los casos señalados en el punto 4.2.2 y en aquellos que puedan ser análogos, siempre y cuando el CLIENTE actúe con premura en avisar a NETRATINGS a partir del momento de su detección para facilitar las acciones correctoras.

4.3. NETRATINGS podrá:

4.3.1. Cambiar o cancelar las CONTRASEÑAS sin ningún preaviso por motivos de seguridad, en caso de detectar su utilización por personal no autorizado del CLIENTE o de terceros.

4.3.2. Con un preaviso, suspenderlas temporalmente en el caso de que el CLIENTE incumpla cualquiera de las obligaciones que le incumben en virtud del presente CONTRATO (especialmente, las relativas al calendario de pagos de la contraprestación o los referidos a la publicación de la información) hasta que el CLIENTE subsane dicho incumplimiento.

4.4. El CLIENTE designa aquí a una o varias persona responsables de recibir y distribuir las claves dentro de su organización, y que actuarán como interlocutores regulares con NETRATINGS.

| Representante(s) Designado(s) Inicial(es): | Sonia Ruiz Morán |
|---|---|
| | Elena Callejo |

## 5. LICENCIA.

5.1. NETRATINGS otorga al CLIENTE una licencia de uso sobre la Información no exclusiva, intransferible, y con una duración determinada por la vigencia del presente contrato, para utilizar las CONTRASEÑAS y la INFORMACION, internamente como guías para la gestión del CLIENTE en la comercialización y promoción de los productos y servicios del cliente, y de forma externa a la organización del CLIENTE en relación con su negocio tal como señala en este documento.

5.2. El CLIENTE dispondrá de esta licencia de uso para el territorio de España

## 6. USO DE LA INFORMACION

6.1. El acceso a la INFORMACION se efectuará mediante el PORTAL DE NETRATINGS correspondiente, salvo en los casos en los que al CLIENTE se le haga entrega de un informe a medida con la INFORMACION.

6.2. El CLIENTE tendrá el derecho de publicar la Información de la siguiente forma:

6.2.1. Internamente, siempre y cuando las personas especificadas como poseedores de CONTRASEÑA acceden directamente a la INFORMACION a través del PORTAL de NETRATINGS correspondiente.

6.2.2. Divulgar, de forma resumida, extractos limitados de Información a sus agencias publicitarias y clientes en la medida en que sea necesario para el marketing de sus propios productos y/o servicios;

6.2.3. Para Clientes que son agencias publicitarias, extractos limitados de Información a sus clientes con el único propósito de planificación de medios; y

6.2.4. Publicar, de forma resumida, extractos limitados de la Información en su propia versión publicitaria comercial y para el consumidor; informes anuales; informes dirigidos a la comunidad financiera (intermediarios financieros, bancos y otros); y a los medios de comunicación social (periódicos, televisión, radio, editores de publicaciones en Internet y otros), al objeto de promocionar su propia imagen corporativa o sus productos.

6.3. De forma general, el CLIENTE no utilizará, directa o indirectamente, esta información para la prestación de servicios a terceros o en beneficio de alguna persona o entidad distintas de la del CLIENTE. Por tanto, el CLIENTE no podrá:

6.3.1. Transferir la Información: Queda expresamente prohibido al CLIENTE transferir, traspasar, arrendar, vender, comunicar, o de cualquier otra forma ceder la Información, ya sea de forma total o parcial, gratuita u onerosa, siendo el CLIENTE el único responsable de las consecuencias que se puedan derivar de sus acciones.

6.3.2. Modificar la Información: Queda expresamente prohibido al CLIENTE alterar, transformar, o de cualquier otra forma modificar total o parcialmente, la Información.

6.3.3. Crear cualquier fichero o recopilación que contenga, total o parcialmente, la Información suministrada por NETRATINGS, con la finalidad de ser distribuida, comunicada públicamente o puesta a disposición de terceros.



6.4. No se facilitará al CLIENTE, ni el CLIENTE está facultado para acceder o utilizar, INFORMACION que no sean la que se suministre al CLIENTE a través del PORTAL DE NETRATINGS, ni a datos sin procesar recopilados por NETRATINGS.



## 7. DIVULGACION DE DATOS.

7.1. De forma general, el CLIENTE deberá obtener el consentimiento por escrito de un representante autorizado de NETRATINGS antes de publicar la siguiente información:.

7.1.1. Siempre deberá solicitar esta autorización antes de publicar cualquier INFORMACION relativa a una tercera parte.

7.1.2. No podrá utilizar el nombre de NETRATINGS en relación con ningún anuncio público (incluidos reclamos publicitarios), sin este consentimiento.

7.2. La Información divulgada debe estar identificada con la máxima exactitud, sin dejar margen a errores, y exhibirá necesariamente la siguiente etiqueta: "Fuente: Nielsen//NETRATINGS. Con copyright. Todos los derechos reservados".

7.3. El CLIENTE no podrá utilizar la información de ninguna manera que desprestigie la marca o el buen nombre comercial de NETRATINGS.

7.4. El CLIENTE no podrá utilizar ni divulgar la INFORMACION ni las CONTRASEÑAS: en ningún procedimiento legal ni administrativo sin el consentimiento previo por escrito de NETRATINGS, salvo que así lo exija la Ley.

7.5. NETRATINGS podrá dar por finalizado anticipadamente y de forma automática, sin necesidad de notificación previa, la licencia de uso de la información, en el supuesto de que el CLIENTE realice un uso del mismo no autorizado o contrario a lo previsto en

el presente Contrato, sin perjuicio de la facultad de adoptar cuantas acciones legales le correspondan para la compensación de los daños y perjuicios ocasionados, en su caso.

## 8.  CONFIDENCIALIDAD

8.1.  Las partes acuerdan que, por lo que respecta a la Información Confidencial (según la definición incluida a continuación) que sea revelada por una parte a la otra en relación con el presente Contrato, la parte receptora de la misma no divulgará dicha Información Confidencial a ningún tercero, ni la utilizará para ningún fin, salvo en relación con los derechos y obligaciones que le correspondan en virtud del presente Contrato.

8.2.  "Información Confidencial" significa toda la información, referente a una parte o a cualquiera de sus filiales o empresas asociadas, que no sea de dominio público, que esté marcada como confidencial o protegida, o que, dadas las circunstancias, razonablemente deba tratarse como información confidencial o protegida, incluyendo los precios y condiciones del presente CONTRATO.

8.3.  Independientemente de cuanto antecede, la Información Confidencial no incluye información que:

8.3.1. en el momento de su divulgación sea o pase a ser de dominio público posteriormente, a través de una fuente distinta de la parte receptora;

8.3.2. se encontrase legítimamente en poder de la parte receptora en el momento de su divulgación;

8.3.3. haya sido desarrollada de forma independiente por la parte receptora sin hacer referencia a la Información Confidencial; o

8.3.4. se haya obtenido posteriormente a través de un tercero que no se encuentre sujeto a una obligación de confidencialidad de la Información objeto de divulgación.




8.4.  En el supuesto de que la parte receptora se vea obligada, por imperativo legal, o en el marco de un proceso judicial, a revelar Información Confidencial, deberá comunicarlo de inmediato a la parte emisora a efectos de solicitar el correspondiente amparo legal de la Información Confidencial. Se exonerará a la parte receptora del cumplimiento de las estipulaciones referentes a no divulgación incluidas en el presente con el alcance necesario a efectos de cumplir la ley o el proceso judicial en cuestión.

8.5.  En el momento de la resolución del presente Contrato, las partes devolverán o destruirán inmediatamente toda la Información Confidencial tangible, exceptuando la Información Confidencial relativa a la clientela del CLIENTE o a los visitantes de los sitios web o el portal del CLIENTE que el CLIENTE esté obligado a conservar de conformidad con la legislación aplicable.

## 9.  RESPONSABILIDAD POR GARANTÍAS.- LIMITACIÓN DE RESPONSABILIDAD

9.1.  NETRATINGS garantiza al CLIENTE el correcto funcionamiento de los servicios contratados, dentro de los parámetros normales de actividad de internet, también garantiza que la información recopilada y entregada en los informes se genera de acuerdo con las metodologías utilizadas en cada servicio, y que su fiabilidad corresponde con las limitaciones de cada una de las fuentes.

9.2.  NETRATINGS deniega expresamente cualquier otra garantía, expresa o implícita, incluidas, a efectos meramente enunciativo, las garantías de comerciabilidad y adecuación a un fin en particular.

9.3. NETRATINGS no será responsable en ningún caso de daños indirectos, especiales, incidentales, consecuentes, punitivos o por confianza, incluidos, entre otros, pérdida de beneficios, ahorro o ingresos, ya sean de carácter contractual, extracontractual o de otra naturaleza (incluida negligencia, responsabilidad con respecto a productos y responsabilidad objetiva) resultado de acuerdos entre el CLIENTE y un tercero, o ante demandas de un tercero, independientemente de si NETRATINGS conocía, o tenía motivos para conocer, la posibilidad de dichos daños, generados por el uso de las SOLUCIONES y de la información que generan.

9.4. Salvo por lo que respecta a las obligaciones de indemnización de NETRATINGS previstas en la estipulación 10 siguiente, la responsabilidad total máxima de NETRATINGS, bajo cualquier circunstancia, no excederá el importe pagado de forma efectiva por el CLIENTE a NETRATINGS en virtud del presente durante los doce meses anteriores a la fecha en la que surgió la causa.

9.5. NETRATINGS no será responsable de ninguna demora o incumplimiento por causas de fuerza mayor.

9.6. En caso de que la legislación aplicable no permita la referida limitación o exclusión de responsabilidad, la limitación o exclusión del objeto de la responsabilidad se considerará modificada de forma que resulte eficaz con el máximo alcance permitido.

## 10. INDEMNIDAD.

10.1. El CLIENTE indemnizará, resarcirá y, a instancias de NETRATINGS, defenderá a NETRATINGS, sus empresas asociadas, directivos, administradores, representantes y empleados, de todas las reclamaciones, obligaciones, daños y perjuicios, pérdidas y gastos, incluidos los honorarios razonables de abogados, derivados o relacionados con (i) cualquier reclamación formulada por un tercero frente a NETRATINGS como consecuencia del incumplimiento por parte del CLIENTE de alguna de las obligaciones que se señalan en presente Contrato o (ii) el uso por el CLIENTE de los servicios en circunstancias que no se ajusten a lo previsto en el presente Contrato; siempre y cuando, no obstante:



10.1.1. NETRATINGS notifique por escrito inmediatamente al CLIENTE la existencia de la reclamación de un tercero;



10.1.2. a instancias del CLIENTE, y de cuenta del mismo, NETRATINGS colabore en la investigación y defensa de dicha reclamación; y

10.1.3. el CLIENTE sea el único facultado para defender o liquidar la reclamación de un tercero (siempre que no celebre ninguna avenencia que afecte negativamente a los derechos u obligaciones de NETRATINGS sin el consentimiento previo por escrito de la misma).

10.2. NETRATINGS indemnizará, resarcirá, y a instancias del CLIENTE, defenderá al CLIENTE, sus empresas asociadas, directivos, administradores, agentes y empleados de todas las reclamaciones, obligaciones, daños y perjuicios, pérdidas y gastos, incluidos los honorarios razonables de abogados, derivados de la reclamación de un tercero frente al CLIENTE en la que sostenga que los servicios infringen los derechos de patente, copyright, marca o secretos industriales de un tercero, siempre y cuando, no obstante

10.2.1. el CLIENTE notifique por escrito inmediatamente a NETRATINGS la existencia de una reclamación;

10.2.2. a instancias de NETRATINGS, y de cuenta de ésta, el CLIENTE colabore en la investigación y defensa de dicha reclamación; y

10.2.3. NETRATINGS sea la única facultada para defender o liquidar reclamaciones de esta naturaleza (siempre que no celebre ninguna avenencia que afecte negativamente a los derechos u obligaciones del CLIENTE, sin el consentimiento previo por escrito de éste).

10.2.4. Si, en opinión de NETRATINGS, existe la probabilidad de que cualquier servicio sea objeto de una acción por violación, o si la misma queda sujeta a dicha acción, NETRATINGS, a su elección, y de su cuenta y cargo,

    10.2.4.1.1.  podrá obtener para el CLIENTE el derecho a continuar utilizando dicho servicio,

    10.2.4.1.2.  podrá sustituir el servicio en cuestión o por otra que no entrañe ninguna violación o que modifique adecuadamente los elementos que corresponda a efectos de que no se produzca ninguna violación, siempre y cuando con ello no varíe la naturaleza esencial del Servicio; o

    10.2.4.1.3.  podrá resolver el presente Contrato y reembolsar al CLIENTE las cantidades ya pagadas por servicios que aún no hayan sido prestados.

10.2.5. Independientemente de cuanto antecede, NETRATINGS no asume responsabilidad alguna por reclamaciones por violación derivadas de

    10.2.5.1.  la combinación de cualquier servicio con software u otros productos que no hayan sido suministrados por NETRATINGS, en caso de que dicha reclamación no se hubiese formulado de no haberse llevado a cabo la combinación en cuestión; o

    10.2.5.2.  la modificación de cualquier servicio, en caso de que dicha reclamación no se hubiese formulado de no haberse realizado la modificación.

10.3.  Para el caso de que en ejecución del contrato NETRATINGS, llegue a tener acceso a datos de carácter personal o bajo la responsabilidad del CLIENTE, NETRATINGS se obliga a respetar los preceptos de la Ley Orgánica de Protección de Datos de Carácter Personal y su normativa de desarrollo, siendo responsable frente al Cliente de las reclamaciones de cualquier índole que puedan hacérsele por parte de toda persona física o jurídica como consecuencia del uso indebido o ilegítimo de datos de carácter personal, realizada directamente por NETRATINGS, o su personal o personas que emplee o utilice en la prestación del servicio.



## 11. DURACIÓN Y RESOLUCIÓN

11.1.  La duración del presente Contrato será de un año (12 meses) a contar desde el 2 de septiembre de 2005, fecha de inicio de entrega de los servicios.

11.2.  Al final de la duración, el presente Contrato se prorrogará automáticamente por períodos sucesivos de 12 meses de conformidad con lo previsto en la estipulación 11.8, a menos que una de las partes lo resuelva mediante preaviso por escrito 30 días antes del vencimiento del período vigente en ese momento.

11.3. El presente Contrato podrá ser resuelto por cualquiera de las partes en caso de incumplimiento significativo por la otra parte, y si dicho incumplimiento no es subsanado durante los treinta (30) días siguientes a la comunicación por escrito del mismo, o si la otra parte es declarada insolvente o queda sujeta a un procedimiento concursal, reorganización o a una petición o acuerdo de naturaleza similar.

11.4.  En caso de resolución por incumplimiento significativo de NETRATINGS, y sin que medie culpa del CLIENTE, el CLIENTE tendrá derecho a recibir una devolución proporcional correspondiente a los importes pagados por servicios que aún no se le hayan prestado en la fecha de resolución.

11.5.  En el supuesto de finalización anticipada por incumplimiento imputable al CLIENTE, NETRATINGS podrá, además de interponer cualquier otra acción legal a la que tenga derecho, declarar exigible el pago inmediato de todas las cantidades que se le adeuden.

11.6.    Tras la finalización anticipada del presente Contrato, de acuerdo con lo previsto en esta cláusula, el CLIENTE no podrá utilizar ninguna Contraseña ni acceder a la Información a través del PORTAL DE NETRATINGS.

11.7.    La resolución del presente Contrato en ningún caso eximirá a las Partes de su responsabilidad anterior por un incumplimiento anterior del mismo. Las estipulaciones 6 a 13 subsistirán a la resolución del presente Contrato.

11.8.    Si se produce una prórroga automática del presente Contrato, el precio a pagar a NETRATINGS correspondiente a cada Periodo de Prórroga se incrementará en un 2,5% o en el IPC interanual si este fuera mayor de dicha cantidad con respecto al periodo inmediatamente anterior, salvo que se haya especificado otra cosa para algún periodo concreto en el punto 15.

## 12. LEGISLACIÓN APLICABLE Y FUERO

12.1.    El presente Contrato se regirá e interpretará de conformidad con la legislación española, y cada parte consiente irrevocablemente, renunciando en su caso a su propio fuero, en la jurisdicción exclusiva y la competencia territorial de los Juzgados y Tribunales de Madrid (España).

12.2.    Las **Partes** deberán, de buena fe, esforzarse en llegar a un acuerdo sobre cualesquiera discrepancias que entre ellas pudieran suscitarse respecto a la interpretación, cumplimiento, validez o resolución del presente **Contrato** o de los que del mismo hubieran de traer causa, durante un plazo no superior a 30 días naturales desde que la existencia de dicha discrepancia se hubiera notificado fehacientemente por alguna de ellas.

12.3.    Para el supuesto en que no fuera posible llegar a un acuerdo sobre las discrepancias en cuestión, todas las **Partes**, con expresa renuncia a cualquier fuero propio que pudiera corresponderles, acuerdan someter dichas discrepancias a arbitraje de derecho en el marco de la Cámara de Comercio de Madrid y de conformidad con su Reglamento y Estatuto, a la que se encomienda la administración del arbitraje.

12.4.    Las **Partes** se obligan a someter la discrepancia a la entidad correspondiente, según el caso, y a cumplir la decisión o el laudo que se emita en todos sus términos.



## 13. ESTIPULACIONES VARIAS

13.1.    En caso de incoherencia entre este Contrato y cualquier Anexo u otro documento adjunto, apéndice, factura o pedido de compra, prevalecerá el presente Contrato, salvo que en el otro documento las partes manifiesten expresamente lo contrario.

13.2.    Cualquier notificación o comunicación que pueda o deba efectuarse de acuerdo con el presente Contrato se realizará por escrito mediante entrega en mano, burofax, conducto notarial o por cualquier medio válido en Derecho que permita dejar constancia de su fecha de recepción, su contenido y la identidad del receptor. Las notificaciones serán dirigidas necesariamente a los domicilios de las Partes arriba indicados.

13.3.    El CLIENTE no podrá ceder el presente Contrato, por imperativo legal o por cualquier otro motivo, sin el consentimiento previo por escrito de NETRATINGS; cualquier cesión, o intento de cesión, sin el consentimiento por escrito de NETRATINGS será nulo y se considerará un incumplimiento significativo.

13.4.    En el caso de que alguna estipulación del presente Contrato fuera nula o anulable, la validez del mismo en su conjunto no quedará afectada por dicha circunstancia, siempre que no se trate de una parte sustancial del mismo que pudiere desvirtuar el sentido original pretendido por las Partes.

13.5.    La estipulación legalmente ineficaz será sustituida por una nueva, o interpretada de un modo legalmente aceptable, que sea de un tenor lo más aproximado posible a la estipulación que las Partes habrían formalizado de haber tenido conocimiento de la ineficacia de la estipulación en cuestión.

13.6.    Salvo mediante instrumento por escrito, firmado por la parte frente a la que se reclame el cumplimiento, el presente Contrato no podrá ser modificado, ni podrá renunciarse a ningún incumplimiento, por acción u omisión.

13.7.    Por lo que respecta a los servicios, el presente Contrato constituye el acuerdo íntegro entre las partes y anula cualquier otro acuerdo y entendimiento entre ellas anterior o contemporáneo, ya sea por escrito o verbalmente.

## 14. SOPORTE Y FORMACION.

14.1.    A petición del CLIENTE y teniendo en cuenta la disponibilidad de recursos y de tiempo de NETRATINGS, NETRATINGS facilitará servicios de formación tal y como se detalla en el Anexo.

14.2.    Soporte ordinario. NETRATINGS proporcionará sin coste soporte ordinario al CLIENTE, que incluye apoyo telefónico, por e-mail, y todo lo relacionado con los procesos de configuración de las diferentes SOLUCIONES.

14.3.    Soporte técnico para el equipo del CLIENTE. NETRATINGS se compromete a ofrecer al CLIENTE soporte técnico.

14.3.1. Este soporte llegará a ser in-situ en los casos en que sea necesario.

14.4.    Formación

14.4.1. En cualquier caso, el CLIENTE podrá solicitar cada año una sesión de formación libre de coste.



14.4.2. En los casos en que la formación tenga que realizarse fuera de Madrid, el CLIENTE asumirá los correspondientes gastos de desplazamiento y estancia.

14.4.3. Si el CLIENTE requiriese más formaciones on-site, el coste será de 500 € por día.

14.5.    No sustitución. El CLIENTE se compromete a no utilizar los servicios de soporte como una sustitución de los servicios de formación, y se compromete a formar debidamente a sus usuarios.

## 15. PRECIO Y CONDICIONES DE PAGO

15.1.    Los honorarios correspondientes a las SOLUCIONES contratadas son (precios en EUROS sin IVA).

Las condiciones económicas y de facturación serán las siguientes.

| Solución | Características | Importe | Facturación. |
|---|---|---|---|
| NetView | Acceso para 5 usuarios a los países siguiente:<br><br>España | 31.518,75€ anual | Facturación trimestral.<br><br>1ª factura se emitirá ~~en el momento de la firma.~~ el 2 da septiembre de 2005 |

15.2.    La forma de pago de todas las facturas será por cheque o transferencia a 30 días, a contar desde la fecha de emisión de las facturas, en adelante fecha de vencimiento.

válido el cambio

15.3.　　En el supuesto de que transcurran más de 30 días desde el vencimiento de una factura sin que el CLIENTE haya procedido a su pago, NETRATINGS, a su absoluta discreción, podrá suspender la totalidad o una parte del Servicio (incluyendo, a título meramente enunciativo, el acceso al PORTAL DE NETRATINGS), hasta que el CLIENTE subsane la mora.

15.4.　　En caso de controversia, el CLIENTE deberá inmediatamente comunicarlo a NETRATINGS, de no ser así, pasados 30 días NETRATINGS podrá reclamar el pago exista o no controversia.

15.5.　　Los importes objeto de controversia no afectarán al pago de los importes que no entrañen ningún conflicto. En caso de que dentro de una misma factura solo una parte del importe sea objeto de controversia, el CLIENTE no retrasará el pago parcial de la parte que no esté en esa situación.

15.6.　　En caso de que el CLIENTE retrase el pago debido a falta de documentación, o requiera un formulario de algún tipo por parte de NETRATINGS, deberá comunicarlo en un plazo de 30 días desde la recepción de la factura, de lo contrario se entenderá que el CLIENTE acepta la factura y procederá al pago sin retraso.

15.7.　　El CLIENTE pagará cualesquiera impuestos o cargas asimiladas aplicables, independientemente de su denominación, gravados por cualquier autoridad en relación con los productos o servicios adquiridos por el CLIENTE en virtud del presente (a menos que se trate de impuestos o cargas asimiladas basadas en los ingresos de NETRATINGS).


Y, para que tenga efecto, firman en Madrid, a 26 de julio de 2005.


Por parte de NETRATINGS Spain S.L. Unipersonal


Diego Semprún
Administrador


Por parte del CLIENTE

Manuel Mirat Santiago
Consejero Delegado