RECEIVED

08 APR -3 PM 8: 47

U.S. DISTRICT COURT
S.D.N.Y.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DIARIO EL PAIS, S.L. and PRISACOM, S.A., )
                                )
            Plaintiffs,               )
                                )
      v.                         )
                                )
THE NIELSEN COMPANY (US), INC.,        )
                                )
            Defendant.             )
                                )

Case No. 07-CV-11295 (HB)

**<u>AMENDED COMPLAINT</u>**

Plaintiffs Diario El Pais, S.L. ("El Pais") and Prisacom, S.A. ("Prisacom" and, collectively with El Pais, "Plaintiffs") seek monetary relief from defendant The Nielsen Company (US), Inc., ("Nielsen") for publishing false statements regarding Nielsen's estimation of the audience of Plaintiffs' website elpais.com. Nielsen's audience estimations are the "currency" used by advertisers and advertising agencies to determine whether and if so how much to allocate to purchasing advertising space among competing websites. As more fully alleged herein, Nielsen has violated New York law in connection with its publication of false and misleading estimations of the audience of elpais.com. In support of their claims, Plaintiffs, upon information and belief, allege as follows:

### NATURE OF THE ACTION

1.       Plaintiff El Pais is the owner of *El Pais*, Spain's most widely read daily newspaper. Plaintiff Prisacom, through its agreement with El Pais, owns and operates elpais.com, the online version of *El Pais*. El Pais and Prisacom are each part of the Promotora de Informaciones, S.A. media conglomerate ("Grupo Prisa"). Prisacom generates revenue by selling space on its webpages to advertisers.

2.    Defendant is the leading provider of online audience estimates in Spain. Defendant's estimates, and rankings produced from those estimates, are one of the most important criteria relied upon by advertisers and advertising agencies in determining how to allocate an advertising budget among competing websites.

3.    At all times, Defendant understood that its estimates of elpais.com's audience and elpais.com's ranking in large measure determined how much advertising revenue elpais.com could earn.

4.    Defendant collects data from a panel of users, and uses that data to produce estimates of any given website's total audience.  Prior to March 2007, the panel from which Defendant collected data was composed of 4,000 users who connected to the internet from their homes.  Under this pre-March 2007 system, Defendant estimated that elpais.com grew its audience from 1.76 million unique users in August 2006 to 2.37 million unique users in February 2007.  These estimates, which were consistent with the trend in data collected and measured by Plaintiffs internally, determined that elpais.com was, save for December 2006, the #2 media website in Spain over this period.

5.    In March 2007, Defendant unilaterally changed both the size and composition of its panel of users as well as the methodology by which Defendant collected and analyzed the data collected from the panel.  Despite these changes, which produced unexplained market-wide increases in nearly all of Defendant's estimates, elpais.com remained the #2 ranked media website in March 2007 and remained so until July 23, 2007 when Defendant announced that elpais.com had become the #1 ranked media website in Spain as of June 2007.  Defendant's estimates, which showed the continued erosion of the gap between elpais.com and the market leader over this period, were consistent with the trend in data collected and measured by Plaintiffs internally.

6.    On September 21, 2007, elpais.com's competitors published news articles that Defendant intended to reduce its estimate of elpais.com's audience by as much as 20% for August 2007 due to an alleged over-inclusion of certain data (the "Competitor Reports").  These

media reports cited persons within Defendant's Nielsen Online service as the source of the information reported therein.

7.    Plaintiffs first learned of the alleged error in Defendant's estimates of elpais.com's online audience by reading the Competitor Reports.

8.    Immediately upon learning of the substance of the Competitor Reports, Prisacom called Defendant and demanded an explanation.  Defendant had no explanation to offer Prisacom at that time, but assured Prisacom that no action would be taken without a complete and thorough review of the data.  Over the next three days, Prisacom and Defendant participated in a series of telephone calls and meetings during which Prisacom repeatedly notified Defendant that, absent a complete and unimpeachable explanation as to the reasons why its estimates of elpais.com's audience were overstated, any immediate reduction in Defendant's estimate of elpais.com's audience was both premature and, potentially, inappropriate.  In addition, Prisacom expressly put Defendant on notice of the material and significant negative effect that a downward revision of Defendant's estimate of elpais.com's audience would have on Plaintiffs' businesses. Responding to Prisacom's concerns, Defendant agreed not to publish any revised data for August 2007 for elpais.com until Prisacom had been given an opportunity to both review the data and receive a full explanation for any material downward revisions to its estimate of elpais.com's audience.

9.    Despite Defendant's assurances, however, Defendant published data for August 2007 on September 25, 2007 (the "August Data") without first consulting with Prisacom or providing any explanations for the results published therein.  The August Data showed a decrease in Defendant's estimate of elpais.com's audience (when compared with Defendant's estimates of July 2007) of more than 1.8 million unique viewers (representing a reduction of more than 37% of elpais.com's total audience from its July 2007 totals), resulting in a downgrading of elpais.com's ranking from #1 to #3 among Spanish media websites.

10.    Defendant's publication of the August Data on September 25, 2007 was widely and immediately reported by elpais.com's competitors.

11.    On September 26, 2007, the International President of Nielsen Online, Jonathan Carson, wrote on the letterhead of The Nielsen Company to Plaintiffs from his office in New York apologizing for violating the agreement not to publish the August Data without giving Plaintiffs an opportunity to review the data and without an explanation justifying the downward revision reported therein.

12.    On November 1, 2007, Defendant published data for September 2007 (the "September Data"). Defendant's September Data was consistent with the August Data in that Defendant stated that elpais.com's audience ranked only third among media websites in Spain.

13.    On November 28, 2007, Defendant published revised monthly data for March through July 2007 (the "Revised Nielsen Data"). The Revised Nielsen Data showed a reduction in Defendant's estimates of elpais.com's audience for each month from data originally published by Defendant in the following amounts: March (24%); April (31%); May (26%); June (33%); and, July (34%).

14.    Defendant's data for the March to September 2007 period is materially and significantly inconsistent with the trends noted in the data collected and measured internally by Plaintiffs.

15.    In relation to the publication of the August Data, Defendant delivered a report, entitled "Elpais.com – Correction of Reported Standard Metrics: March – July 2007" (the "Nielsen Report"), to Prisacom that purportedly explained the reasons justifying Defendant's actions. Notably, the Nielsen Report did not provide any details regarding how Defendant calculated the data for elpais.com as reported in the August Data.

16.    Prisacom conducted a thorough review of its systems and data to verify the accuracy and veracity of the general justifications given in the Nielsen Report for the downward revision of Defendant's estimate of elpais.com's audience for August 2007. Prisacom determined Defendant's explanations, as stated in the Nielsen Report, were either materially incomplete and/or entirely without merit.

17.    To date, Defendant has refused to either (i) provide an accurate and complete explanation as to why elpais.com's audience, as estimated by Defendant for the period March to July 2007, were overstated or (ii) retract the downward revisions to its estimates of elpais.com's audience as reported in the August Data, the September Data and the Revised Nielsen Data.

18.    As a result of Defendant's unwarranted downward revision of Defendant's estimate of elpais.com's audience, Plaintiffs have suffered significant damages as further detailed in Confidential Annex 1,  Plaintiffs further expect that their damages will increase arithmetically, if not exponentially, in the coming months and years unless Defendant takes sufficient steps to correct the serious and systemic errors in Defendant's methodology and, once corrected, restate all of the data published by Defendant since March 2007.

### JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction of this matter based on 28 U.S.C. § 1332.  Plaintiffs are corporations incorporated under the laws of Spain and have their principal places of business in Madrid, Spain.  Defendant is a subsidiary of the Nielsen Company B.V., a Netherlands corporation, and has its principal place of business in New York.  The amount in controversy exceeds, exclusive of interest and costs, the sum specified in 28 U.S.C. § 1332.

20.    This Court has personal jurisdiction over Defendant because it resides in this judicial district.

21.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a).

### PARTIES

22.    Plaintiff El Pais owns and publishes *El Pais*, one of several media entities owned by Grupo Prisa.  *El Pais* is Spain's most widely read newspaper with a circulation of approximately 430,000 copies a day.  El Pais relies heavily on revenue generated by the sale of advertising to meet its production budget.

23.    Plaintiff Prisacom controls the rights to and operates the various websites owned by the various Grupo Prisa companies, including the digital version of *El Pais*, elpais.com.

Prisacom, through its various online media, targets users and advertisers both in Spain and elsewhere. In particular, Prisacom targets users and advertisers among the Spanish-speaking population of the United States, including New York State. Prisacom's main source of income derives from sale of space on its various media websites to advertisers and advertising firms.

24.     Defendant Nielsen is the world's leading provider of marketing information, audience measurement, and business media products and services. Nielsen services clients in more than 100 countries with a global team that is headquartered in New York, New York and Haarlem, The Netherlands. Nielsen Online (also known as "Nielsen Net Ratings" or "NNR"), a service of Defendant, measures and analyzes online audiences, advertising, video, consumer-generated media, word of mouth, commerce, and consumer behavior, and includes products previously marketed under the Nielsen//Netratings and Nielsen BuzzMetrics brands.

## THE NIELSEN RATING SYSTEM

25.     As it does for traditional media such as television, Defendant calculates ratings based on a statistical analysis of data collected from a panel of randomly selected internet users.

26.     Nielsen, through its NNR service, is the leading provider of online media audience measurements in Spain, which it calculates from a sample of online users (the "NNR Panel"). Defendant supplies each member of the NNR Panel with a "box" that, through proprietary software, tracks each member's internet activity.

27.     Defendant uses the raw data collected from the NNR Panelists and, using a proprietary methodology, produces a report that purports to rank the most popular websites in each particular geographic location by audience size. In the online world, audience size is measured by the number of "unique users" that view a website each month. According to Defendant, "unique users" are measured by the number of distinct users that view any page belonging to a website during any given month.

28.     Defendant uses the data collected from the NNR Panel to determine the percentage of NNR Panelists that have viewed any particular website during the previous month.

From that data, Defendant calculates and publishes an estimate of the total audience for that website. Defendant also publishes a ranking of all measured websites based on their respective estimated number of their unique users. Defendant publishes its audience estimates to its clients, which include media companies such as Prisacom and many of the advertisers and advertising firms that are Prisacom's actual and potential customers.

29.     Defendant's estimates of audience and the rankings resulting from the NNR unique user statistics, are the "currency" by which advertisers and their agencies allocate advertising spending among online media outlets in Spain.

30.     Prisacom relies on Defendant to produce accurate and reliable ratings for its various media sites, including elpais.com.

31.     Defendant has publicly held out its methodology as producing accurate and reliable data upon which companies can base their strategic decisions. For example, Defendant has publicly stated that:

> o     "Thanks to their reliability and accuracy, the market research and audience analysis solutions offered by Nielsen//NetRatings allow you to base your strategic decisions on these results, and thus become more competitive."

> o     "NetView provides the most reliable and actual information on online users, both for advertisers as well as agencies, businessmen and publicists."

> o     "Nielsen NetRatings – The global standard for measuring and analyzing Internet audience."

> o     "Nielsen//NetRatings…is the world leader in audience measurement and Internet market investigation."

32.     Plaintiffs' understanding of the details of Defendant's methodology is limited. For each user in the panel, Defendant installs proprietary software in the user's computer (either directly on the computer or by way of some external hardware) which tracks the various uniform resource locators ("URLs", which are a website's address) that are "called" by the user's computer.

33.    By means of this software, Defendant can track the number of "page views" each measured website receives from members of the NNR Panel each month.  Likewise, Defendant also tracks how many "unique users", that is how many individual NNR Panelists, visited each measured website over the prior month.  As each unique user can generate multiple page views, advertisers place a greater value on unique user statistics.  Indeed, the rankings, which are based primarily on NNR's unique user statistics, are the primary measurement of audience in the online world as advertisers are primarily focused on the number of individuals who will view their advertisement.

34.    By means of its proprietary methodology, Defendant estimates each measured website's audience from the data collected from the NNR Panel.

### ELPAIS.COM ATTAINS THE #1 NNR RATING

35.    As the following table shows, according to Defendant, with the exception of December 2006, elpais.com had been consistently rated as the #2 media website in Spain prior to March 2007.

Table 1:  Unique Users (000)

| Company | July 06 | Aug 06 | Sept 06 | Oct 06 | Nov 06 | Dec 06 | Jan 07 | Feb 07 |
|---|---|---|---|---|---|---|---|---|
| Elmundo.es | 2246 | 2226 | 2517 | 2510 | 2766 | 3168 | 2919 | 2672 |
| *Elpais.com* | *1699* | *1764* | *1993* | *2256* | *2355* | *2392* | *2602* | *2373* |
| Vocento Noticias | 1493 | 1728 | 1742 | 1852 | 1924 | 2823 | 2337 | 2266 |
| 20 Minutos | 619 | 574 | 937 | 928 | 1162 | 1011 | 1117 | 1117 |

Source:  Nielsen

36.    Moreover, over the course of 2006 through February 2007, the gap between elpais.com and the media category leader elmundo.es was closing: over this period, the estimated audience of elmundo.es grew by only 426,000 unique users (16%), while the estimated audience of elpais.com grew by 674,000 unique users (28%).  By February 2007, Defendants had reported that elpais.com trailed elmundo.es by only 299,000 unique users.

37.    The consistent and steady growth of elpais.com's audience between July 2006 and February 2007 as estimated by Defendant is consistent with the trends observed in data collected and measured internally by Plaintiffs.

38.    Prior to March 2007, the NNR Panel consisted of 4,000 users who connected to the internet from their homes ("Home Users") but did not capture any data from users who connected to the internet at work ("Work Users").

39.    Despite the fact that the NNR Panel did not include any Work Users prior to March 2007, Defendant maintained at the time, and continues to maintain through the present day, that the various statistics published by Defendant regarding the Spanish online market prior to March 2007, including the monthly ranking based on those statistics, were accurate.

40.    For this reason, Defendant cannot contest that elpais.com was the #2 media website in Spain in February 2007 and had been so for much of the prior year.

41.    In March 2007, Defendant unilaterally changed both the composition of the NNR Panel for Spain, as well as the methodology by which Defendant estimated each website's audience.  Specifically, Defendant increased the size of its panel of Home Users from 4,000 to 16,000 users and added 1,000 Work Users to the NNR Panel.

42.    Defendant has not made public a full explanation of the changes that were made as of March 2007 to the methodology by which the NNR unique user statistics are determined.

43.    Defendant continued to publicly tout the reliability and accuracy of its statistics, including the rankings based on those statistics.

44.    At no time did Defendant ever suggest that its pre-March 2007 statistics and the resulting rankings were inaccurate.

45.    At no time did Defendant ever suggest that its pre-March 2007 statistics were less accurate than the statistics published following the March 2007 changes to the NNR Panel and Defendant's methodology.

46.    As a result of these changes to the NNR Panel and Defendant's methodology, the March 2007 data for the Spanish market showed a market-wide increase of more than 23% in unique users over the prior month.  Elpais.com, and its closest competitors, all experienced growth as well.

47.     However, despite the increase in total unique users of elpais.com reported by Defendant in March 2007, elpais.com's relative ranking remained consistent with prior months: Defendant reported that elpais.com was still the #2 media website in Spain for March 2007.

48.     From March through May of 2007, elpais.com continued to narrow the gap between itself and the market leader elmundo.es in the rankings resulting from the NNR unique user statistics. Finally, in July 2007, Defendant reported that elpais.com had become the market leader in June 2007.

49.     The consistent and steady growth of elpais.com's audience between March 2007 and June 2007 as estimated by Defendant is consistent with the trends observed in data collected and measured internally by Plaintiffs.

50.     At no time prior to September 21, 2007 did Defendant suggest that the data and estimates it had collected, analyzed, and published for June and July 2007 were in any way inaccurate or otherwise overstated the audience of elpais.com.

### DEFENDANT'S PUBLICATION OF THE AUGUST 2007 DATA

51.     On September 21, 2007, three of elpais.com's competitors (elmundo.es, adn.es, and 20minutos.es) published news articles, *i.e.*, the Competitor Reports, citing internal sources at Defendant who claimed that Defendant had erroneously inflated traffic to elpais.com by 20% by improperly including automatic calls to elpais.com's RSS page. The Competitor Reports cited persons within Defendant's NNR business unit as the source of the information reported therein.

52.     RSS (really simple syndication) is a format used to publish frequently updated content. RSS is commonly used by online media to syndicate news headlines to other websites. By subscribing to a RSS feed, the receiving website can publish automatically updating headlines generated by a third party source. In most instances, the website receiving the RSS feed will "call" the originating website automatically to receive the updated headlines. Thus, this "call" to the originating website is an automated call. Defendant's policy apparently is, in

general, not to credit automated calls to the unique user count that forms the basis of the rankings, but rather to credit only user calls towards a website's audience.

53.     The elpais.com RSS page has been in existence since 2004. There have been no material changes to the structure of the elpais.com RSS page, or to the means by which it may be accessed, since 2004 until the end of September 2007. In September 2007, Prisacom made a minor change to the header of the elpais.com RSS page to respond to some of Defendant's expressed concerns.

54.     Immediately upon learning of the substance of the Competitor Reports, Prisacom contacted Defendant's local general manager, Gustavo Nunez, to inquire about the unnamed sources that were cited in, and the substance of, the Competitor Reports. Nunez confirmed that the elpais.com data was being audited due to a high percentage of traffic that had been observed on elpais.com's RSS page. During this September 21, 2007 phone call, Nunez commented that Defendant's preliminary review of the data indicated that as many as one million unique users had been improperly included in elpais.com's audience and that the matter was being reviewed in the United States. Nunez also stated that Defendant's review of the elpais.com data was undertaken in response to "pressure" from an internet measurement user association to which elpais.com's competitors belong, and admitted to being pressured by elpais.com's competitors to make a statement as to the results of Defendant's review. In response, Prisacom demanded that Nunez explain: (a) why it had not been informed of the review of elpais.com data when three other news outlets had already been informed, (b) the details of how the review of elpais.com data was being performed, and (c) why Defendant had not detected this alleged error in its methodology previously. Defendant refused to answer any of Prisacom's questions during this call.

55.     Subsequently on September 21, 2007, Nunez and David Sanchez, also of Nielsen, met in person with the Prisacom's executive team for elpais.com but refused to provide any guidance beyond what had been stated on the phone call earlier in the day. Despite his continued refusal to provide any further details or explanations, Nunez promised that Defendant would,

prior to any publication of any revised data, provide Prisacom with an opportunity to review the data and provide Prisacom with a full explanation for any downward revisions to Defendant's estimate of elpais.com's audience. During this meeting, Nunez stated that the data for August 2007 would be published within the next two days and that this data would not reflect any downward revision to Defendant's estimate of elpais.com's audience.

56.     On September 22-23, 2007, Prisacom reviewed the matter internally and determined that the RSS page could not have generated a large number of invalid unique users.

57.     On September 22 and 23, 2007, Nunez notified Prisacom that the August Data would not be published on schedule, but rather during the course of the following week. For the first time, Nunez confirmed to Prisacom that Defendant intended to publish the August Data reflecting an "adjustment" to Defendant's estimate of elpais.com's audience. Nunez continued to assure Prisacom that it would be given both an opportunity to review the August Data and receive a full explanation justifying the downward revision to elpais.com's audience prior to publication of the August Data.

58.     On September 24, 2007, Prisacom conveyed to Defendant its belief that the elpais.com RSS page could not have caused a material overstatement of unique users for elpais.com generally.

59.     On September 24, 2007, Defendant and Prisacom participated in a conference call with Louise Ainsworth, Defendant's European Manager, and members of Defendant's international technical team, which was in charge of processing, analyzing, and publishing the August Data. During this call, Prisacom notified Ainsworth that (i) Defendant had not adequately explained to Prisacom the reasons justifying a reduction in elpais.com's audience, (ii) Prisacom did not believe that elpais.com's audience figures were overstated as Defendant's data was consistent with the trends in the data collected and measured by Plaintiffs internally, and (iii) any reduction in elpais.com's audience would have a material and significant effect on Plaintiffs' businesses. Ainsworth did not respond to any of these points. Ainsworth only represented to Prisacom that it would not publish the August Data until (i) Defendant had completed a full

analysis of elpais.com's data, (ii) Prisacom had been given an opportunity to review and comment on the August Data, and (iii) Defendant had provided Plaintiffs with a full explanation justifying any downward revision in elpais.com's audience.

60.    On September 25, 2007, Defendant published the August Data.

61.    Defendant did not give Prisacom an opportunity to review the August Data in advance of publication.

62.    The August Data showed a reduction of 1.8 million unique viewers from Defendant's estimate of elpais.com's audience as reported for July 2007. In the August 2007 ranking of Spanish media websites, elpais.com had fallen from #1 to #3.

63.    Defendant did not provide any explanation to Plaintiffs prior to its publication of the August Data that justified the significant and material reduction in elpais.com's audience.

64.    The reduction of elpais.com's audience, as estimated by Defendant, for August 2007 did not reflect the trend in data collected and measured internally by Plaintiffs.

65.    Immediately following Defendant's publication of the August Data, several media outlets published news articles that reported the reduction in elpais.com's audience and ranking.

66.    Defendant attempted to recall its publication of the August Data within hours after publication.

67.    Immediately following the publication of the August Data, Prisacom spoke with Ainsworth, who apologized for Defendant's premature publication of the August Data and stated that it was a result of an error by Defendant's technical team in the United States.

68.    Following the publication of the August Data on September 25, 2007, Prisacom informed Defendant during a conference call of several inconsistencies in Defendant's estimates of elpais.com's audience. Defendant acknowledged these inconsistencies, but stated that its various estimates, as published, were accurate. Defendants at that time notified Prisacom that they intended to again publish the August Data without any modifications.

69.    On September 26, 2007, Jonathan Carson, the International President of Nielsen Online in New York, wrote a letter, on Defendant's letterhead, to Manuel Mirat, the Chief

Executive Officer of Prisacom. Carson confirmed in his letter that Defendant intended to republish the August Data. Although Carson apologized for Defendant's breach of its promises to Plaintiffs not to publish the data before (i) providing Plaintiffs with an opportunity to review and comment on the August Data, and (ii) providing Plaintiffs with a full explanation justifying any downward revision to Defendant's estimate of elpais.com's audience, Carson stated that Defendant did not intend to revise its estimates of elpais.com's audience prior to publication.

## DEFENDANTS' FLAWED METHODOLOGY

70.    On September 26, 2007, in relation to its publication of the August Data, Defendant provided Prisacom with the Nielsen Report, which purported to provide a complete explanation for Defendants' decision to reduce its estimate of elpais.com's audience by more than 37% from the prior month.

71.    The Nielsen Report concludes that, beginning in March 2007, Defendant had improperly counted automated calls to the elpais.com RSS page as unique viewers of elpais.com.

72.    The Nielsen Report fails to establish, and Defendant has failed to verify, that each and every unique viewer that was excluded from elpais.com's audience was, in fact, an automated call rather than a user call.

73.    Although Prisacom made numerous and consistent efforts to obtain a detailed explanation justifying Defendant's decision to exclude more than one million unique visitors from its estimates of elpais.com's audience, Defendant has, to date, given only perfunctory explanations, none of which withstands scrutiny.

74.    There is no basis for Defendant to exclude more than one million unique visitors from its estimates of elpais.com's audience or for Defendant to have downgraded elpais.com from the #1 to #3 position in the rankings resulting from its statistics.

## INJURY

75.    Defendant's unjustified exclusion of more than one million unique visitors to elpais.com has continued each and every month since the August Data was published on September 25, 2007.

76.    Elpais.com's audience, as measured by Defendants, has been materially and significantly understated since the August Data was published on September 25, 2007.

77.    Elpais.com has been improperly relegated to the #3 ranking among Spanish media sites since the August Data was published on September 25, 2007.

78.    The direct and proximate result of Defendant's conduct as herein described has been a significant reduction in Prisacom's advertising revenue, as detailed in Confidential Annex 1.  Prisacom continues to be damaged by Defendant's continued publication of inaccurate and unreliable data and will continue to suffer significant damages over the course of 2008 and beyond until remedial steps are taken. Such lost revenue is due to both the loss of existing advertising as well as the loss of future advertisers who would have done business with Plaintiffs based on their #1 ranking.

79.    Defendant's conduct as described herein has also directly and proximately caused significant damage to Plaintiffs' reputation. Plaintiffs have not only lost their #1 ranking in the market, they have also lost credibility in the market by reason of Defendant's actions which may take years to restore.

## CLAIMS FOR RELIEF

### COUNT ONE
### Trade Libel

80.    Plaintiffs repeat and reallege paragraphs 1 through 79 set forth above.

81.    On information and belief, Defendant is aware that its estimates of elpais.com's audience are inaccurate and rest on a faulty methodology, and that their inaccurate and unreliable estimates harm Plaintiffs.  Defendant's publication of these inaccurate and unreliable estimates

of elpais.com's audience libels Plaintiffs by providing false data about elpais.com's audience to advertisers, thus causing Plaintiffs harm.

82.    Defendant, which is a sophisticated and long-time participant in the provision of audience measurement, is conscious and aware that its flawed methodology causes harm to Plaintiffs.

83.    The provision of inaccurate estimates of elpais.com's audience has caused advertisers to reduce or cease altogether doing business with Plaintiffs, or to refrain from doing so in the future.

84.    As a result of Defendant's libel, Plaintiffs have sustained substantial special damages in the form of lost advertising revenue which are detailed in Confidential Annex 1.

85.    Plaintiffs are entitled to actual damages it may prove at trial.

## COUNT TWO
### Tortious And Negligent Interference With Prospective Economic Advantage

86.    Plaintiffs repeat and reallege paragraphs 1 through 85 set forth above.

87.    A special relationship of trust existed between Plaintiffs and Defendant. Plaintiffs trusted Defendant to accurately collect, analyze, and distribute internet audience ratings. The fact that Defendant is the leading company that analyzes and publishes internet audience measurements for online media in Spain highlights the level of Plaintiffs' dependency on Defendant to perform their measurements accurately.

88.    Plaintiffs' current and future advertising revenues are dependent on the accurate measurement of internet audience.

89.    These estimates of audience size are disseminated, both directly and indirectly, by Defendant to those advertisers and advertising firms with whom Plaintiffs have existing or prospective contractual relations. Defendant's dissemination of inaccurate and unreliable estimates of elpais.com's online audience has libeled Plaintiffs.

90.    At all material times, Defendant possessed and possesses knowledge of Plaintiffs' relationships with its current advertisers, and possesses knowledge that Plaintiffs may enter into contracts with other advertisers in the future.

91.    Defendant intentionally published inaccurate and unreliable statistical estimates of elpais.com's online audience to its clients, including the companies and advertising firms with whom Plaintiffs have, or could have, done business. This has had, and will have, the effect of disrupting Plaintiffs' business relationships, and prospective business relationships, with their advertisers.

92.    Defendant acted dishonestly and improperly in this regard. Before even informing Plaintiffs of its intention to revise its statistical estimate of elpais.com's online audience, Defendant leaked that information to Plaintiffs' competitors. Defendant had no legitimate reason for leaking this information to Plaintiffs' competitors other than to injure Plaintiffs and damage Plaintiffs' relationships with its clients. Moreover, although Defendant expressly promised to allow Plaintiffs an opportunity to review the August Data prior to publication, such opportunity was never provided. Defendant admitted that it had no legitimate reason for failing to fulfill its promise.

93.    Plaintiffs have already sustained substantial damages in the form of lost advertising revenue, and will continue to sustain such losses in the months and years to come.

### COUNT THREE
### Negligent Misrepresentation

94.    Plaintiffs repeat and reallege paragraphs 1 through 93 set forth above.

95.    A special relationship of trust existed between Plaintiffs and Defendant. Plaintiffs trusted Defendant to accurately collect, analyze, and distribute internet audience ratings. The fact that Defendant is the leading company that analyzes and publishes internet audience measurements for online media in Spain highlights the level of Plaintiffs' dependency on Defendant to perform their measurements accurately. Additionally, Plaintiffs reasonably

believed in, and relied upon, Defendant's self-represented expertise in audience measurement when conducting its online media business.

96.     Although Defendant knew that its estimates of elpais.com's audience and its resulting ranking were false and had no reasonable basis in fact, it nonetheless represented to Plaintiffs and the public that these statistics were accurate.

97.     Defendant knew that Plaintiffs used Defendant's audience measurements, including the resulting Rankings, for the purpose of soliciting advertisers, and that Plaintiffs intended to rely and act upon Defendant's audience measurements and the resulting Rankings for the purpose of soliciting advertisers.

98.     In reasonable reliance on Defendant's false representations, Plaintiffs did, in fact rely on Defendant's data to solicit advertisers.

99.     As a result of this reliance, Plaintiffs have sustained substantial damages, including a significant reduction in Prisacom's advertising revenue and damage to their business reputation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     That the Court award Plaintiffs monetary damages in an amount to be finally determined at trial.

B.     That the Court award Plaintiffs such other relief as it may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Respectfully submitted,

_William O. Purcell_

William O. Purcell (WP-5001)
Ethan E. Litwin (EL-7083)
HOWREY LLP
Citigroup Center
153 East 53rd Street, 54th Floor
New York, NY 10022
(212) 896-6500

*Attorneys for Plaintiffs*

Dated:  April 3, 2008

# ANNEX 1

**[FILED UNDER SEAL ON APRIL 3, 2008]**

DM_US2I13350P_1

CASE NO. 07 Civ. 11295

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DIARIO EL PAIS, S.L. and PRISACOM, S.A.,

Plaintiffs,

-v-

THE NIELSEN COMPANY (US), INC.,

Defendant.

AMENDED COMPLAINT

HOWREY LLP
Attorneys for Plaintiff
153 East 53rd Street
54th Floor
New York, NY 10022
(212) 896-6500