IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DIARIO EL PAIS, S.L. and PRISACOM, S.A., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | 07-CV-11295 (HB) |
| ) | |
| THE NIELSEN COMPANY (US), INC., ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO
DISMISS THE AMENDED COMPLAINT**

HOWREY LLP
Citigroup Center
153 East 53rd Street, 54th Floor
New York, New York 10022
(212) 896-6500

## TABLE OF CONTENTS

Pages

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................1

STANDARD OF REVIEW ...........................................................................................7

ARGUMENT .................................................................................................................8

I.      THE NIELSEN LICENSE AGREEMENT DOES NOT GOVERN THE
        ADJUDICATION OF THIS DISPUTE.............................................................8

II.     THE NIELSEN COMPANY IS THE PROPER DEFENDANT TO THIS
        LAWSUIT........................................................................................................12

III.    NIELSEN'S INACCURATE AND UNRELIABLE STATISTICAL
        ESTIMATES ARE NOT PROTECTED SPEECH ..........................................14

IV.     PLAINTIFFS HAVE STATED VALID CLAIMS AGAINST NIELSEN ......18

        A.      Trade Libel...........................................................................................18

        B.      Tortious Interference with Prospective Economic Advantage .............22

        C.      Negligent Misrepresentation.................................................................24

CONCLUSION............................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Alvord & Swift v. Stewart M. Muller Construction Co.*,
   385 N.E.2d 1238 (N.Y. 1978) ......................................................................................23, 24

*Amadasu v. Bronx Lebanon Hospital Center*,
   No. 03 Civ. 6450 (LAK) (AJP), 2005 WL 121746 (S.D.N.Y. Jan 21, 2005).........................19

*Arista Records LLC v. Lime Group LLC*,
   532 F. Supp. 2d 556 (S.D.N.Y. 2007)..................................................................................4

*Bell Atlantic Corp. v. Twombly*,
   127 S. Ct. 1955 (2007)..........................................................................................7, 8, 22

*Bishop v Porter*,
   No. 02 Civ. 9542 (JSR) (GWG), 2003 WL 21032011 (S.D.N.Y. May 9, 2003) ...................23

*Charles Atlas, Ltd. v. Time-Life Books, Inc.*,
   570 F. Supp. 150 (S.D.N.Y. 1983)......................................................................................21

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*,
   516 N.E.2d 190 (N.Y. 1987)................................................................................................9

*Computech International, Inc. v. Compaq Computer Corp.*,
   No. 02 Civ. 2628 (RWS), 2003 WL 31398933 (S.D.N.Y.  Oct. 24, 2002)......................20, 22

*Compuware Corp. v. Moody's Investors Services, Inc.*,
   499 F.3d 520 (6th Cir. 2007) ............................................................................................17

*Costanza Construction Corp. v. City of Rochester*,
   523 N.Y.S.2d 707 (N.Y. App. Div. 1987) .........................................................................25

*Dai Nippon Printing Co. v. Melrose Publishing Co.*,
   113 F.R.D. 540 (S.D.N.Y. 1986) ......................................................................................23

*Drug Research Corp. v. Curtis Publishing Co.*,
   166 N.E.2d 319 (N.Y. 1960)..............................................................................................20

*Erickson v. Pardus*,
   127 S. Ct. 2197 (2007)........................................................................................................8

*Fashion Boutique of Short Hills, Inc. v. Fendi, USA, Inc.*,
   No. 91 Civ. 4544 (MGC), 1992 WL 170559 (S.D.N.Y. July 2, 1992).............................20, 22

*Gaylord Broadcast Co. v. Francis*,
    7 S.W.3d 279 (Tex. App. 1999)........................................................................14

*Genal Strap, Inc. v. Dar*,
    No. 04 CV 1691 (SJ), 2005 WL 525547 (E.D.N.Y. Feb. 28, 2005)........................................23

*Goldwater v. Ginzburg*,
    414 F.2d 324 (2d Cir.1969)........................................................................19

*Gruntal & Co. v. San Diego Bancorp*,
    No. 94 Civ. 5366 (DC), 1996 WL 343079 (S.D.N.Y. June 21, 1996)..............................24, 25

*Gucci America, Inc. v. Duty Free Apparel, Ltd.*,
    277 F. Supp. 2d 269 (S.D.N.Y. 2003)............................................................20, 21

*Henneberry v. Sumitomo Corp. of America*,
    532 F. Supp. 2d 523 (S.D.N.Y. 2007)........................................................24

*Hotel Employees & Restaurant Employees Union, Local 100 v.*
    *City of New York Department of Parks & Recreation*,
    311 F.3d 534 (2d Cir. 2002)........................................................................4

*Iqbal v. Hasty*,
    490 F.3d 143 (2d Cir. 2007)........................................................................7

*Kimmell v. Schaefer*,
    675 N.E.2d 450 (N.Y. 1996)........................................................................24

*Lasalle Bank National Association v. Citicorp Real Estate, Inc.*
    No. 02 Civ 7868 (HB), 2003 WL 1461483 (S.D.N.Y. Mar. 31, 2003) ..................................11

*Matherson v. Marchello*,
    473 N.Y.S.2d 998 (N.Y. App. Div. 1984) ............................................................21

*McNally v. Yarnall*,
    764 F. Supp. 838 (S.D.N.Y. 1991)........................................................................18

*Menaldi v. Pay-Per-View Network, Inc.*
    No. 97 Civ. 6451 (HB), 1998 WL 230994 (S.D.N.Y. May 5, 1998)..................................10, 11

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964)........................................................................18

*Porter v. Property Damage Control Group, Inc.*,
    No. 03 CV 5972, 2007 WL 2907403 (E.D.N.Y. Sept. 28, 2007)............................................11

*Procter & Gamble Co. v. Quality King Distributors, Inc.*,
   974 F. Supp. 190 (E.D.N.Y. 1997) ..................................................................21

*Reporters' Association of America v. Sun Printing & Publishing Association*,
   79 N.E. 710 (N.Y. 1906) ..............................................................................21

*Schroders Inc. v. Hogan Systems, Inc.*,
   522 N.Y.S.2d 404 (N.Y. Sup. Ct. 1987) .........................................................11

*Search King, Inc. v. Google Tech., Inc.*,
   No. Civ 02-1457-M, 2003 WL 21464568 (W.D. Okla. May 27, 2003) ............16, 17

*Sommer v. Federal Signal Corp.*,
   593 N.E.2d 1365 (N.Y. 1992) ........................................................................10

*Squire Records, Inc. v. Vanguard Recording Society, Inc.*,
   226 N.E.2d 542 (N.Y. 1967)...........................................................................20

*TD Waterhouse Investor Services., Inc. v. Integrated Fund Services Inc.*,
   No. 01 Civ. 8986 (HB), 2003 WL 42013 (S.D.N.Y. Jan. 6, 2003)......................10

*Themed Rests, Inc. v. Zagat Survey, LLC*,
   781 N.Y.S.2d 441 (N.Y. Sup. Ct. 2004), *aff'd*,
   801 N.Y.S.2d 38 (N.Y. App. Div. 2005) .....................................................18, 19

*Themed Rests, Inc. v. Zagat Survey, LLC*,
   801 N.Y.S.2d 38 (N.Y. App. Div. 2005) ..........................................................17

*United States ex rel. Evergreen Pipeline Construction Co. v.*
   *Merritt Meridian Construction Corp.*,
   95 F.3d 153 (2d Cir. 1996)..............................................................................10

## STATUTES

FED. R. CIV. P. 8(a)(2) ......................................................................................7, 20, 25

Plaintiffs Diario El Pais, S.L. ("El Pais") and Prisacom, S.A. ("Prisacom") respectfully submit this Memorandum of Law, together with the Affidavit of Ethan E. Litwin, Esq., in opposition to Defendant's motion to dismiss the Amended Complaint.

## PRELIMINARY STATEMENT

Plaintiffs bring this lawsuit to recover substantial damages caused by Defendant's malicious libel of Plaintiffs' business. The facts of this case are straightforward. Prisacom, through its agreement with El Pais, owns and operates elpais.com, the online version of *El Pais*, Spain's most widely read daily newspaper. (Am. Compl. ¶ 23) Prisacom's business is dependent on its ability to generate revenue by selling space on elpais.com to advertisers. (*Id*.) The willingness of advertisers to purchase space on a website, and the amount such advertisers are willing to pay for that space, is in large measure dependent on the audience reached by that particular website. (*Id.* ¶¶ 2, 29)

Defendant The Nielsen Company (US), Inc. ("Nielsen"), among other things, is the leading provider of online intelligence through its Nielsen Online service. (*Id.* ¶¶ 2, 24) Throughout the world, including in Spain, advertisers and advertising agencies rely on Defendant's statistical estimates of online audiences to determine how to allocate their advertising budgets among competing websites. (*Id.* ¶¶ 2, 29) Defendant has built its leading market position in online intelligence through its oft-repeated representations that its statistical estimates of online audiences are both accurate and reliable. (*Id.* ¶¶ 24, 31)

In March 2007, Defendant announced significant changes to both the composition of its panel of internet users (the sample) and to the methodology by which Nielsen extrapolates the total online audience (the statistical estimate) from data collected from the panel. (*Id.* ¶¶ 4, 41) As of March 2007, according to Defendant's statistical estimates, elpais.com was, and had been for some time, the #2 media website in Spain. (*Id.* ¶¶ 4, 35) Although Nielsen reported

significantly larger audiences market-wide under this new methodology, elpais.com continued to maintain its relative position *vis-à-vis* its competitors. (*Id.* ¶¶ 46-47) During the period March 2007 to June 2007, Nielsen reported that elpais.com had continued its steady erosion of the gap in online audience with the historical market leader. (*Id.* ¶¶ 36, 48) Finally, in July 2007, Nielsen reported that elpais.com had become the #1 media website in Spain. (*Id.* ¶ 48)

On September 21, 2007, three of elpais.com's closest competitors, citing sources within Nielsen, published news articles reporting that Nielsen's statistical estimates of elpais.com's online audience were overstated by as much as 20%. (*Id.* ¶¶ 6, 51) Prisacom, which was not aware of this issue prior to September 21st, immediately sought an explanation from Nielsen. (*Id.* ¶ 54) Nielsen confirmed the substance of these news reports, but promised Prisacom that it would have an opportunity to review any revised estimates before publication. (*Id.* ¶ 55)

Despite that express promise, Nielsen abruptly published its statistical estimate of elpais.com's online audience for August 2007 on September 25, 2007 without notice to Plaintiffs. (*Id.* ¶ 9) This report showed a decrease in elpais.com's online audience for August 2007 of more than 1.8 million viewers, reducing elpais.com from the #1 to the #3 media website in Spain. (*Id.*) Since that time, Nielsen has continued to publish monthly statistical estimates that materially misstate elpais.com's online audience. (*Id.* ¶¶ 12-13, 76-77)

Nielsen's downward revision of its statistical estimate of elpais.com's online audience was, and continues to be, unwarranted. Not only is this downward revision contrary to trends observed in data collected and measured internally by Plaintiffs, it is also contrary to the clear trend observed by Nielsen under its pre-March 2007 methodology, which Nielsen still maintains produced accurate and reliable statistical estimates. (*Id.* ¶¶ 14, 16, 44-45, 64) As a result of

Defendant's downward revision of elpais.com's online audience, Plaintiffs have lost, and will continue to lose, a substantial amount of advertising revenue.  (*Id.*, Confidential Annex I)

In response to Plaintiffs' allegations, Nielsen attempts to disavow all responsibility for the many tortious acts that it has committed, and is continuing to commit, against Plaintiffs. Specifically, Nielsen claims that (i) Plaintiffs' claims are governed by a license agreement between Prisacom and Nielsen's Netratings service, (ii) liability, in any event, lies solely with its "Netratings" subsidiary, (iii) even if Nielsen may be found liable in tort, Plaintiffs' claims fail because (a) Nielsen's statistical estimates are constitutionally-protected speech, and (b) Plaintiffs have not sufficiently pled certain elements of their claims.  Each of Nielsen's arguments is without merit and should be rejected.

*First*, the license agreement between Prisacom and Netratings is nothing more than a red herring.  On July 26, 2005, Prisacom signed an agreement to obtain a non-exclusive, non-transferable usage license for Nielsen data and statistics.  (Litwin Aff. Exh. A (Nielsen License Agreement))  No provisions of the Nielsen License Agreement purport to govern *Nielsen's* interactions with third parties or to limit Prisacom's damages as a result of such interactions.  (*Id.* ¶ 9.3)  It is precisely these interactions – Defendant Nielsen's publication of unreliable and inaccurate statistical estimates of the online audience of elpais.com to Prisacom's existing and potential advertisers and advertising agencies – that form the factual basis for this lawsuit.

*Second*, Nielsen's argument that it is not the proper defendant in this case is likewise entirely without merit.  Numerous documents in the public record directly contradict Nielsen's attempt to frame Netratings as the sole relevant and independent actor here.  Contrary to Nielsen's claims that Netratings is "a wholly separate corporation" (Def. Mem. at 9), documents

published on the Netratings website describe Netratings merely as a "brand" within the Nielsen

Online service:

> Nielsen Online, *a service of The Nielsen Company*, delivers comprehensive, independent measurement and analysis of online audiences . . . and *includes products previously marketed under the Nielsen//NetRatings and Nielsen BuzzMetrics brands*. . . . For more information, please visit http://www.nielsen-online.com.

> Nielsen//Netratings and BuzzMetrics are part of the newly formed *Nielsen Online unit within The Nielsen Company*, a global information and media company.

(Litwin Aff. Exh. B ("Corporate Overview")

http://www.netratings.com/about.jsp?section=cor&nav=1)[1]  Moreover, Nielsen's own "Client

Guidelines," which were recently posted on the Netratings website, confirm that Defendant is the

responsible corporate entity for the acts of Nielsen Online and Netratings:

> The Nielsen Company is the copyright owner of all material contained on the Nielsen Online Web site;[2] the services, reports, analyst services, and any other data provided by The Nielsen Company ("data").

> \*      \*      \*

> <u>Nielsen Online</u> is the name of our service in The Nielsen Company, and should be used in reference to data and/or research; *it should not be used as if it were a corporate entity.*

> \*      \*      \*

> <u>The Nielsen Company</u> *is the name of our corporate entity.*

(Litwin Aff. Exh. C ("Client Guidelines for Use of Nielsen Online Data – April 2008")

http://www.netratings.com/downloads/PR_guidelines_0806.pdf (italics added))  Other facts

support finding Nielsen liable for the conduct alleged in the Amended Complaint.  For example,

---

[1] This Court may take judicial notice of all documents and other material contained on the Nielsen, Nielsen Online, and Netratings websites.  *See*, *e.g.*, *Hotel Employees & Rest. Employees Union, Local 100 v. City of New York Dep't of Parks & Recreation,* 311 F.3d 534, 549 (2d Cir. 2002) (taking judicial notice of information published on the Parks Department website); *Arista Records LLC v. Lime Group LLC*, 532 F. Supp. 2d 556, 571 (S.D.N.Y. 2007) (taking judicial notice of information published on the RIAA website).

on October 15, 2007, Defendant Nielsen, on its own letterhead, issued a press release that, in

relevant part, stated:

> The Nielsen Company today announced that it has launched two new *Internet and mobile measurement services – Nielsen Online* and Nielsen Mobile – that build on the company's leadership positions in both sectors . . .
>
> *    *    *
>
> Nielsen Online is comprised of the company's *Nielsen//NetRatings and BuzzMetrics services* . . . .
>
> David Calhoun, chief executive officer of The Nielsen Company said, "As consumers experience media through different channels and technologies, *it is essential that Nielsen measure and interpret* that experience for its clients."
>
> *    *    *
>
> The Nielsen Company is a global information and media company with leading market positions and recognized *brands* in . . . online intelligence (NetRatings and BuzzMetrics) . . . .

(Litwin Aff. Exh. D ("Nielsen Launches New Internet and Mobile Measuring Services," October

15, 2007) http://www.nielsen.com/media/2007/pr_071015.html (italics added))

Defendant's attempt to cast Netratings as an independent actor also fails in the face of

Nielsen's own conduct in the events leading up to this litigation.  On September 26, 2007, the

Defendant wrote to Manuel Mirat, Chief Executive Officer of Prisacom, regarding Defendant's

publication of inaccurate and unreliable statistical estimates of the online audience of elpais.com.

(Am. Compl. ¶ 69)  That letter clearly demonstrates that Defendant, and not Netratings, is the

proper defendant in this case:

> I am writing in connection with your recent discussion with the *Nielsen//NetRatings team* concerning the audience estimates published monthly in the *Nielsen//NetRatings NetView service*.
>
> I can confirm that *our team* will publish the data you discussed . . . .

---

[2] The Netratings website is also owned and copyrighted by The Nielsen Company.  (Litwin Aff. Exh. B)

> Should you or your team wish to engage in further discussion on this topic,
> please feel free to contact *me or members of the Spanish, European or Global
> teams*.

(Litwin Aff. Exh. E (Letter dated Sept. 26, 2007 from Jonathan Carson to Manuel Mirat ("Carson Letter") (emphasis added)))  The Carson Letter was sent on the letterhead of The Nielsen Company, but signed by Mr. Carson in his capacity as International President of Nielsen Online from his office at 770 Broadway, New York.  (*Id.*)  Indeed, this address is the shared headquarters of both The Nielsen Company and its Nielsen Online service.  (Litwin Aff. Exh. F ("Nielsen Online Contacts") http://www.nielsen-online.com/contact)  Whether called a "brand," a "service," a "business unit" or part of a "team," one thing is abundantly clear: neither Netratings nor Nielsen Online is sufficiently independent from The Nielsen Company to absolve the latter from liability.

     *Third*, Nielsen's attempt to swathe its publication of statistical estimates of the online audience of elpais.com in the protective coverings of the First Amendment must fail. Specifically, Nielsen's claim that its statistical estimates are merely opinions given on subjective concepts is clearly distinguished by the few examples cited by Nielsen itself.  Unlike the subjective concepts measured by Zagat (quality of food, service, decor), Moody's (level of risk), or Google (relevance of a website to a given search), Nielsen measures a purely objective fact, namely the number of viewers that visit elpais.com and other websites in a given month. Importantly, despite the fact that Nielsen claims that its statistical estimates are mere "opinions," no such disclaimer appears on the relevant reports published by Nielsen each month.  In fact, Nielsen publishes its statistical estimates of online audiences without any reference to sampling error, margin of error, confidence intervals or any other metric that could help third parties gauge the reliability of these statistics.  Nielsen's failure to properly qualify the reliability of its statistical estimates is exacerbated by its marketing materials, which are replete with

- 6 -

representations that its statistical estimates are both reliable and accurate.  Absent any disclaimer

or qualifying language, Nielsen's statistical estimates of a clearly objective fact – number of

viewers – do not amount to constitutionally-protected speech.

Finally, Nielsen incorrectly claims that Plaintiffs have not sufficiently pled claims for

trade libel, tortious interference, and negligent misrepresentation.  Despite Nielsen's frequent

references to *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), Plaintiffs here have alleged

specific facts and have not relied on mere inferences.

In short, Plaintiffs respectfully submit that each of Nielsen's arguments should be

rejected and that Plaintiffs should be allowed to prosecute their claims.

## STANDARD OF REVIEW

Motions to dismiss are considered in the light most favorable to Plaintiffs.  Under the

Federal Rules, Plaintiffs are obligated to set forth in their Amended Complaint only "a short and

plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P.

8(a)(2).  In determining whether Plaintiffs have met this standard, the court must accept all the

allegations of the claim as true and draw all reasonable inferences in the plaintiff's favor.  *See*

*Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007).

Despite Defendant's reliance on *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007),

*Twombly* does little to change the foregoing standard.  *Twombly* means what it says, namely that

Rule 8(a)(2) is still the federal pleading standard.  *Twombly*, 127 S. Ct. at 1964 (quoting FED. R.

CIV. P. 8(a)(2)).  Thus, even under *Twombly*, Plaintiffs need only plead those facts which (i) give

Nielsen fair notice of the claims being asserted against it, and (ii) if proven, would establish the

elements of the claim.  *Twombly*, 127 S. Ct. at 1964; *accord Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007).[3]

**ARGUMENT**

**I.    THE NIELSEN LICENSE AGREEMENT DOES NOT GOVERN
        THE ADJUDICATION OF THIS DISPUTE**

Plaintiffs' claims properly lie in tort because the Nielsen License Agreement does not govern this dispute.  Simply put, the Nielsen License Agreement governs the provision of Nielsen data to Prisacom.  This dispute concerns Nielsen's provision of Nielsen data to third parties.  In effect, Defendant is arguing here that if a newspaper were to libel a subscriber, the subscriber would be limited to bringing a lawsuit under his subscription agreement.  The fallacy of Defendant's position is easily proven.

*First*, the plain language of the contract clearly demonstrates that this dispute is not governed by the Nielsen License Agreement.  By its own terms, the Nielsen License Agreement is strictly limited to setting forth the terms and conditions governing Prisacom's access and use of Nielsen's NetView service.  (Litwin Aff. Exh. A ¶ 2 ("Purpose"))  Specifically, the Nielsen License Agreement grants a usage license to Prisacom for Nielsen data and statistics.  (*Id.* ¶ 5 ("License"))  Moreover, contrary to Nielsen's argument, the limitation of damages section clearly applies only to damages claimed as "resulting from agreements between [Prisacom] and a third party, or for claims from a third party."  (*Id.* ¶ 9.3)  The Nielsen License Agreement

---

[3] As demonstrated herein, Plaintiffs have made sufficient factual allegations "to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 127 S. Ct. at 1965 (citations omitted).  In *Twombly*, the plaintiffs alleged a conspiracy to fix prices of certain telecommunication services, but failed to make any specific factual allegations to support that allegation. *See Id.* at 1961-66.  Instead, plaintiffs claimed that the alleged conspiracy could be "inferred" from the defendants' parallel conduct. *Id.*  The Supreme Court declined to do so, holding that it could not plausibly infer an illegal conspiracy from mere allegations of legal conduct. *Id.* at 1970-72.  In short, Plaintiffs' Amended Complaint here is not similarly speculative because this Court need not infer the existence of additional facts necessary to establish any of the three claims Plaintiffs have pled.

- 8 -

purports neither to govern Nielsen's own interactions with third parties nor to limit Prisacom's damages as a result of such interactions.  For this reason alone, Defendant's motion must fail.

*Second,* all of the relevant facts in this dispute arise independent of this contractual relationship.  Nielsen's policy is to provide market-wide data for all leading websites, regardless of whether each such entity is a Nielsen subscriber.  Thus, even if Prisacom had not signed the Nielsen License Agreement, Nielsen still would have collected the same data from its panel. From this data, Nielsen still would have calculated its statistical estimate of the online audience of elpais.com and published that statistical estimate to third parties.  Thus, even if the Nielsen License Agreement had not existed, the same inaccurate and unreliable statistical estimates of the online audience of elpais.com would have been provided to Prisacom's competitors and clients, and the same damages would have resulted therefrom.  Thus, the relevant facts of this dispute are wholly independent of the Nielsen License Agreement.

For these reasons, the cases cited by Defendant are inapposite to the facts of this case. For example, in *Clark-Fitzpatrick v. Long Island R.R. Co.*, the court dismissed the plaintiffs' negligence claims only after determining that a valid and enforceable written contract governed the subject matter of the dispute.  516 N.E.2d 190, 192-94 (N.Y. 1987).  Specifically, in *Clark-Fitzpatrick*, the plaintiffs alleged that the defendant failed to exercise due care in performing its various duties under the contract between the parties.  *Id.* at 194.  By comparison, the only duty assumed under the Nielsen License Agreement is the obligation to provide access to the NetView database and Plaintiffs do not claim in this lawsuit that such access was not provided.  Thus, while the *Clark-Fitzpatrick* court found that the plaintiffs' claims arose in contract, and not in tort, *id.*, the opposite is true here.

The other cases cited by Defendant are similarly unavailing.  For example, Defendant cites three cases that were previously decided by this Court.  In *TD Waterhouse Investor Services, Inc. v. Integrated Fund Services, Inc.*, this Court dismissed the plaintiffs' negligence claim for restating their claim for breach of contract.  No. 01 Civ. 8986 (HB), 2003 WL 42013, at *13-14 (S.D.N.Y. Jan. 6, 2003).  Importantly, however, this Court made its finding in that case *only after a full bench trial had been completed* and therefore such dismissal was made on the merits and after full and fair discovery had been provided by the defendant.  *Id.*  Here, Nielsen would have the Court dismiss Plaintiffs' claims as a matter of law, thereby denying Plaintiffs the opportunity to discover and prove facts supporting their claims.[4]  Moreover, the facts of the *TD Waterhouse* case are inapposite to those here.  In *TD Waterhouse*, the plaintiffs claimed that the defendant had negligently performed its accounting and pricing services that had been contracted for by the plaintiffs.  *Id.*, at *12.  In the instant case, Defendant's measurements of elpais.com's online audience and its subsequent publication of said statistical estimates to third parties were not contracted for by Prisacom.  Thus, while this Court properly dismissed the negligence claims in *TD Waterhouse*, the opposite result is warranted here.  In this case, Nielsen did not measure the audience of elpais.com and did not publish those measurements to third parties due to any contractual arrangement with Plaintiffs.  Such actions were taken by Nielsen of its own accord and therefore Nielsen is liable for damage caused by such actions in tort.

Likewise, in *Menaldi v. Pay-Per-View Network, Inc.* this Court dismissed the plaintiff's negligence and injury to business reputation claims on grounds very different from the facts of

---

[4] Similarly, two other opinions Defendant relies upon involved stages of litigation *after* full discovery had been made.  *See United States ex rel. Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp.*, 95 F.3d 153, 159-60 (2d Cir. 1996) (appeal from final judgment following jury verdict); *Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1368 (N.Y. 1992) (appeal from grant of summary judgment after discovery).  Plaintiffs agree with the implicit reasoning behind these cases, namely that Plaintiffs should be allowed an opportunity to take discovery in support of each of their claims.

the instant case.  No. 97 Civ. 6451 (HB), 1998 WL 230994 (S.D.N.Y. May 5, 1998).  In *Menaldi*, the plaintiff had entered into a distribution agreement with the defendants concerning the transmission of the plaintiff's programming over the defendants' cable and satellite network.  *Id.* When the program, a live boxing event, was transmitted, technical errors resulted in a 70-minute frozen picture instead of live action.  *Id.*, at *1.  Menaldi's damages allegedly resulted from such faulty transmission.  *Id.*  The *Menaldi* case, therefore, is easily distinguishable from the case at hand.  In *Menaldi*, the plaintiff essentially claimed that the defendants had negligently performed their duties under the contract.  *Id.*, at *3.  Here, the tortious conduct that gives rise to Plaintiffs' claims is not governed by a contract between the parties.

Finally, as this Court noted in *Lasalle Bank Nat'l Ass'n. v. Citicorp Real Estate, Inc*., tort claims should be sustained where, as here, the cause of action springs from " 'circumstances *extraneous to*, and *not constituting elements of*, the contract.' "  No. 02 Civ 7868 (HB), 2003 WL 1461483, at *3  (S.D.N.Y. Mar. 31, 2003) (citation omitted) (emphasis added); *accord Porter v. Prop. Damage Control Group, Inc.*, No. 03 CV 5972, 2007 WL 2907403, at *10 (E.D.N.Y. Sept. 28, 2007) (dismissing tort claims where plaintiffs had alleged that such claims were based on defendants' "fail[ure] to comply *with the contractual obligations of the contract*") (emphasis in original).[5]  That is the case here, where the circumstances giving rise to Plaintiffs' claims are completely extraneous to the obligations assumed under the Nielsen License Agreement.

---

[5] In *Lasalle*, this Court cited with approval the "masterfully reasoned decision" of *Schroders Inc. v. Hogan Systems, Inc.*, 522 N.Y.S.2d 404 (N.Y. Sup. Ct. 1987) in which that court sustained a negligent misrepresentation claim where, as here, the defendant made false representations about their technical prowess.  *Lasalle Bank Nat'l Assoc.*, 2003 WL 1461483, at *4.  The same is true in this case, as Nielsen falsely claimed that its proprietary sampling methodology produced accurate and reliable statistical estimates of online audiences.  Thus, under the reasoning of *Lasalle* and *Schroders*, Plaintiffs' tort claims should be sustained.

—

As the foregoing amply demonstrates, the Nielsen License Agreement does not govern the instant dispute between the parties.  Accordingly, Plaintiffs respectfully submit that Defendant's motion should be denied.[6]

## II.    THE NIELSEN COMPANY IS THE PROPER DEFENDANT TO THIS LAWSUIT

Plaintiffs have satisfied their pleading requirements to show a set of facts consistent with their theory that Nielsen should be liable for the damages caused by Nielsen's publication of inaccurate and unreliable statistical estimates of the online audience of elpais.com.  In short, Nielsen holds itself out as the author of the statistical estimates produced by its Nielsen Online service and sold under the Netratings brand.  Far from being an independent actor, Netratings is described on its own website as part of the "Nielsen Online unit within The Nielsen Company." (Litwin Aff. Exh. B)  In turn, Nielsen Online is alternatively referred to as either a "unit within The Nielsen Company" or "a service of The Nielsen Company." (*Id.*)  The Netratings website further makes plain that (i) "The Nielsen Company is the copyright owner of all material contained on the Nielsen Online Website; the services, reports, analyst services and any other data provided by The Nielsen Company," (ii) "Nielsen Online is the name of our service in The Nielsen Company, and . . . should not be used as if it were a corporate entity," and (iii) "The Nielsen Company is the name of our corporate entity."  (Litwin Aff. Exh. C)  Nielsen Online has

---

[6] As the Nielsen License Agreement does not govern the adjudication of this dispute, there is no need to separately address the Defendant's argument that the limitation of liability clause in the Nielsen License Agreement precludes Plaintiffs' damages claim.  Nonetheless, it would be remiss to neglect to note that this is yet one more example of Nielsen's tortured and self-serving reading of the Nielsen License Agreement.  As noted above, the Nielsen License Agreement expressly applies only to two types of claims: (i) claims resulting from agreements between Prisacom and a third party, and (ii) claims made against Prisacom by a third party.  (Litwin Aff. Exh. A, ¶ 9.3)  Neither case is applicable here.  Plaintiffs' claims do not result from breaches of underlying agreements with third parties, nor are they the result of claims made by third parties against Plaintiffs.  Plaintiffs' claims are the result of *Nielsen's* libel of Plaintiffs' business *to* third parties.

both (i) issued press releases on the letterhead of The Nielsen Company, (Litwin Aff. Exh. D)
and (ii) claimed the headquarters of The Nielsen Company to be its own (Litwin Aff. Exh. F).

Defendant's argument that its Spanish subsidiary, Netratings, is the proper party here is
further belied by its conduct in this case.  When Prisacom first complained about Defendant's
publication of inaccurate and unreliable statistical estimates of the online audience of elpais.com,
the matter was escalated within hours to Jonathan Carson, the International President of Nielsen
Online.  (Am. Compl. ¶ 68-69)  Writing to Prisacom on the letterhead of The Nielsen Company,
Mr. Carson takes full responsibility for the disputed statistical estimates.  (Litwin Aff. Exh. E)
(apologizing for Nielsen's breaking of its promise to allow Prisacom an opportunity to discuss
the statistical estimates "in depth with our team as had been agreed" before publication)  If this
had truly been a dispute between Prisacom and Netratings Spain, the International President of
Nielsen Online, writing on the letterhead of The Nielsen Company and from its corporate
headquarters in New York, would not have, within hours, responded to Prisacom's initial
complaints.

Plaintiffs respectfully submit that (i) the fact that Netratings is now part of Nielsen Online
(Litwin Aff. Exh. B), (ii) the fact that Nielsen describes Netratings as its "brand" (*id.*), (iii) the
fact that the Netratings website describes Nielsen Online as a "service" of The Nielsen Company
(*id.*), (iv) the fact that the Netratings website specifically states that "Nielsen Online is the name
of our service . . . [and] should not be used as if it were a corporate entity," (Litwin Aff. Exh. C)
(v) the fact that the Netratings website admits that "The Nielsen Company is the name of our
corporate entity," (*id.*) (vi) the fact that the Netratings website admits that The Nielsen Company
is the owner of all copyrighted material on the Netratings website, including "services, reports,
analyst services and any other data," (*id.*) (vii) the fact that Nielsen Online shares a corporate

headquarters with The Nielsen Company (Litwin Aff. Exh. F), (viii) the fact that Nielsen routinely ignores corporate formalities by, among other things, issuing press releases for Nielsen Online on the letterhead of The Nielsen Company (Litwin Aff. Exh. D), and (ix) the fact that Nielsen Online has corresponded with Plaintiffs regarding this dispute on the letterhead of The Nielsen Company (Litwin Aff. Exh. E), are sufficient to demonstrate at this stage Nielsen's liability for the alleged conduct as set forth in the Amended Complaint.

### III.    NIELSEN'S INACCURATE AND UNRELIABLE STATISTICAL ESTIMATES ARE NOT PROTECTED SPEECH

In its moving papers, Nielsen attempts to clothe its statistical estimates in the protective robes of the U.S. and New York constitutions.  In so arguing, Nielsen would have this Court believe that its statistical estimates are nothing more than mere guesswork, the kind of opinion that should not be interpreted literally.  This position stands in stark contrast to Nielsen's many statements concerning the validity of its statistical estimates.  Nielsen presents its statistical estimates as facts, unencumbered by any qualifying measurement such as a margin of error or even a single disclaimer.  Such statements are not deserving of any constitutional protection.  *See Gaylord Broad. Co. v. Francis*, 7 S.W.3d 279, 282-83 (Tex. App. 1999) (finding that allegedly inaccurate report that judge left early 67% of the time, worked half days 50% of the time, and worked on average 27 hours per week were "seemingly scientific statistics" reasonably capable of a defamatory meaning).

Contrary to its marketing messages, Nielsen claims that its publications of statistical estimates of online audiences are mere "expressions of opinion."  (Def. Mem. at 16-17)  Nothing could be further from the truth.  In the first instance, the statistics published by Nielsen are the product of Nielsen's sampling methodology.  "Sampling" is a well-established branch of the science of statistical analysis that is concerned with the selection of individual observations that

is intended to yield some knowledge about a larger population.  Of course, sampling is not an

exact science, and statistics produced by sampling methodology are prone to what is known as

"sampling error."  Sampling error is the error caused by observing a sample instead of the whole

population, and is often expressed as a "margin of error."  A margin of error, therefore, is a

statistic expressing the amount of random sampling error in a study's results.  Simply put, the

larger the margin of error, the less confidence one should have that the study's results are close

to the "true" figures, that is, the figures for the whole population.

Notably, Nielsen's reports that contain its statistical estimates of online audiences do not

contain a margin of error or any other like qualifier.  Moreover, instead of honestly reporting the

sampling error associated with its statistics, Nielsen unambiguously asserts that the statistical

estimates published in its reports are accurate:

> Nielsen//NetRatings has a range of products you can rely on for high quality
> Internet metrics . . . .  Each of these syndicated services has a *unique
> methodology designed to provide accurate results*.

> Nielsen//NetRatings is able to provide *accurate unique audience figures* and
> detailed demographic information because of our rigorous recruitment,
> proprietary tracking and granular measurement processes.

(Litwin Aff. Exh. G ("Press FAQ's"))

http://www.netratings.com/press.jsp?section=pr_faq&nav=7 (emphasis added))  Nielsen also

actively encourages its clients to rely on its statistical estimates:

> The Nielsen Company encourages the use of Nielsen Online data in our clients'
> business decisions, statements to investors, presentations to customers,
> advertisements, press releases, and other public uses.

(Litwin Aff. Exh. C)  Nielsen even suggests that its statistical estimates can be used to precisely

calculate a "Cost Per Thousand Page View" metric that can be used for strategic planning.

(Litwin Aff. Exh. H ("WebRF Enables Cost-Efficient Advertising Planning and Measurement

Using Traditional Media Research Metrics") http://www.nielsen-

netratings.com/downloads/uk/WebRF_UK.pdf)  Yet despite Nielsen's specific claim that its statistical estimates are sufficiently reliable to be used for, among other things, statements made to investors, Nielsen does not discuss sampling error in its reports.  In short, Nielsen reports "data" each month that purports to be the exact number of "unique visitors" to the elpais.com website without any qualification whatsoever.  Far from even identifying this result as guesswork, Nielsen presents this "data" as hard, cold facts.

Ignoring all of the foregoing, Nielsen argues here that its statistical estimates of online audiences do not "contain a provably false factual connotation."  (Def. Mem. at 15)  That is simply not true.  There are many provably false facts made by Nielsen here:

- o  the "fact" that elpais.com had an online audience of 3,818, 3,143, 4,191, 3,305, 3,231, 3,050, 3,768, 3,935, 3,738, and 3,357 unique visitors (in thousands) for the months between March 2007 and December 2007 inclusive;

- o  the "fact" that each of the statistical estimates cited above are "accurate";

- o  the "fact" that sampling error of each of the statistical estimates cited above is sufficiently low to render the result reliable.

For this reason, Nielsen's reliance on *Search King, Inc. v. Google Tech., Inc*., No. Civ 02-1457-M, 2003 WL 21464568 (W.D. Okla. May 27, 2003) is misplaced.  In that case, the issue facing the court was whether Google's "representation of the relevant significance of a web site as it corresponds to a search query is a form of protected speech."  *Id.*, at *1.  The court reasoned that although Google's opinion was based on an algorithm, the concept of a website's relevance to a given search is ultimately "a subjective representation."  *Id.*, at *4.  Thus, the *Search King* court held that Google's "representations" were protected speech because "there is no conceivable way to prove that the relative significance assigned to a given web site is false."  *Id.*

Simply put, the instant case is demonstrably different than *Search King*.  In *Search King*, the dispute centered on whether Google's algorithm was a good proxy for relevance.  2003 WL

21464568, at *4.  By comparison, there is no issue here with the use of sampling methodology to produce estimates of online audiences: the issue in this case is whether Nielsen's sampling methodology produces accurate and reliable results according to well-established rules of statistical analysis.  Specifically, Plaintiffs intend to show that Nielsen's sampling methodology produces so large a sampling error as to render the results statistically unreliable.  Plaintiffs therefore intend to prove that (i) Nielsen's post-March 2007 statistical estimates of the online audience of elpais.com are false and (ii) Nielsen's statements that its statistical estimates of online audiences are accurate and reliable are false.

The balance of the cases cited by Defendant in support of its constitutional argument fail for the same reason.  Unlike the case here, the statements in those cases attempted to quantify subjective matters that are inherently incapable of precise measurement.  *Themed Rests., Inc. v. Zagat Survey, LLC*, 801 N.Y.S.2d 38, 39 (N.Y. App. Div. 2005) (finding that a "quality of food score" has no measurable meaning); *Compuware Corp. v. Moody's Investors Servs., Inc.*, 499 F.3d 520, 529 (6th Cir. 2007) ("A Moody's credit rating is a predictive opinion, dependent on a subjective and discretionary weighing of complex factors . . . .  Even if we could draw any fact-based inferences from this rating, such inferences could not be proven false because of the inherently subjective nature of Moody's ratings calculation.").  It should also be noted that unlike Nielsen's practice, both Zagat[7] and Moody's[8] are careful to include disclaimers in their reports that qualify their statements as expressions of opinion.

---

[7] The 2007 Zagat Survey for New York City Restaurants expressly notes that "[t]he reviews published in this guide are based on *public opinion surveys*, with numerical ratings reflecting the *average scores* given by all survey participants."  (Litwin Aff. Exh. I (Zagat Survey: 2007 N.Y. City Rests.) (emphasis added))

[8] Moody's reports also contain a robust disclaimer: "NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER *OPINION* OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.  Each rating or other *opinion* must be weighed solely as one factor in any investment decision made by or on behalf of any user of the information

- 17 -

In sum, Nielsen's attempt to blur the distinction between opinions based on subjectivity and statements based on statistical analysis fails. While Google, Zagat, and Moody's attempt to quantify subjective concepts like "relevance," "quality of food," and "risk," Nielsen purports to count the number of unique visitors to a website. The reliability and accuracy of that number, the product of statistical analysis, can be verified and Nielsen's many statements as cited above can be proven false.

## IV.    PLAINTIFFS HAVE STATED VALID CLAIMS AGAINST NIELSEN

### A.    Trade Libel

Defendant incorrectly contends that Plaintiffs' trade libel claim should be dismissed because Plaintiffs have not sufficiently pled either malice or special damages. To the contrary, Plaintiffs have alleged facts, if taken in a light most favorable to Plaintiffs, that are sufficient to sustain Plaintiffs' allegation that Nielsen acted with malice. Further, Plaintiffs have stated with sufficient particularity the special damages they suffered as a result of Defendant's libel.

*First*, to successfully plead malice, it is sufficient to allege that Defendant's statements were made "with the knowledge that [they were] false *or* with reckless disregard of whether [they were] false or not." [9] *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964) (cited with approval by Defendant at p. 18 of Def. Mem.); *Themed Rests., Inc. v. Zagat Survey*, LLC, 781 N.Y.S.2d 441, 446 (N.Y. Sup. Ct. 2004), *aff'd*, 801 N.Y.S.2d 38 (N.Y. App. Div. 2005) (same).

---

contained herein, and each such user must accordingly make its own study and evaluation of each security and of each issuer and guarantor of, and each provider of credit support for, each security that it may consider purchasing, holding or selling." (Litwin Aff. Exh. J ("Moody's Rating Report – Jan 2008") (emphasis added))

[9] Defendant impermissibly seeks to hold Plaintiffs to an unwarrantedly high standard of proof. To support its argument in this regard, Defendant points this Court to the *summary judgment* standard for making a showing of actual malice, rather than the much lower pleading standard under Rule 8. *See McNally v. Yarnall*, 764 F. Supp. 838, 846 (S.D.N.Y. 1991) (cited by Def. Mem. at 9 as setting forth the pleading requirement under Rule 8(a); court notes that "a showing of actual malice" would defeat qualified privilege argument raised on summary judgment).

The *Themed Restaurants, Inc.* court reasoned that surveys and polls may be challenged for libel where "a reckless defendant had 'obvious reasons to doubt the veracity of the informant[s] or the accuracy of [the] reports.' " *See Themed Rests.*, 781 N.Y.S.2d at 446 (citing *Goldwater v. Ginzburg*, 414 F.2d 324, 334 (2d Cir.1969) (citation omitted) (alterations in original)). That is precisely what Plaintiffs have alleged here.

In particular, Plaintiffs have alleged that (i) Defendant published statistical estimates of the online audience of elpais.com each month (Am. Compl. ¶¶ 27-28, 30), (ii) such statistical estimates, as published prior to September 2007, were consistent with trends observed in data collected and measured internally by Plaintiffs (*id.* ¶ 49), (iii) Defendant conducted an internal investigation of its statistical estimates of the online audience of elpais.com (*id.* ¶ 54), (iv) Defendant leaked the results of this internal investigation to Plaintiffs' competitors before informing Plaintiffs (*id.* ¶¶ 51, 54), (v) Defendant promised Plaintiffs an opportunity to review and comment on any revised statistical estimates prior to publication (*id.* ¶¶ 55, 59), (vi) Defendant broke that promise by publishing said statistical estimates without notice to Plaintiffs (*id.* ¶¶ 60-61), (vii) Plaintiffs notified Defendant that the statistical estimates of the online audience of elpais.com published after September 2007 were inaccurate (*id.* ¶¶ 58, 68), and (viii) Defendant has continued to publish inaccurate and unreliable statistical estimates of the online audience of elpais.com (*id.* ¶ 75). Accordingly, Plaintiffs' specific allegations here are of the kind that were not made in the cases cited by Defendant. *See*, *e.g.*, *Amadasu v. Bronx Lebanon. Hosp. Ctr.,* No. 03 Civ. 6450 (LAK) (AJP), 2005 WL 121746, at *13 (S.D.N.Y. Jan 21, 2005) (dismissing complaint because plaintiff made only "conclusory assertions that defendants were motivated by 'malice, ill will, personal spite, or in the alternative by defendants' culpable recklessness or gross negligence.'").

Based on these facts, Plaintiffs allege that (i) Defendant knew or had reason to know that its statistical estimates of the online audience of elpais.com are inaccurate and unreliable, despite publicly making statements to the contrary (Am. Compl. ¶ 81), and (ii) Defendant knew or had reason to know that its methodology by which it calculated said statistical estimates is flawed (*id.*). These allegations, when taken in a light most favorable to Plaintiffs, clearly meets the federal pleading standard to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).

*Second*, by claiming that Plaintiffs must do more than specifically identify their lost existing and known potential customers, Defendant materially misstates the standard for pleading special damages under New York law. New York courts have routinely found that plaintiffs meet the pleading requirements for special damages by specifically identifying lost customers. *See Drug Research Corp. v. Curtis Pub'g Co.*, 166 N.E.2d 319, 322 (N.Y. 1960) ("if the special damage was a loss of customers, . . . the persons who ceased to be customers, or who refused to purchase, must be named") (alterations in original); *Squire Records, Inc. v. Vanguard Recording Soc'y., Inc.*, 226 N.E.2d 542, 543 (N.Y. 1967) (holding that special damages sufficiently pled because plaintiff specifically named lost customers); *accord Computech Int'l, Inc. v. Compaq Computer Corp.*, No. 02 Civ. 2628 (RWS), 2003 WL 31398933, at *6 (S.D.N.Y. Oct. 24, 2002) (same); *Fashion Boutique of Short Hills, Inc. v. Fendi, USA, Inc.*, No. 91 Civ. 4544 (MGC), 1992 WL 170559, at *4 (S.D.N.Y. July 2, 1992) (holding that special damages sufficiently pled because plaintiffs specifically identified lost customers).

Notwithstanding this well-established pleading standard, Defendant argues that Plaintiffs must also itemize their losses by customer. (Def. Mem. at 22) In so arguing, Defendant misreads the lone case it cites in support, *Gucci Am., Inc. v. Duty Free Apparel, Ltd*., 277 F.

- 20 -

Supp. 2d 269 (S.D.N.Y. 2003). In *Gucci*, the defendants counterclaimed for unfair competition,

claiming only general damages of "not less than $50,000." *Id*. at 278. Finding that defendants

must plead special damages to support their claim, the court dismissed the counterclaims. *Id.*

Importantly, however, while the Defendant cites dicta to support its argument, the *Gucci* court

actually held that "[s]ince they *neither itemize their losses nor name customers* that DFA

allegedly has lost by reason of Gucci's behavior, the claim must be dismissed for failure to plead

special damages with sufficient particularity." *Id.* (emphasis added). Accordingly, the *Gucci*

holding leaves open the possibility that had defendants *either* itemized their losses *or* named

customers, the defendant would have satisfied the pleading standard for special damages.[10]

Defendants' argument that Plaintiffs are not entitled to seek damages for loss of potential

customers, lost growth, and future lost customers should also be rejected. Notably, Defendant

fails to cite a single case dismissing such claims where, as here, the plaintiff continues to be

libeled each and every month. Indeed, it is a mystery how Defendant expects Plaintiffs to (i)

quantify the amount of advertising a potential advertiser would have purchased in the 4th quarter

of 2007, (ii) quantify the proper rate of growth at this stage, or (iii) identify a future customer lost

as a result of Nielsen's continuing libel of Plaintiffs' business. Contrary to Nielsen's position,

---

[10] The dicta cited by Defendants from *Gucci* " 'persons who cease[] to be customers must be named and the losses itemized' " (Def. Mem. at 21-22) is not grounded in the holding of any court. *Gucci* attributes this quotation to *Procter & Gamble Co. v. Quality King Distribs., Inc.*, 974 F. Supp. 190, 198-99 (E.D.N.Y. 1997), *see Gucci*, 277 F. Supp. 2d at 278, which in turn attributes that quote to *Matherson v. Marchello*, 473 N.Y.S.2d 998, 1001 (N.Y. App. Div. 1984). The dicta of *Matherson*, the original source of the quoted language, is attributed to *Reporters' Ass'n of Am. v. Sun Printing & Publ'g. Ass'n,* 79 N.E. 710 (N.Y. 1906). *See Matherson*, 473 N.Y.S.2d at 1001. Yet this case does not admit of this proposition. To the contrary, the *Reporters' Ass'n* case merely found that "[u]nder the settled rule, whenever special damage is claimed, the plaintiff must state it with particularity, in order that the defendant may be enabled to meet the charge." *Reporters' Ass'n*, 79 N.E. at 711. Specifically, the *Reporters' Ass'n* court went on to hold that "if the special damage was a loss of customers, . . . the persons who ceased to be customers, or who refused to purchase, must be named; and that, if they are not named, no cause of action is stated." *Id.* (omission in original). In short, this is the same well-established pleading standard that is set forth in *Fashion Boutique*, *Computec*, and *Squire Records* and not the higher standard advocated by Defendant. *See Gucci Am., Inc*, 277 F. Supp. 2d at 278 (citing with approval *Fashion Boutique*, noting that in that case, the plaintiffs had satisfied the pleading standard for special damages "by naming [the] three particular customers that it had lost.").

courts have routinely refused to impose such impossible standards on plaintiffs. *See*, *e.g.*, *Charles Atlas, Ltd. v. Time-Life Books, Inc*., 570 F. Supp. 150, 156 (S.D.N.Y. 1983) (holding that plaintiff need not specifically name lost customers where it was "virtually impossible" to identify customers who did not order plaintiff's product).[11]

Accordingly, Plaintiffs' trade libel claim meets the federal pleading standards, and Plaintiffs respectfully submit that this Court should deny Defendant's Motion.

### B.    Tortious Interference with Prospective Economic Advantage

Defendant's argument that Plaintiffs have not adequately pled tortious interference with prospective economic advantage should also be denied. In short, Plaintiffs' specific allegations are sufficient "to raise a reasonable expectation that discovery will reveal evidence" that Defendant tortiously interfered with Plaintiffs' prospective economic advantage. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1965, 1965 (2007).

In particular, Plaintiffs have alleged that (i) Defendant knew that Plaintiffs' business depend on the receipt of advertising revenue (Am. Compl. ¶¶ 1-3), (ii) Defendant knew that Plaintiffs' existing and potential clients relied on Defendant's statistical estimates of online audiences in determining whether to advertise on elpais.com and how much to spend on such advertising (*id.* ¶¶ 1-3, 8, 28-29, 90), (iii) Defendant published statistical estimates of the online audience of elpais.com that did not reflect trends observed in either data collected and measured internally by Plaintiffs or Defendant's prior statistical estimates of elpais.com's online audience (*id.* ¶¶ 9, 12-14, 59-64), (iv) Plaintiffs notified Defendant that its statistical estimates were inaccurate and unreliable (*id.* ¶¶ 58-59, 68), (v) Defendant continued to publish such inaccurate

---

[11] New York courts have historically abstained from requiring plaintiffs to plead special damages with particularity where, as here the libel was widely disseminated. *See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 75 F. Supp. 2d 235, 240 (S.D.N.Y. 1999) (noting the exception to the New York law of special damages that relaxes the

and unreliable statistical estimates to third parties who either currently purchased advertising

space, or may have purchased advertising space, on elpais.com and publicly defended such

statistical estimates as both accurate and reliable (*id.* ¶¶ 9-13, 17, 31, 42-45, 75), (vi) Plaintiffs'

then-existing advertisers elected not to continue to purchase advertising space on elpais.com or

otherwise significantly reduced such purchases (*id.* ¶¶ 78-79, 84, 93, Confidential Annex I), and

(vii) many advertisers who would have purchased advertising in November through December

2007, did not do so (*id.*).  Moreover, Plaintiffs allege that Defendant used wrongful means by (i)

leaking news of its intention to substantially downwardly revise its statistical estimates of

elplais.com's online audience to Plaintiffs' competitors *before* so informing Plaintiffs (*id.* ¶¶ 51,

54, 92), (ii) breaking its express promise to allow Plaintiffs an opportunity to review and

comment on any revised statistical estimates before they were published (*id.* ¶¶ 55, 57, 59-61,

67, 69, 92), and (iii) libeling Plaintiffs (*id.* ¶¶ 81, 84, 89).  Given the foregoing, Nielsen's claims

that Plaintiffs have not "adequately allege[d] exactly how Nielsen supposedly interfered in each

of these business relationships" or have pled only "unsupported and unspecified speculations and

suspicions" ring hollow.[12]

For the foregoing reasons, Plaintiffs respectfully request that Nielsen's motion to dismiss

Plaintiffs' claim for tortious interference with prospective economic advantage be denied.[13]

---

general rule requiring the identification of specific purchasers where the disparaging statement was widely
disseminated).

[12] Plaintiffs' lengthy list of factual allegations is a far cry from the facts of cases cited by Defendant.  *See, e.g.*,
*Genal Strap, Inc. v. Dar*, No. 04 CV 1691 (SJ), 2005 WL 525547, at *3-4 (E.D.N.Y. Feb. 28, 2005) (plaintiff's
complaint devoid of any factual support for allegations and simply characterized defendants' actions as wrongful
and intentional).

[13] Defendant's assertion that there is no claim under New York law for negligent interference with prospective
economic advantage is incorrect. *See Dai Nippon Printing Co. v. Melrose Publ'g Co.*, 113 F.R.D. 540 (S.D.N.Y.
1986) (claim for negligent interference survives motion to dismiss).  The case cited by Defendant, *Bishop v. Porter*,
No. 02 Civ. 9542 (JSR) (GWG), 2003 WL 21032011, at *12 (S.D.N.Y. May 9, 2003), incorrectly cites three cases
for the proposition that no claim for negligent interference exits.  Negligent interference was not considered in any
of those cases.  *See Alvord & Swift v. Stewart M. Muller Constr. Co.*, 385 N.E.2d 1238, 1239 (N.Y. 1978) (only

### C.    Negligent Misrepresentation

Nielsen asks this Court to dismiss Plaintiffs' cause of action for negligent misrepresentation on the sole ground that Plaintiffs have not pled "a special relationship of trust or confidence between the parties."  (Def. Mem. at 24 (citing *Henneberry v. Sumitomo Corp. of Am.*, 532 F. Supp. 2d 523, 538 (S.D.N.Y. 2007)))  To the contrary, Plaintiffs have alleged that there is a special relationship of trust between Plaintiffs and Defendant.  (Am. Compl. ¶¶ 2-3, 87, 95)

Under New York law, the following factors determine whether a special relationship existed between parties absent privity of contract: (i) "whether the person making the representation held or appeared to hold unique or special expertise"; (ii) whether a special relationship of trust or confidence existed between the parties; and (iii) whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Kimmell v. Schaefer*, 675 N.E.2d 450, 455 (N.Y. 1996).  Each of these factors is present here. *First*, Defendant, by its own admission, claims to hold unique expertise in the area of internet audience measurement.  (Am. Compl. ¶¶ 2, 24, 26, 31, 87, 95; Litwin Aff. Exh. B)  *Second*, Plaintiffs specifically relied on Nielsen's expertise and its many representations that its statistical estimates were both accurate and reliable.  (Am. Compl. ¶¶ 26, 28-31, 43-45, 87, 95)  *Third*, as Defendant expressly encourages business to rely on Nielsen's statistical estimates of online audiences making important business decisions, Nielsen cannot now disavow knowledge of how its customers used its product.  (*Id.* ¶¶ 29, 31; Litwin Aff. Exh. C)  Specifically, Defendant knew that Plaintiffs used Nielsen statistical estimates to solicit advertisers.  (*Id.* ¶¶ 1-3, 28, 29, 31, 97)

---

claim for intentional interference with contractual relations considered); *Gruntal & Co. v. San Diego Bancorp*, No. 94 Civ. 5366 (DC), 1996 WL 343079, at *1 (S.D.N.Y. June 21, 1996) (plaintiff only asserted tortious interference with prospective economic advantage, tortious interference with contractual relations, *prima facie* tort and negligent

These allegations are sufficient to meet Plaintiffs' obligation to set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).

For the foregoing reasons, Defendant's motion to dismiss Plaintiffs' negligent misrepresentation claim should be denied.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss Plaintiffs' Amended Complaint should be denied. Should this Court grant Defendant's Motion, Plaintiffs respectfully request leave to amend.

Dated: New York, New York
       April 30, 2008

                                        HOWREY LLP


                                        s/ Ethan E. Litwin
                                        _____
                                        William O. Purcell
                                        Ethan E. Litwin
                                        153 East 53rd Street, 54th Floor
                                        New York, NY 10022
                                        (212) 896-6500

                                        *Attorneys for Plaintiffs*

---

supervision); *Costanza Constr. Corp. v. City of Rochester*, 523 N.Y.S.2d 707, 708 (N.Y. App. Div. 1987) (only claims of tortious interference with contractual relations and negligence asserted).

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing Plaintiffs' Opposition to Defendant's Motion to Dismiss the Amended Complaint were served by the Court's Electronic Case Filing system and by personal service this 30th day of April 2008 upon:

> Leslie Gordon Fagen
> Paul, Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, NY 10019-6064

s/ Ethan E. Litwin
_____
Ethan E. Litwin
