IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| DIARIO EL PAIS, S.L. and PRISACOM, S.A., ) | 07-CV-11295 (HB) |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | <u>AFFIDAVIT OF ETHAN E. LITWIN, ESQ</u> |
| ) | |
| THE NIELSEN COMPANY (US), INC., ) | |
| ) | |
| Defendant. ) | |

STATE OF NEW YORK    )
                     )    ss:
COUNTY OF NEW YORK  )

Ethan E. Litwin, Esq., being duly sworn, hereby deposes and says as follows:

1.    I am a member of Howrey LLP, counsel for Plaintiffs Diario El Pais, S.L. and Prisacom, S.A. in the above-captioned action.  I am familiar with the proceedings in this case.  I make this statement based on my personal knowledge of the facts set forth herein and in support of Plaintiffs' Opposition to Defendant's Motion to Dismiss the Amended Complaint.

2.    For purposes of this motion, Plaintiffs stipulate to Defendant's version of the translation of the Nielsen License Agreement.  Annexed as Exhibit A is a true and correct copy of Defendant's translation of the Nielsen License Agreement.

3.    Annexed as Exhibit B is a true and correct copy of the "Corporate Overview," *available at http://www.netratings.com/about.jsp?section=cor&nav=1* (last visited April 29, 2008).

4.    Annexed as Exhibit C is a true and correct copy of the "Client Guidelines for Use of Nielsen Online Data – April 2008," *available at* http://www.netratings.com/downloads/PR_guidelines_0806.pdf (last visited April 29, 2008).

5.    Annexed as Exhibit D is a true and correct copy of the press release "Nielsen Launches New Internet and Mobile Measuring Services" dated October 15, 2007, *available at* http://www.nielsen.com/media/2007/pr_071015.html (last visited April 29, 2008).

6.    Annexed as Exhibit E is a true and correct copy of the Letter dated September 26, 2007 from Jonathan Carson to Manuel Mirat.

7.    Annexed as Exhibit F is a true and correct copy of the "Nielsen Online Contacts," *available at http://www.nielsen-online.com/contact* (last visited April 29, 2008).

8.    Annexed as Exhibit G is a true and correct copy of "Press FAQ's," *available at* http://www.netratings.com/press.jsp?section=pr_faq&nav=7 (last visited April 29, 2008).

9.    Annexed as Exhibit H is a true and correct copy of the page "WebRF Enables Cost-Efficient Advertising Planning and Measurement Using Traditional Media Research Metrics," *available at http://www.nielsen-netratings.com/downloads/uk/WebRF_UK.pdf* (last visited April 29, 2008).

10.    Annexed as Exhibit I is a true and correct copy of the inner cover of ZAGAT SURVEY: 2007 NEW YORK CITY RESTAURANTS 2 (Curt Gathje & Carol Diuguid eds., Zagat Survey LLC 2006).

11.    Annexed as Exhibit J is a true and correct copy of the "Moody's Rating Report – Jan 2008."

WHEREFORE it is respectfully requested that Defendant's Motion to Dismiss Plaintiffs'

Amended Complaint should be denied.

Dated: New York, New York
       April 30, 2008


                                                    s/ Ethan E. Litwin
                                        _____
                                                  Ethan E. Litwin


Sworn and subscribed to
before me this 30th day of
April, 2008

_____

GRACE L. CHAN
Notary Public, State of New York
No. 02CH6111476
Qualified in New York County
Commission Expires June 14, 2008

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing Affidavit of Ethan E. Litwin, Esq. with annexed exhibits were served by the Court's Electronic Case Filing system and by personal service this 30th of April 2008 upon:

>     Leslie Gordon Fagen
>     Paul, Weiss, Rifkind, Wharton & Garrison LLP
>     1285 Avenue of the Americas
>     New York, NY 10019-6064

                                        s/ Ethan E. Litwin
                                        Ethan E. Litwin

# Exhibit A

The LanguageWorks, Inc.
1123 Broadway
New York, NY 10010
Tel. 212 447 6060
Fax 212 447 6257

**Language Works**

STATE OF NEW YORK    )
                     )        ss
COUNTY OF NEW YORK   )

### CERTIFICATION

This is to certify that the attached, to the best of my knowledge and belief, is a true and

accurate translation into English of "Netratings Spain, S.L Unipersonal and Prisacom, S.A

," completed on 12/20/2007, originally written in Spanish.

_Karen D'Urso_

Karen D'Urso
Director of Production
The LanguageWorks, Inc.

Sworn to and subscribed before me,
This Fifth day of February, 2008.

Notary Public

GINA ST LAURENT
Notary Public, State of New York
No. 01ST6145442
Qualified in New York County
Commission Expires May 15, 2010

## SERVICE CONTRACT

CONTRACT NUMBER: 200507/280

Madrid, July 26, 2005

PARTY OF THE FIRST PART, Mr. Diego Semprún de Castellane, being of full legal age, a Spanish national, with head business office in Madrid, calle Velázquez, 86, gate B, Center Bottom, and having National Identification Document No. 5282205W,

acting for and on behalf of NETRATINGS Spain, S.L. Unipersonal, with head office at calle Velázquez, 86, gate B, Center Bottom, 28006 Madrid, with taxpayer ID B83841445. He is doing so in his capacity as Director (hereinafter NETRATINGS).

PARTY OF THE SECOND PART, Mr. Manuel Mirat Santiago, being of full legal age, a Spanish national, acting for and on behalf of PRISACOM, S.A., with head office in Madrid, calle Ribera del Sena, no number, 4th floor, and with taxpayer ID A 82649690. He is doing so in his capacity as Managing Director (hereinafter CLIENT).

Hereinafter, NETRATINGS and CLIENT shall be referred to jointly as the "Parties" and each one of them individually as the "Party."

Both parties exhibit and recognize each other's legal capacity to enter into and undertake obligations through this Contract, expressly stating that their powers have not been revoked, modified or suspended, and to that end,

### THEY STATE

1.  NETRATINGS is a company specialized in the measurement, analysis and study of Internet audiences, advertising and markets, and has broad knowledge and experience in providing this type of service in the Internet environment.

2.  CLIENT is interested in adopting one or more SOLUTIONS developed by NETRATINGS, for the purposes of measuring its web sites.

3.  In light of the above, both Parties have agreed to enter into this Contract, by which NETRATINGS shall provide Internet measurement services to CLIENT, by granting a usage license; both Parties agree that the relationship shall be governed by the following.

### STIPULATIONS

**1.    DEFINITIONS**

1.1.    "PASSWORDS": User name and passport that NETRATINGS provides to CLIENT's employees and that enable access to the information through the NETRATINGS portal.

1.2.    "INFORMATION": This is the demographic information and any other information that NETRATINGS provides pursuant to this Contract through its various SOLUTIONS referring to the use and/or behavior of users of the Internet, computers and advertising over the Internet.

1.3.   "NETRATINGS PORTAL" shall mean the websites owned by NETRATINGS from which clients are provided access to the various regular reports generated by the NETRATINGS SOLUTIONS.

1.4.   "MEASUREMENT SYSTEM" shall mean any mechanism used for compiling data, used in generating INFORMATION.

1.5.   "SOLUTIONS" refers to any system developed by NETRATINGS composed of software, methodology, services and means of delivery of INFORMATION and CLIENT DATA.

## 2.   PURPOSE

2.1.   This Contract (hereinafter the "CONTRACT") establishes for CLIENT the terms and conditions for using the NETRATINGS SOLUTIONS (the "SERVICES").

2.2.   Specifically, pursuant to the terms of this contract, CLIENT is retaining the following SERVICES:

*NetView.*

System based on the NETRATINGS RDD panel, which shows information about the entire Internet market for the contracted countries. It also enables access to information about the websites that publish data using the Country Market Intelligence solution.

## 3.   INTELLECTUAL AND INDUSTRIAL PROPERTY

3.1.   This contract does not presuppose any type of transfer to CLIENT of the ownership of the intellectual and industrial property, or any of the products and services that are covered under this contract, be they reports, data, analysis or any other format of information, all of which shall continue to be the exclusive property of NETRATINGS.

3.2.   Without prejudice to the provisions of the preceding paragraph, CLIENT preserves all inherent rights, titles and interests with respect to any data provided by CLIENT to NETRATINGS that is not obtained through the MEASUREMENT SYSTEMS used in the SOLUTIONS covered under this contract, and the results of any survey that has been specifically requested and prepared for the CLIENT.

3.2.1   Without CLIENT's advance consent, NETRATINGS shall not sell or otherwise share that data with any other client.

## 4.   PASSWORDS

4.1   The PASSWORDS:

4.1.1.   Prove the identity of CLIENT's employees, and are personal.
4.1.2.   Shall be assigned to CLIENT after the signing of this Contract.

4.1.3.   Shall permit access to the information and the SOLUTIONS contracted through the NETRATINGS PORTAL.

4.2.   With respect to the PASSWORDS, CLIENT:

4.2.1.   Must have custody and use its codes diligently and not disclose them to any third party.

4.2.2.   Must notify NETRATINGS of any incident that occurs with the codes or the usage thereof, such as loss, destruction or theft, so that they may be replaced by NETRATINGS.

4.2.3.   CLIENT shall be liable for any damage that might be caused to NETRATING by the improper use of the PASSWORDS, except in the cases indicated in point 4.2.2. and in any case that might be similar, provided CLIENT acts with haste in advising NETRATINGS as of the time of their detection to facilitate corrective actions.

4.3.   NETRATINGS may:

4.3.1.   Change or cancel the PASSWORDS with no advance notice for reasons of security, if it detects their use by unauthorized personnel of CLIENT or third parties.

4.3.2.   With advance notice, suspend them temporarily in the event that CLIENT fails to perform any of the obligations that it assumes under this CONTRACT (especially those pertaining to the calendar of payments of the consideration or those referring to the publication of the information) until CLIENT rectifies that nonperformance.

4.4.   CLIENT designates here one or more persons responsible for receiving and distributing the codes within its organization, who shall act as regular contact individuals with NETRATINGS.

| Representative(s): Designated person (s): Initial(s): | Sonia Ruiz Morán Elena Callejo |
|---|---|

## 5.   LICENSE

5.1.   NETRATINGS grants CLIENT a usage license for the information that is non-exclusive, non-transferable and has a term determined by the effectiveness of this contract, to use the PASSWORDS and the INFORMATION, internally as guides for the management of CLIENT in the marketing and promotion of client's products and services, and externally in CLIENT's organization with respect to its business as indicated in this document.

5.2.   CLIENT shall have this usage license for the territory of Spain.

## 6.   USE OF INFORMATION

6.1.   Access to the INFORMATION shall be through the corresponding NETRATINGS PORTAL, except in the cases in which CLIENT receives delivery of a customized report with the INFORMATION.

6.2.   CLIENT shall have the right to publish the information in the following form:

6.2.1. Internally, provided the persons specified as PASSWORD holders access the INFORMATION directly through the corresponding NETRATING PORTAL.

6.2.2. Disclosing, in summarized form, limited excerpts of information to its advertising agencies and clients insofar as it may be necessary for the marketing of its own products and/or services.

6.2.3. For Clients who are advertising agencies, limited extracts of information to its clients for the sole purpose of media planning; and

6.2.4. Publishing, in summarized form, limited excerpts of the information in its own commercial advertising version and for the consumer; annual reports; reports addressed to the financial community (financial intermediaries, banks, etc.); and to the news media (newspapers, television, radio, publishers of Internet publications, etc.), for the purpose of promoting its own corporate image or its products.

6.3. In general, CLIENT shall not use this information, directly or indirectly, for providing services to third parties or in favor of any person or entity other than CLIENT. Therefore, CLIENT may not:

6.3.1. Transfer the information: CLIENT is expressly prohibited from transferring, conveying, renting, selling, communicating or otherwise releasing the information, be it totally or partially, free of charge or for valuable consideration, and CLIENT shall be the sole party liable for any consequences that might derive from its actions.

6.3.2. Modify the information: CLIENT is expressly prohibited from altering, transforming or otherwise modifying the information, totally or partially.

6.3.3. Create any file or compilation containing, totally or partially, the information supplied by NETRATINGS, for the purpose of being distributed, communicated publicly or made available to third parties.

6.4. CLIENT shall not be provided with, nor shall CLIENT be authorized to access or use, INFORMATION other than the information supplied to CLIENT through the NETRATINGS PORTAL, or the unprocessed data compiled by NETRATINGS.

# 7.    DISCLOSURE OF DATA.

7.1. In general, CLIENT must obtain the written consent of an authorized representative of NETRATINGS before publishing the following information:

7.1.1. It must always request this authorization before publishing any INFORMATION pertaining to a third party.

7.1.2. It may not use the NETRATINGS name in relation to any public announcement (including advertisements) without this consent.

7.2. The information disclosed must be identified with the utmost accuracy, leaving no margin of error, and shall necessarily exhibit the following label: "Source: Nielsen/NETRATINGS. With copyright. All rights reserved."

7.3. CLIENT may not use the information in any may that might disparage the brand or the good trade name of NETRATINGS.

7.4. CLIENT may not use or disclose the INFORMATION or the PASSWORDS: in any lawsuit or administrative proceedings without the advance written consent of NETRATINGS, unless so required by law.

7.5. NETRATINGS may automatically terminate the information-usage license early, with no need for advance notice, in the event that CLIENT uses the information in a manner not authorized or is contrary to the provisions of

this Contract, without prejudice to the right to take any appropriate legal actions for compensation of damage caused, as the case may be.

**8.    CONFIDENTIALITY**

8.1.    The parties agree that, as to confidential information (according to the definition included below) that may be revealed by one party to the other party in connection with this Contract, the party receiving the information shall not disclose said confidential information to any third party, and shall not use it for any purpose, except in connection with the rights and obligations that it bears pursuant to this Contract.

8.2.    "Confidential Information" shall mean any information, referring to a party or any of its subsidiaries or affiliated companies, that is not in the public domain, that is marked as confidential or protected, or that, given the circumstances, reasonably must be treated as confidential or protected information, including the prices and conditions of this CONTRACT.

8.3.    Independently of the foregoing, the Confidential Information shall not include information that:

8.3.1.    at the time of its disclosure, is subsequently or comes to be in the public domain, through a source other than the receiving party;

8.3.2.    is legitimately in the possession of the receiving party at the time of its disclosure.

8.3.3.    has been developed independently by the receiving party without making reference to the Confidential Information; or

8.3.4.    has been obtained subsequently through a third party that is not subject to a confidentiality obligation with respect to the information that is the subject of the disclosure.

8.4.    In the event that the receiving party is required, by law, or in connection with legal proceedings, to disclose Confidential Information, it must communicate this immediately to the issuing party for the purpose of requesting the corresponding legal coverage of the Confidential Information. The receiving party shall be released from performance of the stipulations referring to non-disclosure included herein with the scope necessary for compliance with the law or legal proceedings in question.

6.5.    At the time of termination of this Contract, the parties shall immediately return or destroy all the tangible Confidential Information, except the Confidential Information about CLIENT's clientele or the visitors to the CLIENT's website or portal that CLIENT is required to keep in accordance with the applicable laws.

**9.    LIABILITY FOR WARRANTIES. LIMITATION OF LIABILITY.**

9.1.    NETRATINGS warrants CLIENT the proper functioning of the contracted services, within the normal parameters of Internet activity, and also warrants that the information compiled and delivered in the reports is generated in accordance with the methodologies used in each service, and that its reliability corresponds to the limitations of each one of the sources.

9.2.    NETRATINGS expressly denies any other express or implicit warranty, including but not limited to warranties of salability or those adapted to a specific purpose.

9.3.    NETRATINGS shall not be liable in any event for indirect, special, incidental, consequential, punitive or confidence damages, including, *inter alia*, loss of profits, savings or income, be they of a contractual, extracontractual or other nature (including negligence, product liability and objective liability) resulting from agreements between CLIENT and a third party, or for claims from a third party, independently of whether NETRATINGS knew of, or had reasons to know of, the possibility of said damages, engendered by the use of the SOLUTIONS and the information that they generate.

9.4.    Except as to NETRATINGS' compensation obligations that are provided in stipulation 10 below, the total maximum liability of NETRATINGS, under any circumstance, shall not exceed the amount actually paid by CLIENT to NETRATINGS under this contract for twelve months prior to the date on which the case arises.

9.5.    NETRATINGS shall not be liable for any delay or nonperformance due to force majeure.

9.6.    In the event that the applicable laws do not permit the aforementioned limitation or exclusion of liability, the limitation or exclusion of the object of the liability shall be considered modified so that it will be effective with the maximum scope permitted.

## 10.    INDEMNITY

10.1.    CLIENT shall indemnify, compensate and, at NETRATINGS' request defend NETRATINGS, its affiliated companies, officers, directors, representatives and employees, from all claims, obligations, damages, losses and expenses, including reasonable fees of attorneys, derived from or related to (i) any claim made by a third party against NETRATINGS as a consequence of CLIENT's nonperformance of any of the obligations that are indicated in this Contract or (ii) the use by CLIENT of the services under circumstances that do not conform to this Contract; provided however that:

10.1.1.    NETRATINGS notify CLIENT immediately in writing of the existence of the claim from a third party;

10.1.2.    At CLIENT's request, and at its expense, NETRATINGS cooperate in the investigation and defense of said claim; and

10.1.3.    CLIENT is the sole party required to defend or settle the claim from a third party (provided it not enter into any mediation that negatively affects the rights and obligations of NETRATINGS without the advance written consent of NETRATINGS).

10.2.    NETRATINGS shall indemnify, compensate and, at CLIENT's request defend CLIENT, its affiliated companies, officers, directors, agents and employees, from all claims, obligations, damages, losses and expenses, including reasonable fees of attorneys, derived from the claim of a third party against CLIENT in which it maintains that the services infringe the patent rights, copyright, trademark or industrial secrets of a third party, provided however that

10.2.1.    CLIENT notifies NETRATINGS in writing of the existence of the claim from a third party;

10.2.2.    At NETRATINGS' request, and at its expense, CLIENT cooperate in the investigation and defense of said claim; and

10.2.3.    NETRATINGS is the sole party required to defend or settle the claim from a third party (provided it not enter into any mediation that negatively affects the rights and obligations of CLIENT without the advance written consent of CLIENT).

10.2.4. If, in NETRATINGS' opinion, it is probable that any service may be the object of an action for violation, or if it is subject to said action, NETRATINGS, at its discretion, and at its expense,

    10.2.4.1.1.   may obtain for CLIENT the right to continue using said service,

    10.2.4.1.2.   may replace the service in question either by another one that does not involve any violation or that adequately modifies the appropriate elements so that no violation occurs, provided that it not vary the essential nature of the Service; or

    10.2.4.1.3.   may terminate this Contract and refund to CLIENT the amounts already paid for services that have not yet been provided.

10.2.5. Independently of the foregoing, NETRATINGS does not assume any liability for claims for violations derived from

    10.2.5.1.   combining any service with software or other products that have not been supplied by NETRATINGS, if that claim would not have been made if the combination in question had not occurred; or

    10.2.5.2.   the change in any service, if that claim would not have been made if the change had not occurred.

10.3.   In the event that, in performance of the contract, NETRATINGS comes to have access to personal information owned by or under the responsibility of CLIENT, NETRATINGS agrees to respect the provisions of the Organic Law of Protection of Personal Information and its implementing regulations, and is liable to Client for the claims of any nature that might be filed by any individual or legal entity as a consequence of improper or illegitimate use of personal information, done directly by NETRATINGS, or its personnel or persons whom it employs or uses in providing the service.

## 11.   TERM AND TERMINATION

11.1.   The term of this Contract shall be one year (12 months) as of  September 2, 2005, the date on which the services will start being provided.

11.2.   At the end of the term, this Contract shall be extended automatically for successive periods of 12 months in accordance with the provisions of stipulation 11.8, unless one of the parties terminates it through written advance notice 30 days prior to the expiration of the period effective at that time.

11.3.   This Contract may be terminated by either of the parties in the event of significant performance by the other party, and if said nonperformance is not rectified within thirty (30) days after the written communication thereof, or if the other party is declared insolvent or is subject to a bankruptcy proceeding, reorganization or a petition or resolution of a similar nature.

11.4.   In the event of termination due to significant nonperformance on the part of NETRATINGS, and involving no fault on CLIENT's part, CLIENT shall have the right to receive a proportional refund corresponding to the amounts paid for services that have not yet been provided as of the date of the termination.

11.5.   In the event of early termination due to nonperformance attributable to CLIENT, NETRATINGS may, in addition to filing any other legal action to which it may be entitled, declare all amounts owed to it immediately due and payable.

11.6.   After the early termination of this Contract, in accordance with the provisions of this clause, CLIENT may not use any Password or access the information through the NETRATINGS PORTAL.

11.7.   The termination of this Contract shall not, under any circumstances, exempt the Parties from their liability for prior nonperformance thereof. Stipulations 6 to 13 shall subsist at the termination of this Contract.

11.8.   If an automatic extension of this Contract occurs, the price to be paid to NETRATINGS corresponding to each Extension Period shall be increased by 2.5% or the interannual CPI if it is higher than said amount with respect to the period immediately preceding, unless specified otherwise for any specific period in section 15.

## 12.   APPLICABLE LAW AND VENUE

12.1.   This Contract shall be governed and interpreted in accordance with Spanish law, and each party consents irrevocably, waiving any venue of its own, to the exclusive jurisdiction and territorial authority of the Courts and Tribunals of Madrid (Spain).

12.2.   The **Parties** must, in good faith, endeavor to reach an agreement on any disputes that might arise between them with respect to the interpretation, performance, validity or termination of this Contract or any dispute that might be based on it, for a period not greater than 30 calendar days after the existence of said discrepancy has been reliably reported by either of them.

12.3.   In the event that it is not possible to reach an agreement over the disputes in question, all the **Parties**, with express waiver of any venue of their own that might correspond to them, agree to submit said disputes to *de jure* arbitration within the Madrid Chamber of Commerce and in accordance with its Regulations and Bylaws, to which the administration of the arbitration is entrusted.

12.4.   The **Parties** agree to submit the dispute to the corresponding entity, as the case may be, and to abide by all terms of any decision or award that is issued.

## 13.   MISCELLANEOUS STIPULATIONS

13.1.   In the event of inconsistency between this Contract and any Exhibit or other attached document, appendix, invoice or purchase order, this Contract shall prevail, unless in the other document the parties expressly state to the contrary.

13.2.   Any notice or communication that may or must be made pursuant to this Contract shall be done in writing through hand delivery, certified fax, notarial channel or by any other legally valid means that makes it possible to document its date of receipt, its content and the identity of the sender. Notices must be addressed to the addresses of the parties indicated above.

13.3.   CLIENT may not assign this Contract, by legal imperative or for any other reason, without the advance written consent of NETRATINGS; any assignment, or intent to assign, without the written consent of NETRATINGS shall be void and shall be considered a significant breach.

13.4.   In the event that any stipulation of this Contract is void or voidable, the validity of the Contract overall shall not be affected by that circumstance, provided that it is not a substantial part of the Contract that might undermine the original sense sought by the Parties.

13.5.   The legally ineffective stipulation shall be replaced by a new stipulation, or interpreted in a legally acceptable manner, that has a substance as close as possible to the stipulation that the Parties would have formalized had they been cognizant of the ineffectiveness of the stipulation in question.

13.6.   This Contract may not be amended except by written instrument, signed by the party against whom any breach is claimed, and no breach, by action or omission, may be waived.

13.7.   As to services, this Contract constitutes the full agreement between the parties and cancels any other prior or contemporaneous agreement and understanding between them, be it written or oral.

## 14.    SUPPORT AND TRAINING.

14.1.   At CLIENT's request, and considering the availability of NETRATINGS' resources and time, NETRATINGS shall provide services of training as specified in the Exhibit.

14.2.   Ordinary support. NETRATINGS shall provide, free of charge, ordinary support to CLIENT, including support by telephone and by email, and everything connected with the processes of configuration of the various SOLUTIONS.

14.3.   Technical support for CLIENT's staff. NETRATINGS agrees to offer CLIENT technical support.

14.3.1.   That support shall be on-site in the cases in which it is necessary.

14.4.   Training

14.4.1.   In any case, CLIENT may request a training session free of charge every year.

14.4.2.   In the cases in which the training has to be done outside of Madrid, CLIENT shall assume the corresponding costs of travel and lodging.

14.4.3.   If CLIENT requires more on-site trainings, the cost shall be € 500 per day.

14.5.   No substitution. CLIENT agrees not to use the support services as a substitution for the training services, and agrees to train its users properly.

## 15.    PRICE AND TERMS OF PAYMENT

15.1.   The fees corresponding to the contracted SOLUTIONS are (prices in EUROS without VAT).

The financial and billing terms shall be as follows.

| Solution | Characteristics | Amount | Billing |
|---|---|---|---|
| NetView | Access for 5 users to the following countries:<br><br>Spain | € 31,518.75 annual | Quarterly billing<br>1st invoice will be issued at the time of signing. [handwritten: on September 2, 2005. Change Valid. (illegible initials)] |

15.2.   The form of payment of all invoices shall be by check or transfer at 30 days, as of the date of issuance of the invoice, hereinafter the due date.

15.3.   In the event that more than 30 days elapse from the due date of an invoice without payment from CLIENT, NETRATINGS, at its absolute discretion, may suspend all or part of the Service (including but not limited to access to the NETRATINGS PORTAL) until CLIENT rectifies the delinquency.

15.4.   In the event of a dispute, CLIENT must immediately inform NETRATINGS; otherwise, after 30 days, NETRATINGS may claim payment whether or not there is any dispute.

15.5.   The amounts in dispute shall not affect the payment of amounts that do not involve any dispute. If, within the same invoice, only one part of the amount is disputed, CLIENT shall not delay the partial payment of the part that is not in question.

15.6.   In the event that CLIENT delays the payment due to lack of documentation, or requires a form of any type from NETRATINGS, it must communicate this within 30 days after receiving the invoice; otherwise, it shall be assumed that CLIENT accepts the invoice and will make payment without delay.

15.7.   CLIENT shall pay any applicable similar amounts or charges, independently of their name, that are assessed by any authority in connection with the products or services acquired by CLIENT under this contract (unless it concerns taxes or similar charges based on NETRATINGS' income).

And, to make it effective, they sign in Madrid, on July 26, 2005

For NETRATINGS Spain S.L. Unipersonal

Diego Semprún                                       For CLIENT
Director                                            [signature]
[signature]                                         Manuel Mirat Santiago
                                                    Managing Director

# Exhibit B



| Solutions | Products | Resources | Press | About | Contacts | Client Login |

## About

### About

**Corporate Overview**

Industry Affiliations

MRC Accreditation
Program

Careers

## Corporate Overview

### A Global Leader in Internet Media and Market Research

Nielsen Online, a service of The Nielsen Company, delivers comprehensive, independent
measurement and analysis of online audiences, advertising, video, consumer-generated media,
word of mouth, commerce and consumer behavior, and includes products previously marketed
under the Nielsen//NetRatings and Nielsen BuzzMetrics brands. With high quality, technology-driven
products and services, Nielsen Online enables clients to make informed business decisions
regarding their Internet and digital strategies. For more information, please visit http://www.nielsen-
online.com

Nielsen//NetRatings and BuzzMetrics are part of the newly formed Nielsen Online unit within
The Nielsen Company, a global information and media company.





Download                           Read BuzzMetrics Press Release            Visit Nielsen Company
Nielsen Online
Press Release

**Want to get a free product demo?**  Contact us today

© 2008 The Nielsen Company. All product names herein
are the property of their respective owners.

Privacy Statement    |    Terms of Use

Exhibit C



# Client Guidelines for Use of Nielsen Online Data
## April 2008

The Nielsen Company encourages the use of Nielsen Online data in our clients' business decisions, statements to investors, presentations to customers, advertisements, press releases, and other public uses. The following guidelines explain proper use of the data, how to obtain The Nielsen Company's approval for use of our data, The Nielsen Company's proprietary rights, guidelines for proper use of Nielsen Online, The Nielsen Company and various related corporate names, and examples of data citations and usage.

## General Guidelines

Clients of Nielsen Online services may use the data pursuant to the terms of their agreement with The Nielsen Company. Unless expressly stated otherwise, all press releases, advertisements, displays and other public dissemination of Nielsen Online data must be reviewed and approved by The Nielsen Company's Public Relations department prior to release (contact information listed below). This includes any release containing statements derived from Nielsen Online data and any statements made to the Securities and Exchange Commission or any other agency or regulatory body, regardless of the purpose. Nielsen Online data must not be used in litigation, unless otherwise agreed to in writing by The Nielsen Company.

Our review is to assist the client in using the data accurately and in the appropriate context.The Nielsen Company is the copyright owner and Nielsen Online is the source of the data. This is particularly important for our new clients, as they are less familiar with our data and its proper and accurate use. However, it is required that all clients contact The Nielsen Company prior to any public release containing Nielsen Online data or derived from Nielsen Online data.

We require clients to use the most current Nielsen Online data available that is applicable to their particular use. Please check to see if there is more updated information available prior to release.

Periodically, clients may request specific or custom data that does not meet the The Nielsen Company's normal reporting criteria. If agreed, The Nielsen Company may provide this data labeled with appropriate footnotes and disclaimers. This type of data must never appear in any public release, report or dissemination unless written consent is provided by The Nielsen Company. *Any reproduction of this type of data must contain the footnotes and disclaimers that originally accompanied the data.* Citations of Nielsen Online data for all international rankings must follow the above guidelines, and must be reviewed by The Nielsen Company Public Relations department.

## Guidelines for Nielsen Online Services
### NetView

In addition to the rules under General Guidelines, we require clients to follow specific rules for data falling below reporting cutoff and specific client-requested custom roll-ups posted on NetView.

Combined home and work audience figures that do not meet minimum sample size standards must contain the following caveat: Home and Work audience duplication projections did not meet minimum sample size standards. Combined home and work audience estimates for these sites may exhibit increased variability month-to-month as a result.

Data appearing in blue on the service do not meet certain sample size requirements and must contain the following caveat: *These Web sites have insufficient sample sizes for reliable projection of audience size. Projected and average measures for these sites may exhibit large changes month-to-month as a result.

http://www.netratings.com/downloads/PR_guidelines_0806.pdf



Data appearing in red on the service do not meet minimum sample size requirements and CANNOT be used in any public documents, including press releases and other marketing/advertising collateral. The data can be used for internal purposes only, such as presentations, but must contain the following caveat**:** *These Web sites have insufficient sample sizes for reliable projection of audience size.*

Custom aggregations or roll-ups of data on the service or any data from Custom Reports may be used by clients to illustrate their unique business models or partnering relationships. However, public use of this data must clearly state the following caveat: *\*This is a nonstandard, custom aggregation and therefore, relative rankings within a category of sites may be affected by the custom nature of this aggregation.* Clients must obtain approval from The Nielsen Company PR department before release of any custom aggregation to the public.

### @Plan

In addition to the rules under General Guidelines, we require clients to follow specific rules on competitive, audience/reach data as posted on the @Plan service.

Clients may not publicly disseminate competitive data obtained from the @Plan service. Clients may use competitive data from @Plan for communications and presentations with other businesses, provided however, such communication or presentation is not available to the general public and the data is the most currently available.

### Use by Financial Clients

In spite of the above stated restrictions, our financial clients may provide their customers with occasional reports, confined to top-level data. From time to time, the client may provide specific, drill-down reports, which provide site-specific information to the customer.

### Use by Advertising Agencies

Advertising agencies may use Nielsen Online data as specified in General Guidelines. They may also use the data to assist their customers in purchasing advertising space and forming ad campaign strategies. Reports containing company-specific or site-specific data directly from Nielsen Online data may be provided occasionally and only to the extent their customers need the information in their decision making process. Ad agencies in their communications to clients are to use category level, aggregated, and other summary-type information in most cases and steer away from providing company-specific or site-specific data to their clients on an ongoing basis.

### Use by Public Relations Agencies

Public relations agencies may use Nielsen Online data as specified in General Guidelines. However, they may not republish the data in press releases/announcements on behalf of their clients unless the client is already a Nielsen Online subscriber.

### The Nielsen Company's Approval and Assistance

The Nielsen Company is happy to assist our clients in interpreting and complying with these guidelines. In order to obtain approval for use of our data as required under these Terms of Use or if you have any questions, please contact The Nielsen Company's Public Relations department indicated below. Please allow for a 24 hour turnaround period for the approval of client press releases, marketing materials or any other public usage of Nielsen Online Data.

Nielsen Online

The Nielsen Company
770 Broadway
New York, New York 10003
www.nielsen-online.com



**Proprietary Rights**

The Nielsen Company is the copyright owner of all material contained on the Nielsen Online Web site; the services, reports, analyst services and any other data provided by The Nielsen Company ("data"). This data is protected by U.S. and foreign copyright, trademark and other proprietary laws. Absence of the "©", "®" or "SM" does not negate this protection.

Under these laws, The Nielsen Company and its affiliates have the exclusive right to publish, display, use, sell and create derivative works of the protected data.  Any other party using The Nielsen Company's data, in any manner not expressly authorized, is infringing on The Nielsen Company's proprietary rights. Any text, document, press release, statement, advertisement, publication or other material containing Nielsen Online data or derived from Nielsen Online data is subject to the above-mentioned restrictions.

**Guidelines for Proper Use of Nielsen Online, The Nielsen Company and Various Related Corporate Names**

**Nielsen Online**

Nielsen Online is the name of our service in The Nielsen Company, and should be used in reference to the data and/or research; it should not be used as if it were a corporate entity.

Nielsen Online, AdRelevance is the brand name for our advertising service, and should be used in reference to the data and/or research; it should not be used as if it were a corporate entity. It should be spelled with a capital R.

Nielsen Online, @Plan is the brand name for our target-marketing service for Internet media planning, buying and selling, and should be used in reference to the data and/or research; it should not be used as if it were a corporate entity. It should be spelled with a capital P.

Nielsen Online, WebRF is the brand name for our reach and frequency media planning tool, and should be used in reference to the data and/or research; it should not be used as if it were a corporate entity. It should be spelled with a capital RF.

Nielsen Online, Analytical Services is the brand name for our custom analytics group, and data and/or research generated by that group must be appropriately footnoted and approved by The Nielsen Company PR department as noted under General Guidelines. It should not be used as if it were a corporate entity.

Nielsen Online WebIntercept is the brand name for our online survey product, and should be used in references to the data and/or research; it should not be used as if it were a corporate entity.

Homescan Online is a CPG service covering the Internet, and is a brand provided jointly by Nielsen Online and ACNielsen. The service should be referenced as Homescan Online, powered by AC Nielsen and Nielsen Online.

## The Nielsen Company

The Nielsen Company is the name of our corporate entity.

Our joint venture partner in France is branded as MediaMetrie. Our joint venture partner in Brazil is known as IBOPE eRatings. In Japan, the company name is NetRatings Japan, and the service is branded as

Nielsen Online

The Nielsen Company
770 Broadway
New York, New York 10003
www.nielsen-online.com



Nielsen Online. Any questions about the proper use of these identities should be referred to the public relations department listed below.

**Quotes**

Quotes attributed to The Nielsen Company executive management team should be sourced as The Nielsen Company. Analyst quotes should be sourced to Nielsen Online. For example, "According to Ken Cassar, Nielsen Online, eCommerce transactions are on the rise."

All data and research should be sourced to Nielsen Online or to each specific service, such as Nielsen Online, AdRelevance.

## Examples of Nielsen Online Data Use

Following are examples of how Nielsen Online data can be used by subscribers.

**To validate a ranking:**

According to Nielsen Online, Company X attracted the third-largest search audience on the Web in May.

**To highlight a research finding:**

Nielsen Online reported that broadband use reached the critical 50 percent benchmark in January.

**To support corporate/brand positioning in a boilerplate:**

Web site X was the No. 1 U.S. automotive site in May 2008, from home and work, according to Nielsen Online.

**Citing a Nielsen Online analyst in a quote:**

"When you're on the Internet, you basically can market to the whole world at once," says Jon Gibs, vice president of media analytics for Nielsen Online.

**To highlight a Web site's growth over time:**

Company X's site jumped 56 percent from March to April, according to Nielsen Online.

**To highlight a Web site's reach on the Internet:**

According to Nielsen Online, Company X had more than 50 million unique visitors in March, reaching 70 percent of the active Internet population.

**To highlight a Web site's reach within a specific target audience:**

Web site X has been successful in attracting younger Internet surfers, as 45 percent of its visitors are between the ages of 12-17, according to Nielsen Online January 2004 data.

**Usage of Custom data:**

According to Nielsen Online custom research, Web site X jumped 85 percent in traffic year-over-year in May.

## Contact us by e-mail: pr.us@nielsen.com

Nielsen Online

The Nielsen Company
770 Broadway
New York, New York 10003
www.nielsen-online.com

http://www.netratings.com/downloads/PR_guidelines_0806.pdf

# Exhibit D



For Employees  |  Other Nielsen Sites  |  Contact Us

**services**    **insights**    **news**    **about nielsen**    **careers**

# Nielsen Launches New Internet and Mobile Measurement Services

## Nielsen Online and Nielsen Mobile Enhance Ability to Measure Rapidly Evolving Media and Advertising Across Global Markets

**October 15 , 2007- New York** – The Nielsen Company today announced that it has launched two new Internet and mobile measurement services—Nielsen Online and Nielsen Mobile—that build on the company's leadership positions in both sectors and further enable it to provide clients with an integrated, comprehensive suite of measurement capabilities.  These two new services, which will strengthen Nielsen's ability to deliver comprehensive global measurement of consumer behavior across all media platforms, will be organized as follows:

- **Nielsen Online** is comprised of the company's Nielsen//NetRatings and BuzzMetrics services, which provide independent measurement and analysis of online audiences, advertising, video, blogs, consumer-generated media, word-of-mouth, commerce and consumer behavior.

- **Nielsen Mobile** combines recently acquired Telephia, the leading provider of syndicated consumer research to the telecom and mobile media markets, with several existing Nielsen initiatives in the mobile market. Nielsen Mobile will use its unique measurement tools and large-scale, integrated consumer panels to understand and interpret the behaviors, attitudes and experiences of mobile consumers.

David Calhoun, chief executive officer of The Nielsen Company said, "As consumers experience media through different channels and technologies, it is essential that Nielsen measure and interpret that experience for its clients. With this new structure, we are prepared to focus with even more intensity on delivering the complete picture of consumer activity and behavior in the digital space and across all media platforms."

**Nielsen Online: The Global Leader in Internet Media, Marketing and Consumer-Generated Media Insight**

Nielsen announced that Itzhak Fisher, former executive chairman of BuzzMetrics, will lead Nielsen Online as executive chairman of the service. The alignment of Internet capabilities under Nielsen Online will ensure that Nielsen continues to develop, grow and lead an industry supported by more than one billion Internet users worldwide, driving a $30 billion global advertising market with 73 percent of U.S. adults participating in online consumer-generated media.

 "The Internet offers critical opportunities for businesses to influence consumer perceptions of brands, products and services," said Mr. Fisher. Integrating the strong capabilities of these two entrepreneurial organizations into Nielsen Online creates a powerful tool for our clients in the fast-paced, constantly changing online space."

Nielsen Online offers a broad portfolio of measurement capabilities that enable clients to make informed business decisions about their digital strategies, including:

- Internet media and market research products supported by patented technologies and innovative and proven research methodologies
- Panel-based and site-centric Internet audience measurement services
- In-depth demographic data, online advertising intelligence, and user lifestyle information
- E-commerce, search and transaction metrics, custom data, research, and analysis;
- Tracking, analysis and measurement of consumer-generated media consumer trends, issues, opinion shifts, predictions and other marketplace-shaping forces

More than 2,000 clients across 16 countries subscribe to Nielsen Online services, including leading advertisers, publishers, technology companies, advertising agencies, retailers and financial services organizations.

In addition to Mr. Fisher, Nielsen Online will be led by Manish Bhatia, president of global services and U.S. sales and a former executive vice president of Nielsen//NetRatings, and by Jonathan Carson, a co-founder of BuzzMetrics, who will serve as president of Nielsen Online's international

---

**Media Contact**

**The Nielsen Company**
Gary Holmes
+1-646-654-8975

Susan Hickey (Nielsen Online)
+1-646-654-8290

Maria Bumatay (Nielsen Mobile)
+1-415-637-4904

organization.

**Nielsen Mobile: The Global Standard in Independent Measurement of Mobile Media**

Nielsen announced that Sid Gorham, the former CEO of Telephia and a 20-year veteran of the telecom industry, has been named president and CEO of Nielsen Mobile. The creation of Nielsen Mobile solidifies Nielsen's leadership position in the $350 billion mobile sector, where consumers are rapidly expanding the way they use mobile phones. Among the 237 million wireless subscribers in the U.S., 70 percent use their phones to text message, more than 32 million accessed the Internet on their phones last month, and 41 percent use their phones to send picture messages.

"Even as technology drives more complex consumer behavior, Nielsen continues to innovate rapidly," said Mr. Gorham. "With our expanded leadership in the mobile space, Nielsen brings clients a complete 360 degree view of their business and consumers.  No one else has the ability to deliver comprehensive consumer insight and intelligence across media platforms."

Nielsen Mobile's technology-driven research provides a unique and holistic perspective of the attitudes, behaviors and experiences of the mobile consumer, including:

- Insight into what mobile consumers think about brands, devices and services through technology that measures awareness, purchase intent, satisfaction, recommendations and loyalty
- Information about what mobile consumers actually do with their mobile devices by measuring market share, consumer spending, revenue share and other consumer behaviors
- Intelligence into how consumers experience services, networks and devices through proprietary technology that measures network, service and application quality

More than 125 global companies in the telecom and mobile media markets rely on Nielsen Mobile for comprehensive measurement and analysis of mobile consumers, including mobile operators, device manufacturers, retailers, infrastructure vendors, investment analysts and content providers.

In addition to Mr. Gorham, Nielsen Mobile will be led by a group of former Telephia executives. John Forese, Jesse Goranson and Tom Stahl will be responsible for Product Management, Client Service, and Technology and Operations, respectively.

Nielsen Wireless, a recently announced initiative to measure wireless media, will be folded into Nielsen Mobile. Nielsen Entertainment's former Nielsen Mobile service has been renamed Nielsen MobileScan. Nielsen RingScan, the company's ring tone measurement service, is under the Nielsen MobileScan umbrella.

**ABOUT THE NIELSEN COMPANY**

The Nielsen Company is a global information and media company with leading market positions and recognized brands in marketing information (ACNielsen), media information (Nielsen Media Research), online intelligence (NetRatings and BuzzMetrics), trade shows and business publications (Billboard, The Hollywood Reporter, Adweek). The privately held company is active in more than 100 countries, with headquarters in Haarlem, the Netherlands, and New York, USA. For more information, please visit www.nielsen.com

# # #

Back to Top ▭

© The Nielsen Company. All rights reserved.  Disclaimer | Privacy Statement

# Exhibit E



The Nielsen Company
770 Broadway, New York, NY 10003
www.nielsen.com

September 26, 2007

Mr. Manuel Mirat

C/Ribera del Sena
s/a edificio APOT - 4A
Madrid, 28042
Spain

Dear Mr. Mirat,

I am writing in connection with your recent discussion with the Nielsen//NetRatings team concerning the audience estimates published monthly in the Nielsen//NetRatings NetView service.

I can confirm that our team will publish the data you discussed, and that the date of publication will be tonight, so that the data is live in the Spanish market tomorrow, 27th September.

The audience number for ElPais.com will reflect a reduction, following the identification of invalid traffic to the non-audience facing page which had artificially boosted numbers over the last six months. This page was accidentally included in the numbers because calls to it closely resembled user-generated traffic. After extensive analysis, we found that only one URL (http://www.elpais.com/rss.html) was causing this data distortion during the last months. Our service follows very specific global rules regarding crediting audience and traffic to one site, and because we cannot identify circumstances where this page could be providing valid traffic to the site, we are obliged to exclude this URL as a source for valid traffic in the NetView service.

We appreciate that these numbers are important to your business and we take this matter very seriously. We understand that you are not happy with the circumstances of this publication and we regret the inconvenience caused. I am particularly sorry that, because of an oversight, the data went live temporarily yesterday before you had a chance to discuss it in depth with our team as had been agreed. We continually review our data QA processes and, as part of that, we will work to ensure that in the future any similar traffic is excluded from the reported data.

Should you or your team wish to engage in further discussion on this topic, please feel free to contact me or members of the Spanish, European or Global teams.

We consider Prisacom an important client and we have tremendous respect for you and your outstanding achievements in the newspaper and online sectors. We hope that in the future we will be able to move past this situation and work together in collaboration.

Please accept my best regards.

Yours sincerely,

Jonathan Carson
President, International
Nielsen Online
1-646-654-7801
jonathan.carson@nielsen.com

# Exhibit F





**contact nielsen online**

**U.S. Headquarters**
770 Broadway, 13th Fl.
New York, NY 10003
United States
T: 1-646-654-7990
F: 1-212-703-5901

Press Contact:
pr.us@netratings.com

**Europe, Middle East Africa Headquarters**
77 St. John Street
London EC1M 4AN
United Kingdom
T: +44 20 7014 0590
F: +44 20 7014 0591

Press Contact:
pr_uk@netratings.com

**Asia-Pacific Headquarters**
59 Wentworth Avenue
Sydney NSW 2000
Australia
T: +61 (2) 8204 5888
F: +61 (2) 8204 5889

Press Contact:
Deanie.Sultana@nielsen.com

For additional location
information

© 2007 The Nielsen Company. All product names herein are the property of their respective owners.

NetRatings.com    BuzzMetrics.com

# Exhibit G

  **A global leader in Internet media and market research**



## Press FAQ's

- *What's your methodology?*
  - Nielsen//NetRatings has a range of products you can rely on for high quality Internet metrics, including NetView, AdRelevance, VideoCensus, MegaView and @Plan. Each of these syndicated services has a unique methodology designed to provide accurate results.
  - NetView, the Nielsen//NetRatings flagship product, provides audience measurement data based on home and work panels recruited through Random Digit Dial (RDD). With a combined total of nearly 30,000 people, the NetView panels yield an array of Web audience metrics, including: unique audience, active reach, Web page views and average time per person. Detailed demographic information is also available via NetView.
  - For information on the methodology of other Nielsen//NetRatings products, please contact the Public Relations team at pr.us@netratings.com.

- *How is Nielsen//NetRatings different from its competitors?*
  - Nielsen//NetRatings provides the highest quality data available, leveraging its RDD panel both in the NetView service and to weight its online panel for MegaView. Nielsen//NetRatings also offers unique data sets such as online advertising metrics and later this year, video streaming.
  - As a member of the Nielsen family, NetRatings can provide you with contacts to Nielsen Media Research, AC Nielsen and Nielsen EDI, among others, making it possible for you to cover all angles of the story.

- *Why does your data occasionally differ from what companies are reporting about their own Web sites?*
  - In general, companies rely on server log data to report and analyze their own internal Web traffic patterns, and there are a number of different reasons why discrepancies may occur between server and panel-based measurement data. Server logs register users based on Web page requests and can overcount users who return to the Web site from a different PC or delete their cookies. Bot and spider traffic can also inflate certain server-based counts. Server logs do not provide reliable geographic or demographic information.
  - Nielsen//NetRatings is able to provide accurate unique audience figures and detailed demographic information because of our rigorous recruitment, proprietary tracking and granular measurement processes. We do not count users who visit a site more than once in a specific time period, and we do not count spiders, bots and other Web crawling technologies which might otherwise be counted as page views or visitors on a company server log.

- *How do I get data from Nielsen//NetRatings?*
  - Some data is available to the public and the press on our Web site www.netratings.com. Check out the "Press" and the "Resources" tabs.
  - For data that is not available online, members of the press should contact the Nielsen//NetRatings Public Relations team at pr.us@netratings.com. We'll be happy to assist you.
  - If you are not a member of the press, but would like data in addition to what is available on our Web site, we sell subscriptions to all of our services. To find out more and talk to a sales representative, see www.netratings.com.

- *What do these metrics mean?*
  - Unique Audience – Includes anyone who went to a site during the reporting period. Anyone who went more than once during the reporting period was not counted again.
  - Active Reach – The percent of active Web users who went to a specific site during the reporting period. Active Web users include anyone who went online or used an Internet application at least once during the reporting period.
  - Time Per Person – The average time spent per person at a site during the reporting period (usually one month).

- *How should I source Nielsen//NetRatings data?*
  - In general, the data we provide you should be sourced to Nielsen//NetRatings.  Sometimes it's useful also to include the product name, such as Nielsen//NetRatings AdRelevance.

# Exhibit H

**Nielsen//NetRatings | WebRF**

A global leader in Internet media and market research



A sophisticated tool for planning online advertising campaigns

## WEBRF ENABLES COST-EFFICIENT ADVERTISING PLANNING AND MEASUREMENT USING TRADITIONAL MEDIA RESEARCH METRICS

### Why do I need WebRF?

In the past there was an absence of reliable, accurate and easily accessible data to assess planned campaigns online. Advertisers and advertising agencies had to rely on their own judgement when selecting domains, sites and pages for advertising placements. In response to demand from the market, Nielsen//NetRatings developed WebRF to bridge this gap by providing information in a form that allows cost-efficient planning and provide measures of success using traditional analyses such as coverage, reach, frequency and audience build profiles.

### > If you are an Advertising Buyer or Planner

WebRF allows you to assess the success of your planned schedule for specified target demographic groups by calculating the optimum audience that you will reach within your specified budget.

### > If you are a Media Owner

WebRF can highlight those areas within your domain(s) that have a high propensity towards specified target demographics. This will enable you to pitch for targeted campaigns as well as highlighting the strengths of your audience over those of your competitors.

### > If you are an Advertiser

WebRF allows you to assess your activity over time with audience day build capability for your campaign. The system will show you when your activity has reached saturation point in terms of coverage as well as highlighting the most efficient ways of reaching this point.

### How does it work?

WebRF combines Nielsen//NetRatings' research on consumer behaviour by using Page View as the basic unit of measurement. This provides a people-orientated, panel-based approach. The information is combined with software supplied by IMS to provide a wide range of analyses based on standard reach and frequency measures including;

> Campaign Optimisation
> Upweight/Downweight Analysis
> Frequency profiling down to page level information
> Audience Build Profiles over time
> Total Page View bought versus Page Views seen by target (effective page views)



Fig. 1. Frequency profiling using data extracted from WebRF at domain level. Domain C shows a decline in frequency suggesting irregular access by the target audience. However, domains A and B show high access levels with little decline in audience values.



**Nielsen//NetRatings | WebRF**

## Why use Page Views?

This approach allows you to understand the characteristics and performance of each page within an individual domain or site. The detail includes who saw what, where, when and for how long which allows the user to construct schedules that meet a wide range of criteria in terms of targeting, frequency and coverage.

### Using WebRF to plan a campaign

WebRF allows you to input a Cost Per Thousand Page View number either on a market wide basis or at domain/site level. This means that your particular budget can be used as one of the defining parameters. The user can create target demographic groups and either select a schedule manually, or buy using WebRF to optimise a schedule.

In either case, the schedule selection can be refined by selecting or deselecting individual domains/sites/pages as well as increasing or decreasing the actual number of Page View buys within the schedule. All this information is summarised on an unduplicated basis giving a performance assessment of the chosen selection. This information can be used to calculate efficiency profiles by comparing the number of Page Views purchased against the effective or seen Page Views by the specified target.

WebRF also has a time management capability that enables the user to construct Audience Build Profiles over given periods of time. This shows the performance of the campaign as it develops and increases coverage until the coverage curve reaches the saturation point. Therefore your campaign expenditure can be maximised to any given point in time.



Fig.2. Audience Build Profiles on a daily basis. This capability highlights both the individual growth curves of each domain as well as possible cut-off points for commercial activity.

### Cross-Media Planning

All information within WebRF can be compared within three separate populations. The Active Internet Universe - the number of people who accessed the internet during the given time period; the Internet Universe - the total connected population, and the Total UK population - this allows a national reach number to be calculated and can therefore be compared with other media.



Fig.3. Frequency Profiling can illustrate differing types of audience behaviour. A steep drop in audience vs. frequency indicates irregular access. A flat profile line indicates repeated access by the same group of people.

For more information, please call us on +44 (0)20 7014 0590 or e- mail
Info_uk@netratings.com

Nielsen//NetRatings
77 St. John Street
London
EC1M 4AN

www.nielsen-netratings.com

http://www.nielsen-netratings.com/downloads/uk/WebRF_UK.pdf

# Exhibit I

# Acknowledgments

We thank Siobhan Burns, Caren Weiner Campbell, Daphne Dennis, Mikola De Roo, Lynn Hazlewood, Laura Mitchell, Bernard Onken, Blake Royer, Steven Shukow, Miranda Van Gelder, Laura Vogel and Barak Zimmerman, as well as the following members of our staff: Emily Parsons (associate editor), Rachel McConlogue (editorial assistant), Sean Beachell, Maryanne Bertollo, Reni Chin, David Downing, Victoria Elmacioglu, Andrew Eng, Jeff Freier, Shelley Gallagher, Randi Gollin, Jessica Grose, Karen Hudes, Natalie Lebert, Mike Liao, Dave Makulec, Josh Rogers, Becky Ruthenburg, Troy Segal, Robert Seixas, Thomas Sheehan, Carla Spartos, Kelly Stewart, Donna Marino Wilkins, Yoji Yamaguchi, Sharon Yates and Kyle Zolner.

The reviews published in this guide are based on public opinion surveys, with numerical ratings reflecting the average scores given by all survey participants who voted on each establishment and text based on direct quotes from, or fair paraphrasings of, participants' comments. Phone numbers, addresses and other factual information were correct to the best of our knowledge when published in this guide; any subsequent changes may not be reflected.

© 2006 Zagat Survey, LLC
ISBN 1-57006-815-1
Printed in the United States of America

# Exhibit J

Moody's Rating  Report - Jan 2008.txt

From: Jim Francis
Sent: Wednesday, January 30, 2008 9:44 AM
To: Jim Francis
Subject: FW: Moody's Final Report


MOODY'S ASSIGNS Aaa TO WEST HARTFORD'S (CT) $15M G.O. BONDS, SERIES 2008A

TOTAL OF $160.9 MILLION IN RATED DEBT OUTSTANDING, INCLUDING CURRENT OFFERING

West Hartford (Town of) CT
Municipality
Connecticut

Moody's Rating

Issue                                               Rating

General Obligation Bonds, Series 2008A              Aaa
    Sale Amount        $15,000,000
    Expected Sale Date  01/30/08
    Rating Description  General Obligation

NEW YORK, January 29, 2008 -- Moody's Investors Service has assigned a Aaa rating to the Town of West Hartford's $15 million General Obligation Bonds, Series 2008A. Concurrently, Moody's has affirmed the Aaa rating on the town's outstanding general obligation debt, affecting $145.9 million in bonds. The bonds are secured by the town's general obligation unlimited tax pledge. Proceeds will finance various capital projects, the largest of which is for street improvements and upgrades to the police station. The rating assignment and affirmation of Moody's highest rating reflects the town's sizeable and diverse equalized net grand list (ENGL), satisfactory financial reserves bolstered by reserved retained earnings in the health insurance fund, and manageable debt burden governed by a comprehensive 12-year capital plan. The rating also considers the town's socioeconomic indices that trend below state and national medians for Aaa-rated municipalities.

SIZEABLE AND DIVERSE EQUALIZED NET GRAND LIST

Moody's anticipates that the town's substantial $9.2 billion ENGL will continue to grow at a moderate rate due to ongoing residential and commercial developments. The town boasts a diverse economic base (70% residential, 16% commercial /industrial) and major employers within the town include a variety of higher education institutions, manufacturing firms and health providers as well as a substantial commercial sector. Additional employment opportunities are found in the financial and manufacturing sectors in the surrounding communities of Hartford (rated A2/stable outlook), Farmington (rated Aa1) and Bloomfield (rated Aa3). The town's tax base growth expanded at an average annual rate of 8.8% over the last five years capturing property value appreciation as well as some residential growth and commercial activity. This is below average when compared to the state's growth rate which increased at an annual average 10.4% over the same time frame. The effect of the October 2006 revaluation is being phased in over five years with 2008 seeing a 21.2% increase.

Management projects significant growth in the ENGL over the medium term given the Blue Back

Page 1

Moody's Rating  Report - Jan 2008.txt

Square site, a $198.8 million mixed-use private/public development in the town center. The project is 80% completed and some highlights of this substantial project entail two parking garages, 70 high-end residential condominiums, big box retailers Barnes and Noble and Crate and Barrel, and the Cheesecake Factory Restaurant. Using proceeds from a previous $48.8 million bond sale, the project also incorporates improvements to the town hall and library, as well as streets, sidewalks, and public areas. The project is expected to increase the assessed value by an extraordinary 3.2%, generating $2.8 million annually in general property taxes when it is completed. The Blue Back Square site has also spurred ancillary development, including a new Whole Foods Market, refurbishment of existing commercial properties and various residential projects.

Wealth levels in West Hartford, though above state medians, fall below Aaa medians, as reflected in the $153,004 ENGL per capita. The Connecticut Aaa median ENGL per capita is a significant $385,924. The per capita (PCI) and median family incomes (MFI), as a percent of the nation, are also significantly below similarly rated credits at 155% and 156%, respectively. The Aaa median PCI and MFI as a percent of the nation is a higher 272% and 251%, respectively. Moody's believes that this wealth profile is offset by the town's considerable economic redevelopment in the town center, coupled with a very strong management team and fiscal stability.

POLICIES PROVIDE STABLE AND COMFORTABLE LEVELS OF FINANCIAL FLEXIBILITY; ADDITIONAL RESERVES MAINTAINED OUTSIDE GENERAL FUND

Moody's believes that the town's consistently stable financial position will be maintained largely due to the policies followed by a seasoned management team. The town has generated four consecutive operating surpluses since fiscal 2004, increasing the undesignated General Fund balance to $15.4 million (a satisfactory 7.5% of General Fund revenues) in fiscal 2007 from $11.2 million (6.7% of General Fund revenues) three years prior. The increase reflects the town's consistently conservative budget practices--specifically in regards to investment earnings, property tax collection assumptions, and anticipated state aid grants -- coupled with strict spending controls. At the current level, the undesignated general fund balance is just slightly below the Connecticut Aaa median of 7.7%.

The fiscal 2008 operating budget included $5.4 million in additional expenses related to health insurance, other post employment benefits and contractual services. The budget was balanced through increased intergovernmental revenue and $781,185 of appropriated General Fund balance. Of note, appropriating General Fund balance as revenue to balance the budget is not a common practice for the town. After having posted a $2 million operating surplus in fiscal year 2007, management elected to provide property tax relief in order to mitigate the impact of the October 1, 2006 revaluation. Additionally, officials did not incorporate the typical $1.0 million in pay-as-you go capital expenditures and small contingency line item. As a result, the town does not have as much financial flexibility as in prior years, however, the town's financial position remains sound due to available reserves held outside the General Fund. These reserves include the Other Post Employment Benefits reserve ($9 million), Capital Non-Recurring fund ($900,000) and Utility reserve ($800,000). Several months into the fiscal year, management reports revenues and expenditures are in line with projections and expect to maintain the undesignated General Fund balance within the town's target of 7.5% of General Fund revenues.

Reflective of West Hartford's proactive nature, the town is addressing energy costs to mitigate future expenditure pressures. Some implemented strategies include the installation of energy management systems, separate heating and cooling systems, the establishment of contracts with alternative energy suppliers and the establishment of a utility reserve. Further, the town established an OPEB reserve in 1985, nearly 13 years prior to the Government Accounting Standards Board requirement. Since it is not

Moody's Rating  Report - Jan 2008.txt

in a legislatively established trust, the monies, if necessary, can be used to offset General Fund expenditures. The town did not make a retiree health insurance contribution from the general fund for fiscal years 2003 and 2004, but continued to pay such claims from the health care reserve. Additionally, the town only partially funded the actuarially determined annual required contribution in fiscal 2005 and 2006. As a result, the town reduced the OPEB reserve to $11.8 million in fiscal 2006 from its peak position of $30 million in fiscal 1999. The town plans to draw this reserve to a minimum of $6.1 million in fiscal 2010-lower than the previously expected floor of $12 million due to unanticipated retiree claims. At this point, the funding for the OPEB reserve beyond fiscal 2009 is unknown since management is currently reviewing the option of establishing an OPEB trust. The town's current unfunded liability is $87 million. In order to reduce future OPEB costs significant plan adjustments such as increased normal retirement age and employee contributions have been implemented for approximately 22% of the nonpublic safety unionized workforce.

The pension fund is expected to improve markedly given favorable negotiations with unionized employees with regard to the normal retirement age for new employees, coupled with the continuation of the complete funding of the annual required contribution (ARC). Fiscal 2003 represented the first time in 12 years that necessitated an ARC as the town pension had been funded in excess of 100% prior to that time. Given the investment environment in fiscal 2003 coupled with a change in the actuarial valuation method in fiscal 2005, the town pension system funding ratio slipped to 79.6% as of January 2005. Unfavorable asset allocations led to another decline in the funding ratio in the subsequent year to 75.2%. Going forward, management expects improved funding ratios as the previously mentioned contract negotiations are expected to reduce the actuarial accrued liability.

DIRECT DEBT BURDEN EXPECTED TO MODERATE

Moody's expects the town's slightly above average 1.7% (of ENGL) direct debt burden will moderate over time due to a combination of the town's healthy principal payout of 68.1% retired within 10 years, carefully planned future borrowing and continuing ENGL growth. Further, the debt service for the $48.8 million G.O. bonds issued for the construction of Blue Back Square is expected to be paid from revenues generated by the new parking structures and special services district taxes.

Reflecting the strength of the community's strategic planning efforts, West Hartford maintains a 12-year capital improvement plan totaling $144.5 million that has provided an important framework for identifying the timing and financial resources necessary to meet capital needs.

The town is a member of the Metropolitan District Commission (MDC), a special district in Hartford that provides water and sanitary services to eight member towns. The town's overall debt increases to a moderate 2.1% (of ENGL) when incorporating overlapping debt associated with the MDC. The MDC has been cited by the U.S Environmental Protection Agency and the United States Department of Justice for overflows from the sewer systems. The abatement plans call for new sewers, removal of storm water flows during storm events, and additional treatment capacity at a cost of $2.1 billion over the next 17 years. Each of the eight member towns has overwhelmingly approved an $800 million authorization to begin stage one of the project. Of note, the total cost of this initial authorization has the potential to be reduced substantially through receipt of both state and federal loans. This debt is not expected to place fiscal strain on the town's General Fund operations since the project will be funded through user surcharges on the individual customer's quarterly bills.

KEY STATISTICS:

2006 Population: 60,700

Page 3

Moody's Rating  Report - Jan 2008.txt

Equalized Net Grand List: $9.2 billion

Equalized Net Grand List Per Capita: $153,004

Median Family Income: $77,865 (156 % of the nation, 119% of Connecticut)

Per Capita Income: $33,468 (155% of the nation: 116% of Connecticut)

FY07 General Fund Balance: $16.9 million (8.3% of General Fund Revenues)

FY07 Unreserved General Fund Balance: $16.1 million (7.9% of General Fund
Revenues)

Available Reserves (includes Unreserved General Fund Balance and OPEB
reserve): $26.1 million (12.7% of General Fund Revenues)

Overall Debt Burden: 2.1%

Adjusted Debt Burden: 2.0%

Payout of Principal (10 years): 68.1%

Post-sale parity debt outstanding: $160.9 million


ANALYSTS:
Alexandra J. Lerma, Analyst, Public Finance Group, Moody's Investors Service Conor McEachern,
Backup Analyst, Public Finance Group, Moody's Investors Service Edith Behr, Senior Credit Officer,
Public Finance Group, Moody's Investors Service

CONTACTS:
Journalists: (212) 553-0376
Research Clients: (212) 553-1653


Copyright 2008, Moody's Investors Service, Inc. and/or its licensors and affiliates including Moody's
Assurance Company, Inc. (together, "MOODY'S").
All rights reserved.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY COPYRIGHT LAW AND NONE OF
SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED,
FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR
STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY
FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S
PRIOR WRITTEN CONSENT. All information contained herein is obtained by MOODY'S from sources
believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as
well as other factors, however, such information is provided "as is" without warranty of any kind and
MOODY'S, in particular, makes no representation or warranty, express or implied, as to the accuracy,

Moody's Rating  Report - Jan 2008.txt

timeliness, completeness, merchantability or fitness for any particular purpose of any such information. Under no circumstances shall MOODY'S have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information. The credit ratings and financial reporting analysis observations, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER. Each rating or other opinion must be weighed solely as one factor in any investment decision made by or on behalf of any user of the information contained herein, and each such user must accordingly make its own study and evaluation of each security and of each issuer and guarantor of, and each provider of credit support for, each security that it may consider purchasing, holding or selling. MOODY'S hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MOODY'S have, prior to assignment of any rating, agreed to pay to MOODY'S for appraisal and rating services rendered by it fees ranging from $1,500 to $2,400,000. Moody's Corporation (MCO) and its wholly-owned credit rating agency subsidiary, Moody's Investors Service (MIS), also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually on Moody's website at www.moodys.com under the heading "Shareholder Relations - Corporate Governance - Director and Shareholder Affiliation Policy." Moody's Investors Service Pty Limited does not hold an Australian financial services licence under the Corporations Act. This credit rating opinion has been prepared without taking into account any of your objectives, financial situation or needs. You should, before acting on the opinion, consider the appropriateness of the opinion having regard to your own objectives, financial situation and needs.