UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
DIARIO EL PAIS, S.L. and PRISACOM, S.A.,  :
                                               :

        Plaintiffs,                  :

                                         :    **07CV11295(HB)**

     against                   :    <u>OPINION AND</u>

                                         :    <u>ORDER</u>

THE NIELSEN COMPANY, (US), INC.,      :
                                                 :

        Defendant.              :
-------------------------------------------------------------------x
**Hon. HAROLD BAER, JR., District Judge:**

       Plaintiffs Diario El Pais, S.L. and Prisacom, S.A. filed an amended complaint on April 3, 2008 charging Defendant The Nielsen Company, (US), Inc. with trade libel, tortious interference with economic prospects, negligent interference with economic prospects, and negligent misrepresentation for lost advertising revenue resulting from the publication of allegedly erroneous estimates of the number of visitors to Plaintiffs' elpais.com website in 2007. Plaintiff El Pais is a leading Spanish newspaper and Prisacom is the owner of the online version of El Pais; both are based in Madrid. Defendant Nielsen is a New York corporation and one of several subsidiaries of a Dutch corporation that together provide audience measurement and business media products. In its motion to dismiss, Defendant raises the following arguments: (1) that Netratings Spain, S.L. Unipersonal ("Netratings"), a Spanish corporation and distant affiliate of Defendant, provided the allegedly erroneous information pursuant to a contract with Prisacom and is thus the proper defendant here; (2) that Plaintiffs' claims are contract claims improperly cast as tort claims; and (3) even if Defendant did owe Plaintiffs an independent duty not covered by the contract, the allegedly libelous speech is protected by the First Amendment. For the reasons discussed below, Defendant's motion to dismiss is granted.

## I. FACTS

       El Pais owns and publishes *El Pais*, which is Spain's most widely read newspaper, and Prisacom controls and operates various websites including the digital version of *El Pais*, elpais.com. Am. Compl. ¶ 1. Plaintiffs allege that the Defendant Nielsen is the world's leading provider of audience measurement services and that, through Nielsen Net Ratings or "NNR," it is the leading provider of online audience estimates in Spain. Id. at ¶¶ 2, 24, 26. Such online

audience estimates are generated from a sample of users (a "NNR Panel") whose internet activity is tracked to form the raw data that Nielsen uses to produce, via a proprietary methodology, reports that purport to rank the most popular websites in a geographic area based on the number of "unique users" that view the website each month.  Id. at ¶¶ 26, 27.  To distinguish user-directed internet activity from automatic or computer-generated activity, the NNR methodology does not count automated "calls" to a website towards the site's ranking.[1]  Id. at ¶ 52.

Plaintiffs rely upon the rankings, describing them as the "currency" by which advertisers and their agencies allocate advertising spending.  Id. at ¶¶ 29, 30.  Plaintiffs do not allege that they have a contract with Defendant The Nielsen Company (US).  Rather, they allege that Prisacom is one of the Defendant's numerous "clients" to whom Defendant publishes its audience estimates.  Id. at ¶ 28.

Prior to March 2007, the NNR Panel for Spain comprised 4,000 users who connected to the internet from their homes.  Id. at. ¶ 38.  Under this composition of the NNR Panel, elpais.com was ranked as the #2 media website for most of the period between August 2006 and February 2007.  Id. at ¶¶ 4, 47.  In March 2007, the NNR Panel was increased from 4,000 to 16,000 home users and 1,000 workplace users were added; Plaintiffs also allege that at this time revisions were made to the methodology used to estimate unique visitors to a website.  Id. at ¶ 41.  Plaintiff allege that in July 2007 Defendant reported that elpais.com was the #1 website in Spain during the previous month. Id. at ¶ 48.   However, on September 21, 2007, three of Prisacom's competitors published news articles that claimed traffic to elpais.com had been erroneously inflated by automatic "calls" to elpais.com's RSS feed. Id. at ¶ 51.[2]  Plaintiffs allege that persons within "Defendant's NNR business unit" were the source of the information in the news articles. Id. at ¶ 51.

That day, Prisacom contacted the Defendant for an explanation and Mr. Gustavo Nunez, Defendant's local general manager, confirmed that elpais.com data was being audited because of the high volume of traffic on the elpais.com RSS page.  Id. at ¶ 54.  Mr. Nunez agreed not to publish any revised data for August 2007 until Prisacom had an opportunity to review the data

---

[1] Such automated "calls" can occur when a website subscribes to a "RSS feed" (RSS stands for "really simple syndication") to receive automatic updates (such as headlines) originating from a third party source (such as a media site like elpais.com). Am. Compl. ¶¶ 51-52.  The website receiving the RSS feed will "call" the originating website automatically.  Id.

[2] Prisacom acknowledges that it maintains a RSS page but disputes that the RSS page could have caused a material overstatement of the unique users to elpais.com. Am. Compl. ¶¶ 52, 58.

and receive an explanation of the downward revisions of the estimated online audience.  <u>Id</u>. at ¶ 55.  On September 24, 2007, Louise Ainsworth, Defendant's European Manager, affirmed this agreement.  <u>Id</u>. at ¶ 59.

Nonetheless, on September 25, 2007, online audience data for August that reflected the recalculation was temporarily published through the Netview service, though attempts were made to recall the published data on that date.  Am. Compl. ¶¶ 60, 66; Decl. of Ethan E. Litwin, (April 30, 2008) ("Litwin Decl."), Ex. E.  Elpais.com fell from the # 1 to the # 3 ranked Spanish website and its estimated audience was reduced by 1.8 million unique users from July 2007. Am. Compl. ¶¶ 9-10.  The next day, Jonathan Carson, president of Nielsen Online in New York, wrote to Plaintiffs in Spain to confirm that the audience estimates in the NNR "NetView service" would be "live in the Spanish market" on September 27, 2007.  Litwin Decl. Ex. E.  Mr. Carson apologized that "the data went live temporarily" on September 25, 2007 before Prisacom had a chance to discuss the revised data with a member of the Nielsen team as had been agreed.  Am. Compl.  ¶ 69; Litwin Decl. Exhibit E.  Also on September 26, 2007 Defendant delivered a report to Prisacom titled "Elpais.com – Correction of Reported Standard Metrics: March – July 2007" that explained the downward adjustments.  Am. Compl. ¶¶ 70, 71.   However, Plaintiffs, conducted their own analysis of the revised data in the report and determined that the report was "either materially incomplete and/or entirely without merit."  <u>Id</u>. at ¶ 16.

Plaintiffs allege that on November 1, 2007, Defendant published the September 2007 data, which showed again that elpais.com was ranked #3.  <u>Id</u>. at ¶ 12.  On November 28, 2007, Defendant published revised monthly data for the period March through July 2007 which reflected downward adjustments to elpais.com's estimated audience ranging from 24% to 34%. <u>Id</u>. at ¶ 13.

## II. STANDARD OF REVIEW

Under Rule 12(b)(6), a complaint will be dismissed if there is a "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss, factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true.  <u>Bell Atl. Corp. v. Twombly</u>, 127 S. Ct. 1955, 1965 (2007); <u>see also</u> <u>ATSI Communications, Inc. v. Shaar Fund Ltd.</u>, 493 F.3d 87 (2d Cir. 2007).  The Court must read the complaint generously, accepting the truth of and drawing all reasonable inferences from well-pleaded factual allegations.  <u>See</u> <u>Erickson v. Pardus</u>, 127 S. Ct.

2197, 2200 (2007); <u>York v. Ass'n of Bar of City of New York</u>, 286 F.3d 122, 125 (2d Cir. 2002). However, the pleader may have to "amplify a claim with some factual allegations where such amplification is needed to render the claim plausible." <u>Iqbal v. Hasty</u>, 490 F.3d 143, 158 (2d Cir. 2007). Bald assertions and legal conclusions, or legal conclusions masquerading as facts need not be accepted as true by the Court. <u>See</u> <u>Twombly</u>, 127 S. Ct. at 1966.

### III. DISCUSSION

Defendant argues first that this is a breach of contract case not a tort case, and that Netratings is the proper defendant, not The Nielsen Company. Defendant also challenges the sufficiency of Plaintiffs' tort allegations themselves under Rule 12(b)(6). Additionally, Defendant argues that the statements at issue here are protected by the free speech provisions of the United States and New York State Constitutions because they are opinions. [3]

#### A. The Nature of Plaintiffs Claims

Plaintiffs assert three tort claims against Nielsen based on allegations that Nielsen published inaccurate estimates of the number of unique users to the elpais.com website. Am. Compl. ¶¶ 76-99. Defendant argues that a "Service Contract" dated July 26, 2005 between Prisacom and NetRatings (<u>see</u> Decl. of William J. Taylor, Jr. (April 17, 2008) Ex. D "Prisacom/Netratings Contract" (hereinafter the "Contract")) governs the matters in dispute here and that therefore Netratings, the Spanish corporation, is the proper defendant.[4]

A breach of contract claim cannot be considered a tort unless a legal duty independent of the contract itself has been violated. <u>Clark-Fitzpatrick v. Long Island Rail Road, Co.</u>, 516 N.E.2d 190,193 (N.Y. 1987); <u>TD Waterhouse Investor Services, Inc. v. Integrated Fund Services, Inc.</u>, 01cv8986 (HB), 2003 WL 42013, at *13-14 (S.D.N.Y. Jan. 6, 2003). The independent legal duty to support a tort claim must "spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." <u>Clark-Fitzpatrick</u>, 516 N.E.2d at 193.

Therefore, if the rights, obligations and duties that form the factual predicate for Plaintiffs' tort claims are wholly encompassed by the Contract, this suit must be dismissed. Conversely, if Plaintiffs' claims are based on legal duties that arise from circumstances

---

[3] Because there are sufficient grounds to grant Defendant's motion to dismiss, I need not address Defendant's alternative argument that the published audience estimates are opinion protected by the United States and New York Constitutions.
[4] Netratings is a wholly-owned subsidiary of Netratings Australia Pty Limited, which in turn is a distant subsidiary of Nielsen. (<u>See</u> Def.'s Mem. 3.)

extraneous to the Contract and Plaintiffs' claims are otherwise properly pled, Defendant's motion to dismiss should be denied. Accordingly, the Court must consider the contents of the Contract to determine its scope and whether the conduct alleged by Plaintiffs is encompassed thereby.

The Court may properly consider the contents of the Contract in ruling upon the instant motion to dismiss. Cortec Industries, Inc. v. Sum Holding, L.P., 949 F.2d 42, 48 (2d Cir.1991); Sel-Leb Marketing, Inc. v. Dial Corp., 2002 WL 1974056, 3 (S.D.N.Y. 2002) (noting the well settled rule that documents that are an integral part of the complaint and of which a plaintiff had knowledge my be considered on a motion to dismiss pursuant to Rule 12(b)(6)). "A plaintiff's careful avoidance of certain documents in its pleading does not make those documents any less integral to the complaint. Sel-Leb Marketing, 2002 WL 1974056, 3 (citing Yak v. Bank Brussells Lambert, BBL (USA), 252 F.3d 127, 131 (2d Cir.2001)). In the 12(b)(6) context, however, a document integral to the complaint may be properly considered "only to determine what the document[] state[s]," and "not to prove the truth of [its] contents." Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007) (quoting Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir.1991).

**1. Scope of the Contract.**

The Contract recites that Prisacom is interested in adopting one of Netratings "Solutions" for purposes of measuring its websites."[5] Contract ¶¶ 2, 3. Specifically, pursuant to the Contract, Prisacom retained one of Netratings "Solutions" known as "Netview" which is "based on the NETRATINGS RDD Panel, which shows information about the entire internet market for the contracted countries [i.e. Spain]." Id. at ¶¶ 2.2, 5.2. Netview is accessible via a password-protected website owned by Netratings (termed a "Netratings Portal"). Id. at ¶1.3.

The Contract grants Prisacom a non-exclusive license to use Netratings' proprietary intellectual property—i.e., Information made available through Netview—subject to certain terms and conditions of use. Namely, pursuant to Paragraph 6.2 of the Contract, Prisacom is authorized to, inter alia, (i) use the Information internally and (ii) disclose "in summarized form, limited excerpts of information to its advertising agencies and clients insofar as it may be necessary for the marketing of its own products and/or services."

---

[5] Under the Contract, the term "Solution" refers to "any system developed by Netratings composed of software, methodology, services and means of delivery of Information and Client Data." (Contract ¶ 1.5.) Under the Contract "Information" includes "demographic and any other information" provided by Netratings "pursuant to this Contract and through its various Solutions referring to the use and/or behavior of the Internet, computers, and advertising over the Internet." (Contract ¶1.2.)

The Contract also addresses the reliability or accuracy of the information provided via the Netview service. Pursuant to Paragraph 9.1, Netratings warrants "the proper functioning of the contracted services" and that the "the information compiled and delivered in the reports is generated in accordance with the methodologies used in each service, and that its reliability corresponds to the limitations of each of the sources."[6]

Finally, the Contract addresses the scope of Netratings' liability in connection with provision of the contracted-for services. Specifically, Paragraph 9.3 provides that Netratings is not liable for any form of damages "resulting from agreements between [Prisacom] and a third party, or for claims from a third party . . . engendered by the use of the Solutions and the information they generate." Under Paragraph 9.4, "the total maximum liability of Netratings, under any circumstance" is limited to the amount Prisacom has actually paid under the Contract during the preceding twelve months.

Reading the Contract, it is evident that the Contract encompasses (1) Prisacom's use of Netratings' internet audience estimates to promote its website as an advertising venue; (2) the limited scope of Netratings' warranties as to the accuracy of the information and reports delivered via the Netview service; and (3) the limitations on Netratings' liability in the event of a breach of such warranties or claims of lost profits based upon agreements between Prisacom and third parties.

### 2. Overlap Between the Contract and Plaintiffs' Tort Claims

Plaintiffs' claims are fundamentally premised on the alleged inaccuracy of internet audience ratings that both parties agree were produced and published by some part of the Nielsen corporate family. Am. Compl. ¶¶ 81, 91, 96; Def.'s Mem. 7. Plaintiffs contend, however, that their claims are not barred by the Contract because it governs the "provision of Nielsen data to Prisacom" and this action "concern's Nielsen's provision of Nielsen data to third parties." Pls.' Opp'n. Mem. 8. But Plaintiffs fail to acknowledge that not only is the allegedly libelous "Nielsen data" precisely the type of intellectual property covered by the Contract, but the Contract's <u>non-exclusive</u> license of that intellectual property inherently contemplates that the information will be shared with other third-party licensees. Moreover, it is clear from the letter

---

[6] Paragraph 9.2 makes clear that Netratings denies all other warranties, whether express or implicit. Thus, Netratings warrants that its reports will be generated in a manner consistent with its methodologies subject to the limitations of its sources, but disclaims any implied warranty that its estimates are an accurate statement of actual internet usage.

attached to Plaintiffs' Litwin Declaration that the information was published through the NetView service—the very Netratings "Solution" retained by Prisacom pursuant to the Contract. Claims that the information was generated in a manner inconsistent with the Netratings' own methodologies are covered by the limited warranty set forth in Paragraph 9.1 (and subject to the damage limitations of Paragraph 9.3 and 9.4). Claims that the internet audience estimates are an inaccurate reflection of actual usage are precluded by Paragraph 9.2 which denies all other warranties whether express or implicit.

It is thus clear that the Contract encompasses the fundamental subject matter of Plaintiffs' claims. Accordingly, the range of conduct alleged in the Amended Complaint that may possibly "spring from circumstances extraneous to" the Contract and give rise to an "independent legal duty" is exceedingly narrow. Clark-Fitzpatrick, 516 N.E.2d at 193.

**3. Defendant's Role**

In an attempt to tie in Nielsen, Plaintiffs' call Prisacom a "client" of Nielsen because it publishes audience estimates to Prisacom. Am. Compl. ¶ 28. But delivering such audience estimates is unequivocally provided for in the Contract. Plaintiffs fail to allege facts to support its conclusory assertion that Prisacom is a Nielsen "client" by virtue of anything other than the Contract.

Plaintiffs also attempt to blur the distinction between the corporate identities of Netratings and Defendant, but Plaintiffs have not pled allegations sufficient to "pierce the corporate veil."[7] In re Currency Conversion Fee Antitrust Litig., 265 F.Supp. 2d 385, 426-27 (S.D.N.Y. 2003) (noting that "purely conclusory allegations cannot suffice to state a claim based on veil-piercing or alter ego liability"). Plaintiffs request that this Court take judicial notice of a portion of the Netratings' website that references the Nielsen Company and labels products such as Nielsen/NetRatings "brands" or "services" as opposed to separate corporate subsidiaries or affiliates.[8] (Pls.' Opp'n. Mem. 4-5; Litwin Aff., Exs. B-D.) Not only are Plaintiffs barred from amending their complaint through their brief in opposition to the instant motion to dismiss, La Salle Bank Nat'l Ass'n v. Citicorp Real Estate Inc. 2003 WL 146148 at *4 (S.D.N.Y. 2003), but

---

[7] At oral argument, Plaintiffs disavowed any attempt to "pierce the corporate veil," arguing instead that The Neilsen Company was the "direct actor" and that the claims at issue are not covered by the Contract. (Hrg Tr. 14:23-25; 16: 1-4). However, because the bulk of the factual underpinnings of Plaintiffs' claims are encompassed by the Contract, Plaintiffs must pierce the veil for Defendant to be liable for such conduct.

[8] The exhibit provided by Plaintiffs is dated at the time of briefing for this motion to dismiss, not at the time that the acts underlying the Complaint are alleged to have occurred.

even if this Court were inclined to do as Plaintiffs request, the statements on Netratings' website are insufficient to overcome "the presumption of separateness afforded to related corporations." De Jesus v. Sears, Roebuck & Co., Inc., 87 F.3d 65, 70 (2nd Cir.1996) (internal quotation omitted); see Christensen v. SBM Industries, Inc., 9 Fed.Appx. 52, 53 (2nd Cir. 2001) (under New York law, "[a] party seeking to pierce the corporate veil bears a heavy burden of demonstrating complete domination by the parent and that such domination was the instrument of fraud or otherwise resulted in inequitable consequences." (internal quotation omitted)).[9]

When they filed their Complaint, Plaintiffs knew they had a contract with Netratings, not Defendant. If their true intent was to argue that Netratings was merely the alter ego of Defendant, Plaintiffs should have so-alleged in their Complaint. But to do so, Plaintiffs would have had to acknowledge the existence of the Contract and Plaintiffs, not surprisingly given their theory of the case, elected not to do so. Plaintiffs may not escape the plain terms of the Contract by recasting their claims as torts.

Finally, Plaintiffs attempt to reach Nielsen by their focus on the fact that after the "leaks" surfaced, a European Manager of Nielsen promised that Nielsen would review the new numbers jointly with Prisacom before releasing the August estimates. Am. Compl. ¶¶ 54-59. Further, Plaintiffs point to the letter from Mr. Jonathan Carson, the International President of Nielsen Online in New York, to Prisacom in which Mr. Carson acknowledged the August estimates may have been prematurely published but insisted that the corrected numbers were accurate. Am. Compl. ¶ 69. But such post hoc, corrective actions are not the allegedly tortious acts for which Plaintiffs seek relief. Plaintiffs' claims are based on allegations that inaccurate audience estimates were published, not that the estimates were prematurely published in breach of Defendant's oral assurances that Prisacom would be allowed to review them first.

Because Plaintiffs' claims are encompassed by the Contract and Plaintiffs have failed to allege either that Defendant has breached an independent legal duty extraneous to the Contract or that Netratings is merely the alter ego of Defendant, Plaintiffs have failed to state a claim for which relief may be granted under Rule 12(b)(6).

---

[9] Even though veil-piercing allegations benefit from the liberal pleading standards of Fed. R. Civ. Pro. 8(a), Textiles Network Ltd. v. DMC Enterprises, LLC, 2007 WL 2460767, 2 (S.D.N.Y., 2007), Plaintiffs' Amended Complaint does not set forth any veil-piercing allegations because Plaintiffs elected to proceed against The Nielsen Company as a "direct actor" premised on their incorrect conclusion that the claims at issue here were not encompassed by the Contract.

**B. Failure to State The Tort Claims**

Even if Plaintiffs' claims were not barred as encompassed by the Contract under the rule of <u>Clark-Fitzpatrick</u>, Plaintiffs' Amended Complaint fails to state a claim for which relief may be granted. Each of Plaintiffs' claims is addressed in turn.

**1. Trade Libel:**

There are four elements to a trade libel claim: (1) falsity of the alleged statements; (2) publication to a third person; (3) malice; and (4) special damages. <u>Computech Int'l, Inc. v. Compaq Computer Corp.</u>, 2002 WL 31398933, at *5 (S.D.N.Y. Oct. 24, 2002). Defendant argues that Plaintiffs failed to allege malice or meet the pleading requirements for special damages under FRCP 9(g). Def.'s Mem. 21.

The Plaintiffs fail to properly allege "actual malice," which is a required element when the party libeled is a public figure. <u>See</u> <u>New York Times v. Sullivan</u>, 376 U.S. 254, 280 (1964); <u>Celle v. Filipino Reporter Enterprises Inc</u>. 209 F.3d 163, 177 (2d Cir. 2000). As owners and operators of media outlets, Prisacom and El Pais qualify as "public figures" and consequently must allege that Nielsen, also a media company, acted with actual malice. <u>Celle</u>, 209 F.3d at 177. Actual malice requires proof that party making the statement had a subjective awareness of either the falsity or probable falsity of the defamatory statement, or acted with reckless disregard of its truth or falsity. <u>Id</u>. at 182-83. Actual malice must be pled with specificity. <u>Themed Restaurants, Inc. v. Zagat Survey, LLC</u>, 781 N.Y.S.2d 441, 449 (N.Y. 2004).

Plaintiffs' conclusory and unsupported assertions that the Defendant knew the revised audience estimates were inaccurate are insufficient to meet the pleading requirements for actual malice. Moreover, even Plaintiffs' own allegations show that Netratings and Nielsen took actions to ensure that the revised audience estimates (about which Plaintiffs complain) were accurately computed in accordance with Netratings' methodology. According to the Amended Complaint, on September 21, 2007, the day that Plaintiffs' competitors published news articles about the revised audience estimates, Defendant's local general manager told Prisacom that "the elpais.com data was being audited due to a high percentage of traffic that had been observed on elpais.com's RSS page." [10] Am. Compl. ¶ 54. The audit and Defendant's September 26, 2007 report belie a subjective belief that the resultant estimates (i.e. those published September 25,

---

[10] Plaintiffs do not complain about the initial March – June 2007 estimates which showed elpais.com ascending to the #1 spot, but which Netratings concluded improperly counted automatic calls to elpais.com's RSS page. (<u>See</u> Am. Compl. ¶ 76.)

2007 and thereafter) are accurate; such actions are clearly inconsistent with a "reckless disregard" for the truth.

From the face of the Amended Complaint, Defendant's actions demonstrate a concerted effort to ensure that the published estimates were accurately calculated in accordance with Netratings' methodology. Whether the revised estimates misstate the actual number of unique users to elpais.com as Plaintiffs suggest is merely a difference of opinion as to whose methodology provides a more reliable estimate of actual internet traffic. But contentions that a different methodology would have produced a more accurate result do not amount to allegations that Defendant acted with actual malice when it published estimates that it had confirmed were consistent with its own methodology. Plaintiffs fail to state a claim for trade libel because their Amended Complaint does not allege facts that render "plausible" the actual malice element of trade libel, Iqbal v. Hasty, 490 F.3d 143, 158 (2d Cir. 2007), let alone a set facts that satisfy the heightened pleading requirements for actual malice. Zagat Survey, 781 N.Y.S.2d at 449.

Therefore, Plaintiffs' claim for trade libel must be dismissed.

**2. Tortious Interference with Prospective Economic Advantage[11]**

Tortious interference claims have a limited scope and an extremely high pleading standard. Genal Strap v. Irit Dar, 2005 WL 525547, at *3 (E.D.N.Y. 2005). To render Plaintiffs' tortious interference claim "plausible," See Iqbal, 490 F.3d at 158 (2d Cir. 2007), Plaintiffs must provide some factual allegations that but-for Defendant's alleged acts, Plaintiffs would have entered into contracts with specific prospective advertisers or maintained consistent levels of advertising with their existing advertisers. See, School of Visual Arts v. Kuprewicz 771 N.Y.S.2d 804, 813 (N.Y.Sup. 2003) ("It is well-settled that an essential element of [the intentional interference with prospective economic advantage] tort is that the plaintiff would have consummated a contract with another person but for the interference of the defendant"). Moreover, Plaintiffs must also allege that Defendant intentionally interfered with Plaintiffs' existing business relationships and acted solely out of malice or used dishonest, unfair, or other improper means. Henneberry v. Sumitomo Corp. of America, 415 F.Supp.2d 423, 467 (S.D.N.Y.,2006) (citing Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003)).

---

[11] There is no claim for negligent interference with prospective economic advantage under New York law. Bishop v. Porter, 2003 WL 21032011, at *12 (S.D.N.Y. May 8, 2003).

Plaintiffs allege that Nielsen intentionally published inaccurate and unreliable estimates of elpais.com's online audience to companies and advertising firms with whom Plaintiffs have or could have done business, damaging Plaintiffs' existing and prospective business relationships. Am. Compl. ¶ 91. But Plaintiffs do not assert any factual allegations that, if true, would show that the inaccurate audience estimates were the "but-for" cause of damage to existing business relationships or loss of prospective ones.

Moreover, even if Plaintiffs have sufficiently alleged that Nielsen intended to publish inaccurate estimates (a contention clearly undermined by Plaintiffs' allegations about Defendant's audit and other efforts to ensure the accuracy of published estimates), Plaintiffs have not made allegations that suggest the estimates were published with an intent to interfere with Plaintiffs' business relationships. With respect to the "intent to interfere" or "improper means" element of the tort, Plaintiffs sole factual allegations relate to the timing of Defendant's release of its estimates—that Defendant's "leaked" the revised statistical estimates to Plaintiffs' competitors and then published them before Plaintiffs had an opportunity to comment. But Plaintiffs' tortious interference claim stems from the alleged inaccuracy of the estimates, not the timing of their release. Plaintiffs do not offer any allegation that, if true, would show Defendant deliberately or improperly produced inaccurate audience estimates to interfere with Plaintiffs' advertising business. Therefore, Plaintiffs' claim for tortious interference with prospective economic advantage must be dismissed.

### 3. Negligent Misrepresentation

Under New York law, a claim of negligent misrepresentation lies where (1) the defendant had a duty, as a result of a special relationship, to give correct information, (2) the defendant made a false representation that he or she should have known was incorrect, (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose, (4) the plaintiff intended to rely and act upon it, and (5) the plaintiff reasonably relied on it to his or her detriment. Henneberry, 532 F. Supp. 2d 523.

Allegations of negligent misrepresentation must comply with the particularity requirements of Fed. R. Civ. P. 9(b). Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 583 (2nd Cir. 2005); Phoenix Four, Inc. v. Strategic Res. Corp., 05 CV 4837 (HB) 2006 WL 399396, *10 (S.D.N.Y. Feb. 21, 2006). Rule 9(b) requires the specific pleading of "facts that 'give rise to a strong inference' that the defendants had an intent to defraud,

knowledge of the falsity or a reckless disregard for the truth." <u>Henneberry</u>, 532 F. Supp. 2d at 542. The inference may be established either (a) by alleging facts that show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. <u>Id</u>.

Plaintiffs fail to allege facts to support such an inference. First, Plaintiffs fail to make any allegations that Defendant had a motive to publish inaccurate audience estimates or to favor Plaintiffs' competitors. To the contrary, Defendant has a strong motivation to ensure the accuracy of the estimates that are its primary product and, in Plaintiffs' words, the "currency" of the internet advertising industry. Second, Plaintiffs allege no facts that are strong circumstantial evidence of conscious misbehavior or recklessness. From the face of Plaintiffs' Amended Complaint it is clear that Defendant and Netratings audited their data and analyzed it to ensure that the estimates were generated in accordance with their methodologies.

A claim of negligent misrepresentation also requires a special relationship of trust or confidence between the parties. <u>Henneberry</u>, 532 F. Supp. 2d at 538. Plaintiffs fail to sufficiently allege such a special relationship whether or not the Contract governs the business relationship between Prisacom and Nielsen; courts have routinely held that an arms-length commercial transaction, without more, does not give rise to a special duty to speak with care. <u>Id</u>. at 539 (citing <u>Kimmell v. Schaefer</u>, 652 N.Y.2d 715, 718 (1996)). Plaintiffs have not alleged that Defendant did anything other than what Netratings was obligated to do by the Contract: namely, provide internet usage data and estimates in accordance with Netratings' proprietary methodologies. And even if the Contract does not govern the relationship between Plaintiffs and Nielsen, Plaintiffs have not provided factual allegations that support an inference that the relationship was anything more than an arms-length. Moreover, Plaintiffs cannot claim that this is a case where a party "wholly without knowledge seek[s] assurances from one with exclusive knowledge" <u>Heard v. City of New York</u>, 82 N.Y.2d 66 (1993) because Plaintiffs' own internet audience estimates show that Defendant is not the exclusive holder of specialized knowledge about how to estimate internet traffic. Thus, the claim for negligent misrepresentation must be dismissed.

## IV. CONCLUSION

For the reasons stated above, the Defendant's motion to dismiss the complaint is granted.

The Clerk of the Court is instructed to close the case and any open motions and remove it from

my docket.

**SO ORDERED**
**New York, New York**
**November 6, 2008**

**U.S.D.J.**